# EXHIBIT D

STATE OF MINNESOTA                F I L E D              DISTRICT COURT

COUNTY OF HENNEPIN      03 MAR 14  F I 5: 15  FOURTH JUDICIAL DISTRICT

HENN CO DIST Y  DEPUTY
COURT ADMINISTRATOR

Daniel Gordon, Brandon Welter,
David Ellingson, Kari A. Wallace,
on behalf of themselves and
all others similarly situated,

            Plaintiffs,

                          **ORDER GRANTING CERTIFICATION OF**
                          **APPLICATIONS CLASS, CLARIFYING**
vs.                       **OPERATING SYSTEMS CLASS**
                          **DEFINITION, AND  DETERMINING**
                          **CLASS PERIOD**
                                Court File No.  MC 00-5994

Microsoft Corporation,

            Defendant.

---

      The above entitled matter came on for hearing before the Honorable Bruce A. Peterson on December 16, 2002.

      Richard M. Hagstrom, Esq. represented the Plaintiffs.   Charles B. Casper, Esq. and Robert L. DeMay, Esq. represented the Defendant.

      Based on the the arguments of counsel, and all the files, records, and proceedings, the court makes the following:

### ORDER

1.    Plaintiffs' Motion for Certification of an Application Systems Class is **granted.**   The class will consist of:

        All persons or entities who indirectly acquired or purchased in Minnesota for their own use, and not for further selling, leasing, or licensing, Microsoft Word, Microsoft Excel, or any other software product in which  Word or Excel has been incorporated in whole or in part ("Microsoft Applications Software") at any time during the class period.

2.   Plaintiffs' Motion for Amendment of the Operating Systems Class definition is **granted**. The class will consist of:

> All persons or entities who indirectly acquired or purchased in Minnesota for their own use, and not for further selling, leasing, or licensing, any version of the following Intel-compatible PC software: Microsoft MS-DOS, Microsoft Windows, or any other software product in which MS-DOS or Windows has been incorporated in whole or in part ("Microsoft Operating System Software") at any time during the class period.

3.   Excluded from each class definition are Microsoft and its alleged co-conspirators, their parents, subsidiaries, affiliates, officers and directors. Also excluded are any federal, state, or local governmental entity, and any judge or judicial officer presiding over this matter, their judicial staff, and members of their immediate families.

4.   The class period is from May 18, 1994, to December 15, 2001.

5.   The attached Memorandum is hereby incorporated into this Order.

Dated: March 14, 2003

Bruce A. Peterson
Judge of District Court

2

## MEMORANDUM

Plaintiffs have moved the court to amend the previously certified operating systems class to include purchasers of Microsoft Word, Microsoft Excel, and any product that incorporates Word or Excel. Although the methodology for determining classwide injury and damages proposed by Plaintiffs' expert witness, Professor Jeffery K. MacKie-Mason, differs somewhat from the methodology of Dr. Keith Leffler, which was the basis for the original class certification, it is adequate at this stage of the proceedings. Since applications software constitutes a different market from operating systems, the court grants certification of a second class of applications software purchasers. The court also amends the class definition, clarifying that all versions of MS-DOS and Windows are included. Because Defendant's compliance with the Revised Judgment on December 15, 2001, raises significant new questions about whether the anticompetitive conduct alleged previously by Plaintiffs continued and about how consumers were impacted thereby, Plaintiffs' motion to extend the class period past that date is denied.

### Facts and Procedural History

Microsoft Corporation is the largest manufacturer of computer software. Microsoft produces both Windows operating system software and various applications software, such as Excel, Word, and Office. The operating system ("OS") of a computer is a software program that controls the allocation and use of computer resources. Most of Microsoft's operating system software is distributed to PC manufacturers known as original equipment manufacturers ("OEMs"). OEMs preload the software onto PCs, which are then sold to the consumer. Microsoft refers to this as the OEM channel. In addition to purchasing the software pre-loaded on a new PC, consumers can also

3

purchase it in a shrink-wrap package. Microsoft refers to this as the finished goods channel.

Applications are software programs that perform specific user-oriented tasks. Applications programs are typically written to run on a particular operating system and cannot run on other operating systems unless the developer creates additional code to "port" the program to another operating system. Like the operating system software, Microsoft's applications software can be purchased through either the OEM channel or the finished goods channel. Plaintiffs contend that Microsoft currently controls over 85% of the market for word processing and spreadsheet software and that it obtained that monopoly control through anticompetitive conduct.

On March 30, 2001, this court certified a class of indirect purchasers of Microsoft operating system software. The class consisted of

> Persons or entities who acquired for their own use, and not for further selling, leasing or licensing, a license in Minnesota from Microsoft or an entity under Microsoft's control, for an Intel compatible PC version of MS-DOS, Windows 95, upgrades to higher MS-DOS versions, upgrades to or of Windows 95, Windows 98, upgrades to or of Windows 98, or other software products in which MS-DOS or Windows has been incorporated in full or in part at any time during the Class Period.

The court's Memorandum set forth the legal standards for certification of such a class, which continue to apply to this motion.

On October 25, 2002, Plaintiffs moved that the certification order be amended to (1) add indirect purchasers of Microsoft Word, Microsoft Excel, and any other software product that incorporates Word or Excel, such as Microsoft Office or Microsoft Works Suite, (2) clarify that all versions of MS-DOS and Microsoft Windows are included in the class definition, and (3) extend the class period to the date of trial. Plaintiffs contend that

the amended class definition is reasonable due to the similarity between the OS market and the applications software market and the "interrelation between Microsoft's anti-competitive conduct in the complementary applications and operating systems markets." (Pltf. Memo at 5)

Under Minn.R.Civ.P. 23.01 Plaintiffs must establish numerosity, commonality, typicality, and adequacy.   As in the prior motion, there are few disputes about these requirements as applied to applications class members.   Plaintiffs point out that the class is numerous since nearly all members of the operating systems class will also be purchasers of applications software.  The class includes thousands of geographically diverse members, making joinder impossible.   Common questions of law and fact include whether Microsoft is a monopolist in the markets for PC operating systems and applications software, whether Microsoft and its co-conspirators engaged in anticompetitive activity and unlawful restraint of trade, whether Microsoft violated the Minnesota Antitrust Law, and whether Microsoft's conduct has caused harm to each class member.

Plaintiffs claim that Microsoft principally damaged applications class members by causing the price of applications software to increase.  Although the amount of damage varies, the claims of the class representatives are typical.   Defendant argues that the requirements of typicality and adequacy will be destroyed by the addition to the class of applications purchasers because "class members who licensed operating systems would have no incentive to have their lawyers expend the time and resources necessary to prove that Microsoft unlawfully overcharged purchasers of application software." ( Def. Memo

5

at 28)  This, however, is not such a problem if indirect purchasers of applications software are certified as a separate class, as the court has done here.

Under Minn.R.Civ.P. 23.02(c) Plaintiffs must show that questions of law and fact pertaining to the class as a whole predominate over questions that pertain only to individual class members and that a class action is superior to other methods available for resolving the dispute.   Defendant makes its principal challenge to the superiority requirement, arguing the unmanageability of determining class-wide damages.

Analysis

I.      **The Application Software Class**

To maintain an antitrust suit as a class action, Plaintiffs must be able to establish a violation of antitrust law, the fact that injury occurred on a class-wide level as a result of the violation, and "some indication of the amount of damage." Keating v. Philip Morris, Inc., 417 N.W.2d 132, 137 (Minn.App.1987).   As in the original motion, in order to prove class-wide damages to applications consumers, Plaintiffs must first show an overcharge to direct purchasers.  Once an overcharge is established, Plaintiffs must then prove to what extent this overcharge was passed on through the distribution channels.

Plaintiffs contend that a damages analysis similar to the one used for the OS market can be applied to the application software market.  As with MS-DOS and Windows, applications software reaches end users through two principal channels.  In some instances consumers buy the product pre-installed on a new computer system.  In other cases consumers purchase a shrink-wrapped package containing the application.

In addition to the similarity between the distribution channels, Plaintiffs claim that Microsoft's conduct in the application market is interwoven with its conduct in the OS

6

market. Applications are written to run on only one operating system. This means that people who buy Microsoft Word need some form of Windows to run the application. Plaintiffs claim that this creates a "chicken-and-egg" problem. Consumers wish to buy an operating system that can run a large number of applications, and developers prefer to write for operating systems that have a large consumer base. This ensures that applications will continue to be written for the already dominant Windows, which in turn will ensure that consumers will continue to prefer it to other operating systems. This "applications barrier to entry" prevents upstart operating system developers from obtaining the applications that are needed for their platforms to become viable alternatives to Windows. According to Plaintiffs, Microsoft has further solidified its monopoly in the two markets by controlling crucial applications markets, such as word processing and spreadsheet applications. Microsoft has allegedly given its applications developers preferential access to Windows code and failed to "port" its applications software to other operating systems. Plaintiffs contend that in this way Microsoft's monopoly in the OS market reinforces its monopoly in the applications market and visa versa.

Plaintiffs point out that indirect purchaser classes for Microsoft's operating systems as well as applications software have been certified in California, Florida, and New Mexico, and that Microsoft has not claimed there that certification of a class of applications software purchasers presents inherent obstacles not encountered for a class of operating system purchasers.

7

A.   **Monopoly Overcharge to Direct Purchasers.**

The original class certification was based upon the expert opinion of Dr. Keith Leffler, who proposed using three "yardstick" methods to measure a monopoly overcharge to direct purchasers. The three yardsticks were a price comparison between Microsoft's market and markets unaffected by the alleged anticompetitive activity, a comparison between Microsoft's profit margins and the profit margins of other companies in the comparable markets, and a comparison of prices in the current market with prices in the same market before the alleged anticompetitive activity. The yardstick methodologies would be used to determine a "benchmark" price. Once the benchmark price had been determined, Leffler proposed to deduct the benchmark price from the actual price paid to determine the amount of overcharge.

The Plaintiffs now rely on the testimony of Professor Jeffery K. MacKie-Mason. To calculate the overcharge MacKie-Mason also uses three comparisons. Two of MacKie-Mason's comparables are similar to Leffler's—a comparison between Microsoft's profits and price premiums and the profits and price premiums of other companies in related markets. MacKie-Mason also compares Microsoft's rate of return with the rate of return of other companies in related markets. As with Leffler, MacKie-Mason determines a benchmark price which represents what Microsoft would have to charge to receive a similar profit, rate of return, and price premium as the other companies. MacKie-Mason has already employed this methodology for a similar class certification motion in California.

Although MacKie-Mason's methodology is not beyond question, it does present a workable method, one that has already been used to determine a monopoly overcharge to

8

direct purchasers. As noted in the original certification order, the strength and accuracy of the model cannot be determined here, but will be established upon application of the facts at trial. *See* <u>Zenith Radio Corp. v. Hazeltine Research Inc.</u>, 395 U.S. 100, 123-124 (1969).

**B.    Measuring Pass Through**

Once the overcharge is established, the pass through to consumers must be calculated. Plaintiffs have the burden not only of showing that pass through occurred, but of proposing a method that will determine individual damages for every indirect purchaser in the class.

Leffler proposed to look at cost changes at the top of a distribution channel and determine how they affect prices at the bottom of the channel. MacKie-Mason agrees with the methods proposed by Leffler. MacKie-Mason states that although all economists generally agree that some pass through occurs, the actual rate must be measured empirically. He uses a regression analysis to calculate what percentage of the overcharge is passed on to consumers.

MacKie-Mason proposes looking at how different preloaded software packages affect the overall price of the computer. (MacKie-Mason Aff. ¶ 46) For example, he observes how the price of a computer changes as the user chooses between Microsoft Office and Microsoft Office Pro. He then calculates the cost to the OEM of providing Office rather than Office Pro. Id. This provides a measurement of how much of the cost to the OEM is passed through to the consumer. For sales via the finished goods channel MacKie-Mason regresses price at the bottom of the channel to price at the top of the channel. (Id at ¶ 47)

9

Defendant claims that in California MacKie-Mason "delivered sweeping conclusions about market conditions in a few channels, based on a tiny sliver of data that is demonstrably unrepresentative of the many different intermediate companies and sales practices by which Microsoft software is distributed; and his 'multiple regression' analyses...are riddled with fundamental flaws." (Def. Memo at 8)  Defendant goes on to raise a series of specific objections to MacKie-Mason's California analyses: he lacked any empirical basis whatsoever for major distribution channels such as system builders, his data were simply insufficient for estimates in other major channels, (e.g., he studied too few OEMs for too narrow a period, his sample for finished goods sold by volume licensers is too small and unrepresentative, and his data for finished goods sold in retail stores were unreliable) and he had no basis to extrapolate his results to distribution channels and time periods for which he had little or no data.  Defendant also contends that MacKie-Mason's California studies are riddled with technical errors.

Defendant asserts: "The time has come for Plaintiffs to set forth their proofs." (Def. Memo at 8)  The court disagrees.  As the court attempted to articulate in the initial class certification order, the time for proof is at trial.  At the class certification stage Plaintiffs do not have to present a damage analysis, but merely show that it can be done. MacKie-Mason asserts: "There is little dispute that there are standard economic and statistical methods that can be applied to calculate pass-through." (MacKie-Mason Aff. ¶40)  The court does not read Defendant's materials to challenge the existence of such methods, only to contend that MacKie-Mason has not properly applied them.  Indeed, Microsoft's own expert, Professor Jerry Hausman, apparently concluded that a pass through analysis can be done. (Decl. of MacKie-Mason in support of Renewed Motion

10

for Class Certif. (Calif.) ¶29, citing Hausman Calif. Decl. ¶56,57)  To be sure, Hausman claims that the pass through rate is in fact much less than that set forth by MacKie-Mason and varies with particular demand conditions.  (Hausman Aff. at 50-53)  But whether pass through rates differ for different distribution chains, and what the rates are, are disputes to be resolved at trial.

Defendant's many complaints about the adequacy of MacKie-Mason's database and the technical quality of his regression analysis will be important matters for the jury to address at trial.   For now, the "Court's inquiry is limited to whether or not the proposed methods are so insubstantial as to amount to no method at all."  In Re Potash Antitrust Litigation, 159 F.R.D. 682, 697 (D.Minn. 1995).   Although the damage calculations for Minnesota have yet to be done, Plaintiffs' methods represent a viable means for proving the fact of injury to each member of an applications class, and such a class should be certified.

C.    **Number of Classes**

Defendant initially claimed MacKie-Mason's work is so deficient that not only should the class not be expanded, but it should be decertified.  Having seen in MacKie-Mason's Reply Affidavit and Plaintiff's Reply Memorandum that a separate analysis will be submitted for Minnesota, however, at the hearing defense counsel recognized that the question of decertification would have to await the submission of Plaintiff's expert report in Minnesota, presently due May 5, 2003.[1]

---

[1]    Following the submission of expert reports for both parties, the court asked defense counsel to submit a letter to the court setting forth their proposed procedure and legal standards for addressing decertification.  Upon receipt a conference call will be conducted with court and counsel to establish appropriate procedures and standards.

At the hearing neither party could identify any compelling practical distinction between one class that would include both operating systems and applications, which could then be divided into subclasses, and separate classes for operating systems and applications. Plaintiffs prefer one class to avoid duplicative notices to class members and resulting confusion, but defense counsel represented at the hearing that Defendant was interested in the most convenient and clear method of notification.

Operating systems and applications clearly are in different markets. While there may be overlapping proof, the questions of Microsoft's conduct and damages will have to be proved separately for operating systems and applications. Accordingly, this court will certify two separate classes with the understanding that one notification will be made to class members who are in both classes. This is apparently the approach taken by the other courts which have addressed this question. Different applications such as Word and Excel also occupy separate markets, and subclasses may need to be identified for trial.

## II.    Extending the Class Period

The court's prior class certification order established the class period as "May 18, 1994 to the present" (i.e., March 30, 2001). Plaintiffs initially moved the court to extend the class period to the date of trial. Recognizing the inherent problems in notification of class members prior to trial, Plaintiffs have revised this request to an extension of the class period up to 120 or 90 days prior to trial, currently scheduled for February 2, 2004. Defendant objects to this extension, based upon a settlement agreement it reached with the Department of Justice and nine state Attorneys General and with which it began

complying on December 15, 2001. ("Revised Judgment")  Defendant's Memorandum

sets forth some of the major actions Defendant took as a result of this agreement:

- After the agreement, Microsoft stopped negotiating prices individually with OEMs and started using a published pricing schedule.

- Microsoft issued its first major update to Windows 2000 Professional on August 1, 2002, and its first major update to Windows XP on September 9, 2002.  Pursuant to its agreements with the government, with these updates it is possible for OEMs and hardware vendors using Windows to offer programs from Microsoft's competitors on their PCs instead of Microsoft's integrated programs, including key programs such as Microsoft's Internet Explorer.   This eliminates an important restriction on competition that was central to the Plaintiffs' Complaint.

- On August 6, 2002, Microsoft disclosed application program interfaces which will enable software developers to write programs that run on Windows.   Subsequently Microsoft disclosed additional application program interfaces to enable competitors to create software that operates on Windows.

Defendant contends that this agreement and Microsoft's resulting changes in conduct

fundamentally changed the competitive structure of the software industry.   Defendant

points out that the California court, when presented with a similar request, limited the

extension to a period ending December 15, 2001.

These changes in Microsoft's competitive conduct address some of the central

allegations made by Plaintiffs in their Complaint.   As a result, it appears that to establish

antitrust violations in the period following December 15, 2001, Plaintiffs would have to

introduce substantial additional expert and factual evidence, which Defendant indicates it

would vigorously contest.   This sounds almost like a separate trial on liability after

December 15, 2001, will be necessary and raises the question as to whether, under Rule

23.01, the question of Microsoft's liability is common to the entire extended class.

Plaintiffs raise several objections to Microsoft's argument.  Plaintiffs rely on MacKie-Mason's declaration in support of the Plaintiffs' motion in California to extend the class period through December 31, 2002.  In that declaration MacKie-Mason makes conclusory statements that Microsoft's market share for operating systems and applications remains very high and that "the impacts of the conduct from 1988 through 2001 are ongoing." (¶¶9, 13)  He asserts that the impacts flow from the same market-wide conduct Microsoft engaged in previously.

MacKie-Mason may be correct, and it could well be that at a trial Plaintiffs could establish continuing antitrust violations by Microsoft through the extended class period.  Nonetheless, Plaintiffs would have to prove the ineffectiveness of the series of measures Microsoft took pursuant to the Revised Judgment.  Given the complexity already inherent in this case, which is now expanded to two classes and several applications subclasses, it appears advisable to limit Plaintiffs' proof in this trial to the conduct of Microsoft before it began complying with specific restrictions negotiated with the government.  A trial of the effectiveness of those restrictions is better left for another day.

The series of specific objections made by Plaintiffs to Microsoft's argument do not seriously undermine this logic.  First, Plaintiffs logically point out that the Revised Judgment may have changed Microsoft's conduct, but it did not immediately end damages to class members from alleged anticompetitive conduct prior to December 15, 2001.  Even if Microsoft began perfect compliance with the antitrust laws on December 15, 2001, it would take some time for the effects of its new behavior to work its way through the distribution chain.  The problem with this argument is that the court has

14

no idea what the lag time would be and has no way to establish a later class termination date before which all class members would still be experiencing the effects of Microsoft's conduct prior to December 15, 2001. If, for the reasons described above, the court restricts Plaintiffs from presenting additional evidence on post-Revised Judgment conduct, and the time lag is not known, the only logical termination date available to the court is December 15, 2001.

Second, Plaintiffs state that compliance with the terms of a consent decree is an entirely separate issue from compliance with the antitrust laws. This is obviously correct, and the court has acknowledged that Plaintiffs might be able to establish that Microsoft is in violation of the antitrust laws even if it is in compliance with the Revised Judgment. Nonetheless, establishing such violations would require different and additional proof not common to that applicable to earlier purchasers in the class.

Third, Plaintiffs argue that Microsoft should not be absolved from lingering consequences of its anticompetitive conduct. Most courts would agree that lawbreakers should not be absolved of misconduct. Perhaps a separate class action should be initiated regarding Microsoft's conduct after December 15, 2001. Such a follow on case, of course, would not address the question of compensation for consumers who purchased Microsoft products after December 15, 2001, but who paid prices dictated by Microsoft's conduct before December 15, 2001. If Plaintiffs had submitted persuasive evidence about how long it would take for the effect of changes in Microsoft's conduct in December 2001 to work its way through the distribution system, the court could have some rational basis for extending the class period for that amount of time. This is a

15

complicated question, however, Plaintiffs have not attempted it, and the court is unwilling to speculate.

Fourth, Plaintiffs contend that by arguing for a December 15, 2001, cutoff, "Microsoft by implication admits that its liability in the government case is co-extensive with its liability in this case." (Pltf. Reply Memo at 20)   Plaintiffs then call for the application of offensive collateral estoppel on the issue of liability.  This argument is not well developed, there have been extensive proceedings in other courts regarding Microsoft, and the court will be pleased to entertain any motions by Plaintiffs, or Defendants for that matter, regarding collateral estoppel.

Fifth, Plaintiffs point out that many of the actions cited by Microsoft took place months after December 2001.  The court recognizes, of course, that Microsoft would be unwise to contend that the entire market changed suddenly on December 15, 2001.  But some date must be chosen, and at this point December 15, 2001, appears to be the start of a series of actions by Microsoft that would require different proof from Plaintiffs.  Accordingly, it is a logical date to terminate the class.

Sixth, Plaintiffs point out that Microsoft's own evidence confirms that Microsoft has not suffered from changing its agreements with OEMs, which did occur on December 16, 2001.  The complexities of proof remain the same, however.   If Microsoft eliminated anticompetitive contract arrangements and was still able to maintain its profits, that may call into question the illegal nature of its prior arrangements.  Addressing this question interjects another issue into this case and requires non-common proof in an already complicated litigation.

Finally, Plaintiffs contend that the settlement addressed Microsoft operating systems only and has no effect on applications. This is Plaintiffs' most telling argument. Certainly the focus of the Department of Justice litigation was operating systems, and the focus of the Revised Judgment is enhancing competition in operating systems. The effect of the Revised Judgment is not completely limited to operating systems, however. As the court understands it, disclosing application program interfaces so that other software developers can write applications to run on Windows, eliminates one of the controls on the applications market of which Plaintiffs complain. (*See* Second Amended Complaint at ¶¶ 132, 140-141.) It is also apparent that Microsoft's conduct in the operating systems market and in the applications market is interwoven and that it would be difficult to assess Microsoft's conduct after December 15, 2001, in the applications market without taking into consideration the evidence of what happened in the operating systems market as a result of the Revised Judgment. Thus, on balance it appears advisable to keep both class periods the same.

Whether to extend this class period is a question about which reasonable minds can readily differ. It would make little sense to create needless follow-on litigation by carving up a class along arbitrary lines that have little meaning in the real world. However, a settlement agreement with the United States and nine states designed to address the very conduct at issue in this case would appear to be an event significant enough to bear out Defendant's claim that it changed Microsoft's competitive position. The government lawyers who negotiated the deal undoubtedly thought that it would. The Defendant has persuaded the court that enough additional evidence would be required to address the significance of the Revised Judgment that the question of Microsoft's

liability throughout a lengthened class period is not common, and Plaintiff's motion should be denied.

### III.    Product Definition.

The class previously certified consisted of consumers who had purchased MS-DOS and Windows.   Microsoft has apparently taken the position that, apart from certain versions of MS-DOS, only Windows 2.x, Windows 3.x and Windows 95/98 are included in the existing class.  Plaintiffs have moved the court to clarify that this class includes the latest models of Windows, including Windows XP, which went on the market in 2001.[2] Defendant contends that Plaintiffs have to establish at least a prima facie case that Microsoft has engaged in illegal conduct with respect to these later models.

The court is not convinced.  Plaintiffs allege that Microsoft has monopolized the market for operating systems.  If Plaintiffs establish that Microsoft engaged in illegal conduct to obtain and maintain that monopoly and that the effect of this conduct was damage to class members, they should prevail in this lawsuit.  Plaintiffs do not have to establish illegal conduct with respect to every model sold by Microsoft to perform the function of an operating system.   The question is Microsoft's monopoly power in the operating system market, and any operating systems offered by Microsoft that are reasonable substitutes for each other and therefore in this same market should be included in this same class definition.  As a practical matter, of course, Plaintiffs at trial will have to establish that all class members were damaged, so proof of a monopolistic overcharge and a pass through to consumers for every operating system will have to be forthcoming.

---

[2]       At the hearing, Defendant indicated that including Windows XP in the class would have little significance if, as the court decided in the Order, the class period is restricted to December 15, 2001, which is only shortly after the XP system was released.

## Conclusion

Plaintiffs have met their burden of showing a workable methodology for calculating damages for indirect purchasers of applications software. A second class should be certified. Plaintiffs have also shown that a clarification of the class definition to include all versions of MS-DOS and MS Windows is appropriate. Defendant has established that different proof would be required regarding Microsoft's conduct after December 15, 2001, and the class should not be extended after that date.

19



# Hennepin County

# DISTRICT COURT

### 12-C, Government Center
### 300 South Sixth Street
### Minneapolis, MN 55487

# Facsimile Cover Sheet

FAX    Tel

**To:** Robert L. DeMay, ESQ.          335-1657   150
Richard M. Hagstrom, ESQ      336-9100   914

**Company:** _____

**Phone:** _____

**Fax:** _____

**From:** Frank Dikker

**Company:** Judge Peterson

**Phone:** 612-596-2128

**Fax:** 612-596-9143

**Date:** 3/14/03

**Pages including this cover page:** 20

**Comments:** Pls call if questions or problems   FD

NOTICE:

This message is intended only for the use of the individual or entity to whom it is addressed. This message may contain information that is privileged, confidential, and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to the above address via U.S. Postal Service. Thank you.