IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICROSOFT CORPORATION,

Defendant.

Civil Action No. 98-1232 (CKK)

Next Court Deadline: March 6, 2002
Tunney Act Hearing

## MEMORANDUM OF THE UNITED STATES IN SUPPORT OF ENTRY OF THE PROPOSED FINAL JUDGMENT

CHARLES A. JAMES
  *Assistant Attorney General*
DEBORAH P. MAJORAS
  *Deputy Assistant Attorney General*
PHILLIP R. MALONE
RENATA B. HESSE
DAVID BLAKE-THOMAS
PAULA L. BLIZZARD
KENNETH W. GAUL
ADAM D. HIRSH
JACQUELINE S. KELLEY
STEVEN J. MINTZ
BARBARA NELSON
DAVID SEIDMAN
DAVID P. WALES
  *Attorneys*

U.S. Department of Justice
Antitrust Division
601 D Street N.W., Suite 1200
Washington, D.C. 20530
(202) 514-8276

PHILIP S. BECK
  *Special Trial Counsel*

February 27, 2002

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

I.    THE TUNNEY ACT GOVERNS THE COURT'S DISPOSITION OF THE REVISED
      PROPOSED FINAL JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

II.   THE UNITED STATES HAS COMPLIED WITH ALL TUNNEY ACT PROCEDURAL
      PREREQUISITES TO THE COURT'S PUBLIC INTEREST DETERMINATION . . . . . 17

      A.    Summary Of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      B.    The United States Fully Complied With All Tunney Act Requirements
            Regarding The CIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

            1.    "The Nature And Purpose Of The Proceeding" . . . . . . . . . . . . . . . . . . . . 22

            2.    "A Description Of The Practices Or Events Giving Rise To The Alleged
                  Violation Of The Antitrust Laws" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

            3.    "An Explanation Of The Proposal For A Consent Judgment, Including An
                  Explanation Of Any Unusual Circumstances Giving Rise To Such Proposal Or
                  Any Provision Contained Therein, Relief To Be Obtained Thereby, And The
                  Anticipated Effects On Competition Of Such Relief" . . . . . . . . . . . . . . . . . . 23

            4.    "The Remedies Available To Potential Private Plaintiffs Damaged By The
                  Alleged Violation In The Event That Such Proposal For The Consent Judgment
                  Is Entered In Such Proceeding" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

            5.    "A Description Of The Procedures Available For Modification Of Such
                  Proposal" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

            6.    "A Description And Evaluation Of Alternatives To Such Proposal Actually
                  Considered By The United States" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

            7.    Including Information Not Required By The Tunney Act Cannot Result In A
                  Noncompliant CIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

      C.    The United States Fully Complied With All Tunney Act Requirements Regarding
            Determinative Documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

D.  The United States Fully Complied With All Tunney Act Requirements Regarding Publication of Summaries In Newspapers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

E.  The United States Has Fully Complied With The Tunney Act Requirement That It Respond To Public Comments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

F.  The United States Will Fully Comply With the Tunney Act Requirement That It Publish the Comments and Response . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

G.  The Second Revised Proposed Final Judgment Needs No Separate Round Of Public Comment And Response . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

III.  THE COURT MUST ENTER THE PROPOSED DECREE IF IT IS WITHIN THE REACHES OF THE PUBLIC INTEREST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

A.  Whether The Proposed Decree Is Within The Reaches Of The Public Interest Is Determined By The Test Of *Microsoft I* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

B.  The Court's Task In Entering A Consent Decree Differs From Adjudicating A Remedy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

IV.  ENTRY OF THE REVISED PROPOSED FINAL JUDGMENT IS IN THE PUBLIC INTEREST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

A.  The Revised Proposed Final Judgment Satisfies The Goals Of An Antitrust Remedy And Properly Addresses All Bases Of Liability Affirmed By The Court Of Appeals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

a.  Stops The Unlawful Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

b.  Prevents Recurrence Of Unlawful Conduct . . . . . . . . . . . . . . . . . . . . . . 56

c.  Restores Competitive Conditions To The Market . . . . . . . . . . . . . . . . . . 57

B.  The Revised Proposed Final Judgment Compares Favorably To The Initial Final Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

1.  The Revised Proposed Final Judgment Relies On Conduct Restrictions, Rather Than Structural Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

2.  Remedying Tying Is No Longer An Objective . . . . . . . . . . . . . . . . . . . . . . . . . 65

3.  The New Conduct Restrictions Compare Favorably To Those In The Initial Final Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

    a.  Substantive Provisions Included In Both The Initial Final Judgment And The Revised Proposed Final Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

    b.  The RPFJ Contains Provisions Not Included In The Initial Final Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

C.  The Revised Proposed Final Judgment Creates Competitive Conditions . . . . . . . . 70

V.  THE COURT SHOULD MAKE ITS PUBLIC INTEREST DETERMINATION AND ENTER THE DECREE AS EXPEDITIOUSLY AS POSSIBLE . . . . . . . . . . . . . . . . . . . . 70

A.  The Court Should Not Hold An Evidentiary Hearing . . . . . . . . . . . . . . . . . . . . . . . . 71

B.  The Court Should Not Delay Entry Of The Decree Pending The Remedies Hearing In *New York v. Microsoft* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

1.  Linking This Case To The Remedies Hearing In *New York* Would Be Bad Law And Bad Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

2.  The Claimed Benefits Of Linkage Are Illusory . . . . . . . . . . . . . . . . . . . . . . . . 77

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

APPENDIX A: COMPARISON OF COURT OF APPEALS' FINDINGS ON LIABILITY TO PROVISIONS OF THE REVISED PROPOSED FINAL JUDGMENT

APPENDIX B: UNITED STATES v. MICROSOFT CORP. — NEWSPAPER NOTICE

APPENDIX C: DECLARATION OF DAVID S. SIBLEY

# TABLE OF AUTHORITIES

## Prior Decisions in This Case

*Microsoft Corp. v. United States*, 122 S. Ct. 350 (2001) (Denying Certiorari) . . . . . . . . . . . . . . 8

*Microsoft Corp. v. United States*, 530 U.S. 1301 (2000) (Declining to Accept Appeal) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc) (per curiam) (Appellate Decision) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Microsoft Corp.*, 2001 WL 931170 (D.C. Cir. Aug. 17, 2001) (en banc) (per curiam) (Denying Stay of Mandate) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Microsoft Corp.*, 97 F. Supp. 2d 59 (D.D.C. 2000) (Initial Final Judgment) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 27, 51, 63
65, 66, 67, 68

*United States v. Microsoft Corp.*, 87 F. Supp. 2d 30 (D.D.C. 2000) (Conclusions of Law) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 8, 16, 23, 40

*United States v. Microsoft Corp.*, 84 F. Supp. 2d 9 (D.D.C. 1999) (Findings of Fact) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 8, 16, 23
40, 64, 70

## Cases

*Adams v. Bell*, 711 F.2d 161 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*American Can Co. v. Mansukhani*, 814 F.2d 421 (7th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . 72

*American Water Works Ass'n v. EPA*, 40 F.3d 1266, 1274 (D.C. Cir. 1974) . . . . . . . . . . . . . . 34

*Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799 (D.C. Cir. 2001), *petition for certiorari filed*, 70 U.S.L.W. 3465 (Jan. 11, 2002), (No. 01-1050) . . . . . . . . . . . . . . 49

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) . . . . . . . . . . . . . . . . . . . . 49

*Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*, 386 U.S. 129 (1967) . . . . . . . 16, 43, 75

*Commissioner v. Lundy*, 516 U.S. 235 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Fifth & Walnut, Inc. v. Loew's Inc.*, 176 F.2d 587 (2d Cir. 1949) . . . . . . . . . . . . . . . . . . . . 15, 43

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL
JUDGMENT - PAGE iv

*Ford Motor Co, v. United States*, 405 U.S. 562 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 41

*Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Hartford-Empire Co. v. United States*, 323 U.S. 386 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Hyperlaw, Inc. v. United States*, 1998 WL 388807, 159 F.3d 636 (D.C. Cir. 1998)
(unpublished table decision) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*In re IBM Corp.*, 687 F.2d 591 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*International Salt Co. v. United States*, 332 U.S. 392 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Janus Films, Inc. v. Miller*, 801 F.2d 578 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . 43, 44

*Local No. 93, International Association of Firefighters v. City of Cleveland*, 478
U.S. 501 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Maryland v. United States*, 460 U.S. 1001 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*Massachusetts School of Law at Andover, Inc. v. United States*, 118 F.3d 776
(D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31, 35, 36, 37, 49

*Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206 (1998) . . . . . . . . . . . . . . . 12

*Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Sorenson v. Secretary of Treasury*, 475 U.S. 851, 860 (1986) . . . . . . . . . . . . . . . . . . . . . . . . 15

*South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Sullivan v. Stroop*, 496 U.S. 478 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. AT&T*, 552 F. Supp. 131 (D.D.C. 1982), *aff'd mem. sub. nom.*
*Maryland v. United States*, 460 U.S. 1001 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Alex. Brown & Sons*, 963 F. Supp. 235 (S.D.N.Y. 1997), *aff'd sub*
*nom. United States v. Bleznak*, 153 F.3d 16 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . 75

*United States v. Alex. Brown & Sons*, 169 F.R.D. 532 (S.D.N.Y. 1996), *aff'd sub*
*nom. United States v. Bleznak*, 153 F.3d 16 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . 31

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL
JUDGMENT - PAGE v

*United States v. Armour & Co.*, 402 U.S. 673 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Automatic Data Processing, Inc.*, 1996-1 Trade Cas. (CCH) ¶ 71,361 (D.D.C. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Bechtel Corp.*, 648 F.2d 660 (9th Cir. 1981) . . . . . . . . . . . . . . . . . 17, 32, 41, 45

*United States v. Blackstone Capital Partners II Merchant Banking Fund*, 1999-1 Trade Cas. (CCH) ¶ 72,484 (D.D.C. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Borden Corp.*, 347 U.S. 514 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Central Contracting Co.*, 537 F. Supp. 571 (E.D. Va. 1982) . . . . . . . . . . . . . 31

*United States v. City of Miami*, 614 F.2d 1322 (5th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316 (1961) . . . . . . . . . . . . 38, 41, 50

*United States v. Enova Corp.*, 107 F. Supp. 2d 10 (D.D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . 71

*United States v. Figgie International Inc.*, 1997-1 Trade Cas. (CCH) ¶ 71,766 (D.D.C. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Foodmaker, Inc.*, 1996-2 Trade Cas. (CCH) ¶ 71,555 (D.D.C. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) . . . . . . . . . . . . . . . . . . . 45

*United States v. Grinnell Corp.*, 384 U.S. 563 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Input/Output, Inc.*, 1999-1 Trade Cas. (CCH) ¶ 72,528 (D.D.C. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Mahle GmbH*, 1997-2 Trade Cas. (CCH) ¶ 71,868 (D.D.C.1997) . . . . . . . . . 13

*United States v. Microsoft Corp.*, 56 F.3d 1448 (D.C. Cir. 1995) . . . . . . . . . . . 36, 37, 38, 39, 41
42, 45, 49, 73, 74

*United States v. National Lead Co.*, 332 U.S. 319 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Oregon State Medical Society*, 343 U.S. 326 (1952) . . . . . . . . . . . . . . . . . . . . 38

*United States v. Paramount Pictures, Inc.*, 334 U.S. 131 (1948) . . . . . . . . . . . . . . . 15, 16, 41, 43

*United States v. RCA*, 46 F. Supp. 654 (D. Del. 1942), *appeal dismissed*, 318 U.S. 796 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Swift & Co.*, 286 U.S. 106 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 45

*United States v. Loewen Group Inc.*, 1998-1 Trade Cas. (CCH) ¶ 72,151 (D.D.C. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Titan Wheel International, Inc.*, 1996-1 Trade Cas. (CCH) ¶ 71,406 (D.D.C. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Trump*, 1988-1 Trade Cas. (CCH) ¶ 67,968 (D.D.C. 1988) . . . . . . . . . . . . . . 14

*United States v. United Artists Theatre Circuit, Inc.*, 1971 Trade Cas. (CCH) ¶ 73,751 (E.D.N.Y. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. United Shoe Machinery Corp.*, 391 U.S. 244 . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Western Elec. Co.*, 900 F.2d 283 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . 45

*United States v. Western Elec. Co.*, 993 F.2d 1572 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . 42

*Utah Public Service Commission v. El Paso Natural Gas Co.*, 395 U.S. 464 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## Statutes and Rules

Sherman  Act, 15 U.S.C. § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Sherman  Act, 15 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Clayton Act, § 5(a), 15 U.S.C. § 16(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 25

Clayton Act, ch. 323, § 5, 38 Stat. 730, 731 (1914) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Tunney Act (Antitrust Procedures and Penalties Act, § 2), 15 U.S.C. § 16(b)-(h) . . . . . . . *passim*

      15 U.S.C. § 16(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 17, 18, 20
                                            22, 28, 30, 31, 71
      15 U.S.C. § 16(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 30, 31, 32
      15 U.S.C. § 16(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 32
      15 U.S.C. § 16(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 13, 35, 36
                                            37
      15 U.S.C. § 16(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 78

15 U.S.C. § 12(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

15 U.S.C. § 18a(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

15 U.S.C. § 21(*l*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Expediting Act, 15 U.S.C. § 29(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C.§ 455(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Fed. R. Civ. P. 41(a)(1)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

**Legislative Materials**

119 Cong. Rec. 3452 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 24, 27

119 Cong. Rec. 24,600 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

119 Cong. Rec. 24,604 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

The Antitrust Procedures & Penalties Act: Hearings on S. 782 & S. 1088 Before
        the Subcomm. on Antitrust & Monopoly of the Senate Committee on the
        Judiciary, 93d Cong. (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 21, 27, 28, 71

Consent Decree Bills: Hearings on H.R. 9203, H.R. 9947, and S. 782 Before the
        Subcomm. on Monopolies & Commercial Law of the House Comm. on
        the Judiciary, 93rd Cong. (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 21

H.R. Rep. No. 93-1463 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6535 . . . . . . . 20, 35, 36, 39, 75

S. Rep. No. 93-298 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 28, 32, 36, 45
                                                                                                                          71

**Miscellaneous**

47 Fed. Reg. 21,214 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

59 Fed. Reg. 59,426 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

66 Fed. Reg. 59,452 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 17, 19

3 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (rev. ed. 1996) . . . . . . . . . . . . . . 7, 64

Maimon Schwarzschild, *Public Law by Private Bargain: Title VII Consent Decrees and the Fairness of Negotiated Institutional Reform*, 1984 Duke L.J. 887, 903 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Note, *The Scope of Judicial Review of Consent Decrees under the Antitrust Procedures and Penalties Act of 1974*, 82 Mich. L. Rev. 153 (1974) . . . . . . . . . . . 40, 43

*Webster's Third International Dictionary* (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICROSOFT CORPORATION,

Defendant.

Civil Action No. 98-1232 (CKK)

Next Court Deadline: March 6, 2002
Tunney Act Hearing

## MEMORANDUM OF THE UNITED STATES IN SUPPORT OF
## ENTRY OF THE PROPOSED FINAL JUDGMENT

The proposed final judgment, as revised and modified, represents the culmination of six years of investigation, litigation, appeals, and negotiation. It is a comprehensive remedy that puts into place meaningful, effective, and enforceable restrictions on Microsoft and, critically, comports with both the legal standards for relief in an antitrust case and the decision by the Court of Appeals in this case. Just as important, it provides relief effective *now*. Failure to enter the proposed final judgment would mean that Microsoft's anticompetitive practices likely would continue unabated for several more years, an eternity in this ever-changing market. Accordingly, in the United States' best judgment, entry of the proposed final judgment is in the public interest.

## BACKGROUND

1. On May 18, 1998, the United States filed a civil complaint alleging that Microsoft had engaged in anticompetitive conduct in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. At Microsoft's request, the case was consolidated with a similar action brought

by twenty[1] states and the District of Columbia.[2]  The United States and the States jointly

presented the case in a 78-day bench trial that began on October 19, 1998, and ended on June 24,

1999.  The court heard testimony from 26 witnesses and admitted depositions of 79 other

witnesses and 2733 exhibits.  On November 5, 1999, the court entered 412 findings of fact.

*United States v. Microsoft Corp.*, 84 F. Supp. 2d 9 (D.D.C. 1999) ("*Findings of Fact*").  On

April 3, 2000, after the parties attempted unsuccessfully to settle the suit through months-long

mediation before Judge Richard Posner,[3] the district court entered its conclusions of law.  87 F.

Supp. 2d 30 (D.D.C. 2000) ("*Conclusions of Law*").  On June 7, 2000, after further proceedings

on remedy, the district court entered its final judgment.  97 F. Supp. 2d 59 (D.D.C. 2000)

("Initial Final Judgment" (IFJ)).

Plaintiffs never contended that Microsoft unlawfully *obtained* its monopoly in Intel-

compatible personal computer (PC) operating systems.  Plaintiffs alleged, and the district court

ruled, that Microsoft successfully had engaged in anticompetitive acts to *protect* and *maintain*

that monopoly, in violation of Section 2 of the Sherman Act.  *Conclusions of Law* at 37-44.  The

district court also ruled that Microsoft had attempted to monopolize the Internet Web browser

market, in violation of Section 2, and had tied its Web browser, Internet Explorer (IE), to its

Windows operating system, in violation of Section 1.  *Id.* at 45-51.  The district court rejected

plaintiffs' claim that Microsoft's exclusive dealing contracts violated Section 1 of the Sherman

---

[1]One State later withdrew, and another settled in July 2001.

[2]On February 1, 2002, this Court de-consolidated the cases.  Order at 3 (Feb. 1, 2002).

[3]At the time, Judge Posner was Chief Judge of the United States Court of Appeals for the Seventh Circuit.

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 2

Act. *Id.* at 51-54. To remedy the violations, the court ordered Microsoft to break up into separate operating system and applications businesses. Initial Final Judgment, 97 F. Supp. 2d at 64-65. The Initial Final Judgment also ordered transitional conduct restrictions until the structural relief became effective. *Id.* at 66-69.

Microsoft filed notices of appeal,[4] and the Court of Appeals, sua sponte, ordered that any proceedings before it be heard en banc. Order, No. 00-5212 (D.C. Cir., June 13, 2000). The district court certified the case for direct appeal to the Supreme Court pursuant to the Expediting Act of 1903, as amended, 15 U.S.C. § 29(b), and stayed its judgment pending completion of the appellate process. Order (June 20, 2000). The Supreme Court declined to accept the appeal and remanded the case to the Court of Appeals. *Microsoft Corp. v. United States*, 530 U.S. 1301 (2000).

2. After extensive briefing and two days of oral argument, the en banc Court of Appeals issued a unanimous and comprehensive decision affirming in part, reversing in part, and remanding in part for proceedings before a different district judge. *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc) (per curiam) ("*Microsoft*").

a. The Court of Appeals affirmed the district court's ruling that Microsoft maintained its operating system monopoly, in violation of Section 2 of the Sherman Act, by engaging in specific acts that impeded the emergence of two nascent "middleware" threats to that monopoly. *Id.* at 50-80.[5] "Middleware" is platform software that runs on top of an operating system but

---

[4]Plaintiffs did not cross-appeal the dismissal of their Section 1 claim alleging exclusive dealing.

[5]The Court of Appeals also rejected Microsoft's procedural challenges to the trial court proceedings, finding the district court's actions "comfortably within the bounds of its broad

simultaneously exposes its own application programming interfaces (APIs) so that applications can run on the middleware itself. *Id.* at 53; *Findings of Fact*, ¶ 28. An application written to rely exclusively on a middleware program's APIs could run on all operating systems on which that middleware runs (i.e., would be "cross-platform"). The Court of Appeals found that middleware posed a potential threat to Microsoft's operating system monopoly because if enough applications developers (known as independent software vendors (ISVs)) wrote enough applications for widely used middleware, computer users no longer would be reluctant to choose a non-Windows operating system for fear that it would run an insufficient array of applications. *Microsoft*, 253 F.3d at 53. Over time, this widely used middleware might have the potential to erode the "applications barrier to entry" that protected Microsoft's Windows monopoly.

Microsoft's anticompetitive acts centered on two particular middleware threats: Netscape's Web browser (Navigator), and Sun Microsystem's Java technologies. Microsoft set out to ensure that its own Web browser, IE, gained dominant usage so that ISVs would continue to focus their efforts on the Windows platform rather than the Navigator platform. Microsoft took steps to constrict Netscape's access to the distribution channels that led most efficiently to browser usage: pre-installation by computer manufacturers (known as original equipment manufacturers (OEMs)), distribution by Internet access providers (IAPs), and the ISVs themselves. Through restrictions placed in its Windows licenses to OEMs, exclusive deals with IAPs and ISVs, and a combination of inducements to — and threats of retaliation against — other third-parties, Microsoft sought to impede the emergence of middleware as a potential threat to its operating system monopoly. *Id.* at 58-74.

---

discretion to conduct trials as it sees fit." *Microsoft*, 253 F.3d at 98, 100-01.

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 4

Java technologies posed a middleware threat to Microsoft by enabling developers to write programs that could be ported to different operating systems with relative ease.  In May 1995, Netscape announced that it would include a Sun-compliant Windows Java Virtual Machine (JVM), a key component of Java technologies, with every copy of Navigator, thereby creating the possibility that Sun's Java implementation would achieve the necessary ubiquity on Windows to pose a threat to the applications barrier to entry.  *Id.* at 74.  Thus, by limiting the usage of Navigator, Microsoft simultaneously would limit the distribution of Java.  Microsoft, however, took additional steps directed specifically to interfere with the development, distribution, and use of cross-platform Java.  Those steps included:  (1) pressuring third parties not to support cross-platform Java (*id.* at 75); (2) seeking to extinguish the Java threat through technological means that maximized the difficulty with which applications written in Java could be ported from Windows to other platforms, and vice versa (*id.* at 74-75); and (3) other anticompetitive steps to discourage developers from creating Java applications compatible with non-Microsoft JVMs (*id.* at 75-78).

In affirming liability for monopoly maintenance, however, the Court of Appeals upheld 12 of the 20 district court findings that particular acts constituted bases for violations of Section 2.  *See id.* at 59-78.  In particular, the court rejected the findings that Microsoft had violated Section 2 by prohibiting OEMs from "automatically launching a substitute user interface upon completion of the boot process" (*id.* at 63); overriding the user's choice of browser in certain circumstances (*id.* at 67); giving away its Internet Explorer browser to IAPs and ISVs (*id.* at 67-68, 71-72); offering IAPs a bounty for each customer the IAP signs up for service using the IE browser (*id.* at 67-68); developing and giving away the Internet Explorer Access Kit (IEAK) (*id.*

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 5

at 68); entering into exclusive agreements with Internet Content Providers (ICPs) (*id.* at 71); and creating a JVM that runs faster on Windows but lacks the cross-platform attributes that Sun's (hence Navigator's) JVM possesses (*id.* at 74-75). In addition, and importantly, the Court of Appeals expressly rejected the district court's conclusion that, "apart from Microsoft's specific acts, Microsoft was liable under § 2 based upon its general 'course of conduct.'" *Id.* at 78. The court found that the district court had failed to "point to any series of acts, each of which harms competition only slightly but the cumulative effect of which is significant enough to form an independent basis for liability." *Id.*

b. The Court of Appeals also reversed the district court's determination that Microsoft had attempted to monopolize the Web browser market in violation of Section 2. *Id.* at 80-84. The court found that plaintiffs had failed to define and prove a market for Web browsers, a necessary element of the claim. *Id.* at 81-82.

c. The Court of Appeals vacated the district court's judgment on the Section 1 tying claim as well, and remanded that claim to the district court for reconsideration under the rule of reason. *Id.* at 84-97. In so holding, the Court of Appeals held that the market for platform software presented unique issues under tying law. The "nature of the platform software market affirmatively suggests that per se rules might stunt valuable innovation" (1) because "the separate-products test is a poor proxy for net efficiency from newly integrated products"; and (2) "because of the pervasively innovative character of platform software markets, tying in such markets may produce efficiencies that courts have not previously encountered and thus the Supreme Court had not factored into the per se rule as originally conceived." *Id.* at 92-93. The court directed that on remand, plaintiffs would be limited to proving that the anticompetitive

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 6

effects from tying outweigh the benefits in the *tied* product market, not just that those effects outweigh the benefits overall.  *Id.* at 95.  In addition, plaintiffs would be "precluded from arguing any theory of harm that depends on a precise definition of browsers or barriers to entry . . . other than what may be implicit in Microsoft's tying arrangement."  *Id.*

  d.  In light of its determination that it had "drastically" (*id.* at 105, 107) altered the district court's conclusions on liability, and its finding that an evidentiary hearing on remedy was necessary prior to the district court's imposting a remedy (*id.* at 101-103), the Court of Appeals vacated the final judgment and remanded the case to the district court for further proceedings.  *Id.* at 107.  The court also offered guidance "to advance the ultimate resolution of this important controversy."  *Id.* at 105.  Though recognizing that, "[a]s a general matter, a district court is afforded broad discretion to enter that relief it calculates will best remedy the conduct it has found to be unlawful," *id.*, the Court of Appeals directed this Court to "reconsider whether the use of the structural remedy of divestiture is appropriate with respect to Microsoft, which argues that it is a unitary company."  *Id.*

  Critically, the Court of Appeals admonished the district court on remand to bear in mind the role of causation when fashioning relief, directing this Court to "consider whether plaintiffs have established a sufficient causal connection between Microsoft's anticompetitive conduct and its dominant position in the [operating system] market."  *Id.* at 106.  Absent "clear[]" indication of a "'*significant causal connection* between the conduct and creation or maintenance of the market power,'" Microsoft's unlawful behavior "should be remedied by 'an injunction against continuation of that conduct.'"  *Id.* at 106 (quoting 3 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 650a, at 67 (rev. ed. 1996) ("*Antitrust Law*")) (emphasis added by Court of

Appeals).  The court emphasized that it had "found a causal connection between Microsoft's exclusionary conduct and its continuing position in the operating systems market only through inference," *id.* at 106-07, but that even the district court "expressly did *not* adopt the position that Microsoft would have lost its position in the [operating system] market but for its anticompetitive behavior."  *Id.* at 107 (quoting *Findings of Fact*, ¶ 411) (emphasis added).  The court concluded that the remedy should be "tailored to fit the wrong creating the occasion for the remedy."  *Id.* at 107.

e.  Finally, the Court of Appeals concluded that the district judge's contacts with the press violated the Code of Conduct for United States Judges and warranted disqualification under 28 U.S.C.§ 455(a).  *Id.* at 107-118.  The court vacated the remedy on the additional basis that the district judge's misconduct infected the remedial phase.  *Id.* at 117.

3.  After the Court of Appeals rejected Microsoft's petition for rehearing, Microsoft filed a petition for a writ of certiorari based on the Court of Appeals' failure to vacate the *Findings of Fact* and *Conclusions of Law* — and not just the remedy — in light of the district judge's misconduct.  Petition for a Writ of Certiorari, No. 01-236 (Aug. 7, 2001) ("Cert. Petition").  Although Microsoft's petition was limited to the issue of judicial misconduct, it promised a future petition on several issues relating to liability when the case becomes final — after the remand to the district court and another appeal to the D.C. Circuit.  *Id.* at 15.  On October 9, 2001, the Supreme Court denied Microsoft's petition.  *Microsoft Corp. v. United States*, 122 S. Ct. 350 (2001).

Meanwhile, on the same day it filed its petition for certiorari, Microsoft moved the Court of Appeals to stay its mandate pending disposition of the petition by the Supreme Court.  The

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 8

Court of Appeals denied Microsoft's motion, *United States v. Microsoft Corp.*, 2001 WL 931170 (D.C. Cir. Aug. 17, 2001) (en banc) (per curiam), and issued its mandate on August 24, 2001. That same day, a random selection assigned the case to this Court.

4. On September 6, 2001, plaintiffs advised Microsoft that they did not intend to pursue the Section 1 tying claim on remand, and that they did not intend to pursue on remand the restructuring of Microsoft into two separate companies. As explained to the Court in the Joint Status Report filed on September 20, 2001, Plaintiffs' goal was to achieve the expeditious imposition of relief that would effectively remedy Microsoft's illegal conduct. Joint Status Report at 21 (Sept. 20, 2001).

5. On September 28, 2001, this Court ordered the parties to "concentrate all of their resources" on a new round of intense settlement negotiations and probable mediation. Order at 2-3 (Sept. 28, 2001). The Court emphasized the importance of these efforts in light of the passage of time — more than six years since plaintiffs' claims arose and more than four years of litigation, *id.* at 2. The Court expressly directed plaintiffs to "determine which portions of the former judgment remain appropriate in light of the appellate court's ruling and which portions are unsupported following the appellate court's narrowing of liability." Tr. 9/28/01 at 8. The Court also adopted a fast-track discovery and evidentiary hearing schedule in case the parties failed to settle.[6]

On November 2, 2001, following five weeks of intensive negotiation and mediation as ordered by the Court, the United States and Microsoft agreed on terms of a proposed final

---

[6]Indeed, the evidentiary hearing in *New York v. Microsoft Corp.*, No. 98-CV-1233 (CKK) (D.D.C.), between the Non-Settling States and Microsoft is scheduled to begin on March 11, 2002. Order at 2 (Oct. 2, 2001).

judgment.  Stipulation at 1 (Nov. 2, 2001).  Further negotiations with several of the plaintiff

States resulted in submission on November 6, 2001, by the United States, the Settling States,[7]

and Microsoft of the Revised Proposed Final Judgment (RPFJ).  Pursuant to the requirements of

Section 2 of the Antitrust Procedures and Penalties Act ("Tunney Act"), 15 U.S.C. §§ 16(b)-(h),

the United States filed its Competitive Impact Statement (CIS) on November 15, 2001, and

published the RPFJ, CIS, and description of the procedures for submitting public comments on

the proposed decree in the *Federal Register* on November 28, 2001.  66 Fed. Reg. 59,452 (2001).

The public comment  period closed on January 28, 2002  — with more than 30,000 comments

submitted — and the United States' response to those comments is being filed concurrently with

this Motion and supporting Memorandum.  Under the Tunney Act, this Court must now

determine whether the RPFJ is in the "public interest."  15 U.S.C. § 16(e).

      6.  On January 30, 2002, the Court ordered the parties to address "whether, in response to

the comments received by the Department of Justice in accordance with 15 U.S.C. § 16(b), the

United States and Microsoft are considering any modifications of the Proposed Final Judgment."

Order at 1 (Jan. 30, 2002).  Responding in a Joint Status Report filed on February 7, 2002, the

parties stated that they were considering making modifications and would submit any proposed

modifications to the Court on or before February 27, 2002.  Joint Status Report at 7 (Feb. 7,

2002).  Simultaneously with this Memorandum, the parties have filed a Second Revised

Proposed Final Judgment (SRPFJ), which includes modifications to which the United States,

---

[7]New York, Ohio, Illinois, Kentucky, Louisiana, Maryland, Michigan, North Carolina, and Wisconsin (the "Settling States") — each a party to *New York v. Microsoft Corp.*, No. 98-CV-1233 (CKK) (D.D.C.) — have signed the Revised Proposed Final Judgment.

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 10

Microsoft, and the Settling States have agreed.[8]  This Memorandum is couched in terms of, and generally refers to, the proposed decree before modification (i.e., the RPFJ), addressing the modifications of the SRPFJ only as required.  However, the decree the Court should enter is the *modified* version of the RPFJ — that is, the SRPFJ.

## DISCUSSION

## I.    THE TUNNEY ACT GOVERNS THE COURT'S DISPOSITION OF THE REVISED PROPOSED FINAL JUDGMENT

By its express terms, the Tunney Act applies to "*[a]ny* proposal for a consent judgment submitted by the United States for entry in any civil proceeding brought by or on behalf of the United States under the antitrust laws," 15 U.S.C. § 16(b) (emphasis added), without regard to when the United States submits it.  Moreover, the Court is required to make its Tunney Act public interest determination "[b]efore entering *any* consent judgment proposed by the United States under this section."  *Id.* § 16(e) (emphasis added).  The Revised Proposed Final Judgment on its face is a proposal for a consent judgment submitted by the United States for entry in a civil proceeding brought by the United States under the antitrust laws.  By the plain and unambiguous statutory language, the Tunney Act applies and governs the Court's consideration of the RPFJ.

The Tunney Act applies even though the parties proposed the RPFJ after trial and after the Court of Appeals affirmed Microsoft's liability for monopoly maintenance.  These

---

[8]The United States also filed, simultaneously with this Memorandum, a Memorandum Regarding Modifications Contained in Second Revised Proposed Final Judgment.  As explained briefly below, *see* Section II.G, page 34, the SRPFJ is a logical outgrowth of the RPFJ, its incremental modifications responding to public comments, and the overall result further advances the public interest.

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 11

circumstances[9] have led some to suggest, *see* AAI Tunney Act Comments, at 4-9 (MTC # 0030600); ProComp's Comments to the Proposed Final Judgment, at 1-2 (MTC # 0030608) ("ProComp Comments"); Memorandum of Points and Authorities in Support of the California Plaintiffs' Motion to Intervene at 18-21 (Jan. 23, 2002)) ("Cal. Plaintiffs' Br.")), that the Tunney Act does not apply to some proposals for consent judgments submitted by the United States for entry in a civil proceeding brought by the United States under the antitrust laws, including the RPFJ, because of the stage at which they are proposed. It has been variously suggested that the Act does not apply to proposals that arise after the taking of testimony begins (*id.* at 10, 18-19 n.9); after litigation to judgment (*id.* at 11, 18), apparently whether or not that judgment is vacated on appeal; and after litigation through judgment and appeal (*id.* at 18), again apparently without regard to the result on appeal.

Because, then and now, most consent judgments in government antitrust cases are entered before trial, Congress undoubtedly focused on pre-trial consent judgments when it enacted the Tunney Act. But Congress knew that consent judgments could be proposed at later stages, *see* pages 15-16 below, and it did not exempt them from the Tunney Act. Even if Congress had failed to foresee later-arising proposals, in the face of an "unambiguous statutory text [such a failure] is irrelevant," *Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206, 212 (1998), because application of an unambiguous statute "in situations not expressly anticipated by

---

[9]The United States has never before initiated a Tunney Act proceeding so late in a lawsuit, although the settlement in the *AT&T* case came after the trial court had "already heard what probably amounts to well over ninety percent of the parties' evidence." *United States v. AT&T*, 552 F. Supp. 131, 152 (D.D.C. 1982), *aff'd mem. sub. nom. Maryland v. United States*, 460 U.S. 1001 (1983). The *AT&T* court followed Tunney Act procedures without deciding that the Tunney Act applied to what the parties characterized as the modification of a consent decree in one case and the dismissal of a different case. *See id.* at 144-45.

Congress" merely shows the statute's breadth.  *Id.* (citation and internal quotation marks omitted).

The plain meaning of "[a]ny proposal for a consent judgment" is sufficient to support the conclusion that the Tunney Act applies here.  But if one wants more support for reading "any" to mean "any," that support is readily at hand.  First, nothing in the language of the Tunney Act suggests that the Act reaches only proposals for consent judgments in government civil antitrust cases that are submitted at some appropriate time.[10]  And the context of the Tunney Act suggests a broad reading of the statute's coverage — at the very least, a reading not limited to consent judgments before testimony is taken.[11]  The term "Tunney Act" refers to Sections 5(b)-(h) of the

_____

[10]It has been suggested that the Tunney Act provision permitting a court to consider, as part of its public interest determination, "the public benefit, if any, to be derived from a determination of the issues at trial," 15 U.S.C. § 16(e)(2), limits the reach of the Act to pre-trial settlements.  *See* Cal. Plaintiffs' Br. at 18.  But that subsection demonstrates only that a consent decree may be proposed prior to trial, not that the Act is limited to pre-trial proposals.  Indeed, in this case, the alternative to entry of the RPFJ likely would be trial of outstanding remedy issues.  Pursuant to the statute, the Court may properly consider "the public benefit, if any" of requiring determination of those issues at trial.

[11]The United States has consistently maintained that Tunney Act procedures are not required with respect to judgments addressing only claims for civil penalties under the antitrust laws.  The antitrust laws do not provide civil penalties for violation of  their substantive, competition-regulating, provisions.  There are civil penalties under the "antitrust laws" as defined in the Clayton Act, *see* 15 U.S.C. § 12(a) (defining "antitrust laws"), only for failure to comply with provisions relating to premerger notification and waiting periods, *id.* § 18a(g), and for violation of certain orders issued by certain federal agencies (not including the Department of Justice), *id.* § 21(*l*).  Courts in this district have consistently entered agreed upon settlements for civil penalties under 15 U.S.C. § 18a(g) without employing Tunney Act procedures; each such entered judgment states that its entry is in the public interest.  *See, e.g.*, *United States v. Input/Output, Inc.*, 1999-1 Trade Cas. (CCH) ¶ 72,528 (D.D.C. 1999); *United States v. Blackstone Capital Partners II Merchant Banking Fund*, 1999-1 Trade Cas. (CCH)  ¶ 72,484 (D.D.C. 1999); *United States v. Loewen Group Inc.*, 1998-1 Trade Cas. (CCH) ¶ 72,151 (D.D.C. 1998); *United States v. Mahle GmbH*, 1997-2 Trade Cas. (CCH) ¶ 71,868 (D.D.C. 1997); *United States v. Figgie Int'l Inc.*, 1997-1 Trade Cas. (CCH)  ¶ 71,766 (D.D.C. 1997); *United States v. Foodmaker, Inc.*, 1996-2 Trade Cas. (CCH) ¶ 71,555 (D.D.C. 1996); *United States v. Titan*

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 13

Clayton Act. Section 5(a), originally enacted in 1914 as Section 5, gives prima facie evidence

effect to certain consent decrees, subject to the proviso that the section does not give that effect

to "consent judgments or decrees entered before any testimony has been taken." 15 U.S.C.

§ 16(a). If Congress in 1914 had understood the words "consent judgments or decrees" to refer

only to ones entered before any testimony had been taken, there would have been no need to

draw the distinction, and the proviso would have been surplusage.[12] *See South Dakota v.*

*Yankton Sioux Tribe*, 522 U.S. 329, 347 (1998) ("the Court avoids interpreting statutes in a way

that 'renders some words altogether redundant'") (quoting *Gustafson v. Alloyd Co.*, 513 U.S.

561, 574 (1995)). Had Congress used the term "consent judgment" in Section 5(b) of the

Clayton Act to mean something different than its meaning in Section 5(a), it surely would have

said so. *See Commissioner v. Lundy*, 516 U.S. 235, 250 (1996) ("the normal rule of statutory

construction [is] that identical words used in different parts of the same act are intended to have

---

*Wheel Int'l, Inc.*, 1996-1 Trade Cas. (CCH) ¶ 71,406 (D.D.C. 1996); *United States v. Automatic Data Processing, Inc.,* 1996-1 Trade Cas. (CCH) ¶ 71,361 (D.D.C. 1996); *United States v. Trump*, 1988-1 Trade Cas. (CCH) ¶ 67,968 (D.D.C. 1988). In each case, the United States noted the issue in a motion for entry of judgment, explaining to the court that it believed Tunney Act procedures were not required.

[12]As enacted in 1914, the prima facie evidence provision made even clearer congressional understanding that there could be consent judgments or decrees entered after testimony had been taken. The text included this additional proviso, rendered superfluous by the passage of time:

> *Provided further*, This section shall not apply to consent judgments or decrees rendered in criminal proceedings or suits in equity, now pending, in which the taking of testimony has been commenced but has not been concluded, provided such judgments or decrees are rendered before any further testimony is taken.

Clayton Act, ch. 323, § 5, 38 Stat. 730, 731 (1914). This language not only clearly contemplates consent judgments or decrees entered after some testimony has been taken, but also gives prima facie evidence effect to some of them.

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 14

the same meaning") (quoting *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990), and *Sorenson v. Secretary of Treasury*, 475 U.S. 851, 860 (1986) (internal quotation marks omitted)).

Second, Congress clearly was aware that consent judgments could arise relatively late in the course of an antitrust case. Not only were there examples ready at hand involving well-known antitrust cases, *see, e.g.*, *Fifth & Walnut, Inc. v. Loew's Inc.*, 176 F.2d 587, 592-93 (2d Cir. 1949) (consent decrees with some defendants entered on remand, after Supreme Court affirmed liability in part and reversed in part in *United States v. Paramount Pictures, Inc.*, 334 U.S. 131 (1948)),[13] but the legislative history contained prominent references to the possibility. Representative Hutchinson, then the ranking minority member of the House Judiciary Committee and of its Monopolies and Commercial Law subcommittee, inserted into the hearing record a statement plainly recognizing that circumstances arising during prosecution of a case might make settlement seem appropriate.[14] And Thomas Kauper, then Assistant Attorney General-Antitrust

---

[13]*See also Utah Pub. Serv. Comm'n v. El Paso Natural Gas Co.*, 395 U.S. 464, 467-68 (1969) (Supreme Court refers to a decree it had rejected (for failure to comply with its mandate) as a "consent decree" even though it had been agreed to following a trial on the merits and a Supreme Court determination of liability).

[14]"[S]uppose that during the prosecution of a case against an oil company the government decided to settle for less relief than it could win on the merits because of the adverse impact full relief might have on a recently intervening energy crisis." Consent Decree Bills: Hearings on H.R. 9203, H.R. 9947, and S. 782 Before the Subcomm. on Monopolies & Commercial Law of the House Comm. on the Judiciary, 93rd Cong. 41 (1973) ("House Hearings") (statement of Hon. Edward Hutchinson).

Similarly, Miles Kirkpatrick, who had recently stepped down as chairman of the FTC, testified at the same hearings about circumstances under which the government might file a proposed consent decree "with relief significantly different from that originally claimed." These circumstances included "the post complaint realization by the Antitrust Division that there are certain aspects of its case that do not have the strengths that were initially believed to be present: *that realization could come . . . after the partial trial of the case itself.*" *Id.* at 145 (statement of Miles W. Kirkpatrick) (emphasis added).

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 15

Division, specifically noted in his testimony that "a consent decree . . . may come after trial." The Antitrust Procedures & Penalties Act: Hearings on S. 782 & S. 1088 Before the Subcomm. on Antitrust & Monopoly of the Senate Committee on the Judiciary, 93d Cong. 117 (1973) ("Senate Hearings") (testimony of Thomas E. Kauper).

Finally, a reading of the statutory language that precludes its application at this stage would lead to anomalous results. Nothing plausibly explains why Congress would want a court to enter consent judgments in the later stages of government civil antitrust cases without following Tunney Act procedures — publication of the decree and CIS, a public comment period, and so forth. Nor is it plausible that Congress intended, sub silentio, to prohibit courts from entering consent judgments at certain stages of the litigation. Courts have long entered consent judgments reached after the taking of evidence, after determinations of liability, and even after affirmance of liability by the Supreme Court, as the *Paramount Pictures* history just cited demonstrates. Moreover, the Supreme Court has expressly acknowledged the authority of the Attorney General to settle cases at any stage. *See Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*, 386 U.S. 129, 136 (1967) (Court does "not question the authority of the Attorney General to settle suits after, as well as before, they reach here").

We do not, of course, suggest that this Court approach its public interest determination in this proceeding as if the RPFJ had been filed simultaneously with the complaint. The trial record, *Findings of Fact*, *Conclusions of Law*, and appellate decisions in this case all exist, and the Tunney Act does not require the Court to ignore them. But as we discuss below, *see* pages 39-42, the history of this case does not change the nature of the Court's public interest determination; it changes only the circumstances in and to which that standard is applied.

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 16

## II.    THE UNITED STATES HAS COMPLIED WITH ALL TUNNEY ACT PROCEDURAL PREREQUISITES TO THE COURT'S PUBLIC INTEREST DETERMINATION

With the filing today of the public comments and the government's responses, the United States has completed all of the steps required of it before the Court enters a proposed consent judgment under the Tunney Act, 15 U.S.C. §§ 16(b)-(d), except for the publication of those comments and responses.  We expect to publish as required, in the manner described below in Section II.F, and we will promptly notify the Court when we have done so.  The United States will then have complied completely with the requirements of the Act.[15]

### A.    Summary Of Compliance

On November 6, 2001, the United States (together with the Settling States and Microsoft) submitted to the Court the Revised Proposed Final Judgment.  The United States filed its Competitive Impact Statement with the Court on November 15, 2001, and published the RPFJ and CIS in the *Federal Register* on November 28, 2001 (66 Fed. Reg. 59,452), as required by 15 U.S.C. § 16(b);[16] *see also* Order at 2-3 (Nov. 8, 2001) ("Nov. 8 Order").  The CIS included each

---

[15]Although the United States has fully complied with each Tunney Act requirement, even substantial compliance that fulfills the purposes of the statute would suffice, for a court should "decline to read the . . . statute as making strict technical compliance with the [Tunney Act] a condition to final entry of the decree."  *United States v. Bechtel Corp.*, 648 F.2d 660, 664 (9th Cir. 1981).

[16]"Any proposal for a consent judgment submitted by the United States for entry in any civil proceeding brought by or on behalf of the United States under the antitrust laws shall be filed with the district court before which such proceeding is pending and published by the United States in the Federal Register at least 60 days prior to the effective date of such judgment."  15 U.S.C. § 16(b).

"Simultaneously with the filing of such proposal, unless otherwise instructed by the court, the United States shall file with the district court, publish in the Federal Register, and thereafter furnish to any person upon request, a competitive impact statement."  *Id.*

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 17

of the six required recitals, *see* 15 U.S.C. §§ 16(b)(1)-(6),[17] as well as other material.  Copies of

the RPFJ and CIS were made available to the public at the Court's website.[18]  The United States

also made them available at the Department of Justice website.  Because there were no "materials

and documents which the United States considered determinative in formulating" the proposed

judgment ("determinative documents"), 15 U.S.C. § 16(b), the United States was not required to

make copies of such documents available at the Court.[19]  The United States furnished copies of

the CIS to those who requested them.[20]

     As required by 15 U.S.C. § 16(c) and the Court's Order of November 8, 2001, the United

States published in the *Washington Post* (November 16 – 22, 2001), the *San Jose Mercury News*

---

[17] Section 16(b) requires that the CIS "recite":

(1) the nature and purpose of the proceeding;
(2) a description of the practices or events giving rise to the alleged violation of the antitrust laws;
(3) an explanation of the proposal for a consent judgment, including an explanation of any unusual circumstances giving rise to such proposal or any provision contained therein, relief to be obtained thereby, and the anticipated effects on competition of such relief;
(4) the remedies available to potential private plaintiffs damaged by the alleged violation in the event that such proposal for the consent judgment is entered in such proceeding;
(5) a description of the procedures available for modification of such proposal; and
(6) a description and evaluation of alternatives to such proposal actually considered by the United States.

15 U.S.C. § 16(b).

[18]*See* 15 U.S.C. § 16(b) (materials "shall also be made available to the public at the district court and in such other districts as the court may subsequently direct").  This Court did not direct that any materials be made available at any other district court.

[19]*See supra* note 18.

[20]*See supra* note 16.

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL
JUDGMENT - PAGE 18

(November 17 – 23, 2001), and the *New York Times* (November 17 – 23, 2001) a notice

complying with the requirements of that statutory provision and the Order.[21]

On November 28, 2001, the United States published procedures for submitting comments

on the RPFJ. 66 Fed. Reg. 59,452 (2001). The 60-day public comment period (*see* 15 U.S.C.

§ 16(d)), began the same day and ended on January 28, 2002.[22] During that period, the United

---

[21]Section 16(c) provides:

The United States shall also cause to be published, commencing at least 60 days prior to
the effective date of the judgment described in subsection (b) of this section, for 7 days
over a period of 2 weeks in newspapers of general circulation of the district in which the
case has been filed, in the District of Columbia, and in such other districts as the court
may direct--

    (i) a summary of the terms of the proposal for the consent judgment,

    (ii) a summary of the competitive impact statement filed under subsection (b) of
    this section,

    (iii) and a list of the materials and documents under subsection (b) of this section
    which the United States shall make available for purposes of meaningful public
    comment, and the place where such materials and documents are available for
    public inspection.

15 U.S.C. § 16(c). The Court designated three newspapers, including one of general circulation
in the District of Columbia. Nov. 8 Order at 2.

[22]Section 16(d) provides:

During the 60-day period as specified in subsection (b) of this section, and such
additional time as the United States may request and the court may grant, the United
States shall receive and consider any written comments relating to the proposal for the
consent judgment submitted under subsection (b) of this section. The Attorney General
or his designee shall establish procedures to carry out the provisions of this subsection,
but such 60-day time period shall not be shortened except by order of the district court
upon a showing that (1) extraordinary circumstances require such shortening and (2) such
shortening is not adverse to the public interest.

15 U.S.C. § 16(d). The United States treated as Tunney Act comments various communications

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL
JUDGMENT - PAGE 19

States received over 30,000 public comments.  *See* Joint Status Report 3-4 (Feb. 7, 2002).  The United States is filing those comments and its response to them, *see* 15 U.S.C. §§ 16(b), (d),[23] simultaneously with the filing of this Memorandum.  The United States believes that it will have completed all Tunney Act procedural requirements when it publishes the public comments and its response to these comments in the manner described below in Section II.F.  The United States will notify the Court when publication occurs.

### B.    The United States Fully Complied With All Tunney Act Requirements Regarding The CIS

The CIS filed by the United States in this case fully satisfies all Tunney Act requirements. In enacting the Tunney Act, Congress sought, among other things, "to encourage additional comment and response by providing more adequate notice [concerning a proposed consent judgment] to the public," S. Rep. No. 93-298, at 5 (1973) ("Senate Report"); H.R. Rep. No. 93-1463, at 7 (1974) ("House Report"), *reprinted in* 1974 U.S.C.C.A.N. 6535, 6538; the CIS is the primary means by which Congress sought to do so.  Introducing his bill, Senator Tunney explained that the six items of information required in a CIS would "explain to the public[,] particularly those members of the public with a direct interest in the proceeding, the basic data about the decree to enable such persons to understand what is happening and make informed

received between the first business day following submission of the initial Proposed Final Judgment to the Court and the beginning of the statutory comment period.

[23]"Any written comments relating to such proposal and any responses by the United States thereto, shall also be filed with such district court and published by the United States in the Federal Register within such sixty-day period."  15 U.S.C. § 16(b).

"At the close of the period during which such comments may be received, the United States shall file with the district court and cause to be published in the Federal Register a response to such comments."  15 U.S.C. § 16(d).

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 20

comments o[r] objections to the proposed decree during the 60-day period."  119 Cong. Rec.

3452 (1973) (remarks of Sen. Tunney) ("Tunney Remarks").[24]  The purpose could be achieved,

Senator Tunney suggested, without adding greatly to the government's workload because the six

prescribed items "do not require considerably more information than the complaint, answer and

consent decree themselves would provide and, therefore, would not be burdensome

requirements."  Senate Hearings at 3 (statement of Sen. Tunney) ("Tunney Statement").

The CIS in this case succeeded beyond all expectations in achieving the congressional

goal.[25]  As noted above, over 30,000 public comments were submitted, a number apparently

beyond the wildest imaginings of the Tunney Act's sponsor in 1973, see House Hearings at 45

(testimony of Sen. Tunney) (predicting that "in the typical case, you will have [no public

comments], but perhaps you will have 10 to 15 in a highly controversial case").  Indeed, the

number of comments received on the RPFJ exceed the number received in the *AT&T* case by

more than an order of magnitude, *see United States v. AT&T*, 552 F. Supp. 131, 135 (D.D.C.

1982) ("over six hundred comments"), *aff'd mem. sub. nom. Maryland v. United States*, 460 U.S.

---

[24]Senator Tunney also noted that the need to file a CIS would help to focus the parties' attention during settlement negotiations.  Tunney Remarks, 119 Cong. Rec. at 3452.

[25]We attribute this success not only to the CIS itself, but also to the Internet's contribution to making the CIS, the RPFJ, the decisions of this Court and the Court of Appeals, and a wealth of other material readily available to the American public, far more available than mere publication in the *Federal Register* and distribution of paper copies by the United States and through this Court and other district courts would have accomplished.  *See* ABA Section of Antitrust Law, Report to the Council of the Section of Antitrust Law Re: Proposed "Antitrust Procedures and Penalties Act," *reprinted in* Senate Hearings at 427, 431 (citing "the minimal attention which the average citizen devotes to the daily contents of the *Federal Register*").  The United States posted the RPFJ and the CIS on the Department of Justice website; they also were (and continue to be) available to PACER account holders at the Court's website; and they therefore are instantly available at any hour of day or night to anyone in the world with an Internet connection.

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL
JUDGMENT - PAGE 21

1001 (1983); 47 Fed. Reg. 21,214, 21,214-24 (1982) (listing name and address of each

commentor on proposed *AT&T* decree, with length of comment in pages).[26]

Although many of the comments received are unlikely to contribute new insights

concerning the RPFJ,[27] approximately 2,900 — a number nearly five times the total number of

comments in *AT&T* — contain "a degree of detailed substance concerning the RPFJ."  Joint

Status Report at 4 (Feb. 7, 2002).  Although the Court has only just received the full set of

comments, the United States provided the Court with an advance installment of 47 of the most

extensive comments on February 14, 2002.  The Court therefore is aware already of substantial

evidence that the public did not lack the raw material for formulating "informed comments o[r]

objections to the proposed decree" (Tunney Remarks, 119 Cong. Rec. at 3452).

Having established that the CIS in this case richly fulfilled the statutory purpose, we turn

to whether its content met the formal requirements of the statute.  In addressing that question, we

proceed through the six recitals the statute specifies, and then address additional aspects of CIS

content.  As the statute requires, the CIS "recite[s]":

### 1.     "The Nature And Purpose Of The Proceeding"

Section I of the CIS, CIS at 2, describes the nature and purpose of the proceeding, as the

statute requires.  15 U.S.C. § 16(b)(1).  We are aware of no suggestion that this description is

inadequate or otherwise fails to satisfy the statutory requirement.

---

[26]By contrast, the Department's 1994 consent decree with Microsoft generated only five
public comments.  *See* 59 Fed. Reg. 59,426, 59,427 (1994).

[27]As previously noted, Joint Status Report at 3 (Feb. 7, 2002), over 1,000 comments were
unrelated to this case or the RPFJ, nearly 3,000 are form letters, and nearly 20,000 contain an
overall view of the RPFJ but no particularized discussion of it.

2.    "A Description Of The Practices Or Events Giving Rise To The Alleged Violation Of The Antitrust Laws"

Section III of the CIS, CIS at 5-17, describes the practices giving rise to Microsoft's antitrust violation.[28]  We are aware of no suggestion that this recital is inadequate or otherwise fails to satisfy the statutory requirement.

3.    "An Explanation Of The Proposal For A Consent Judgment, Including An Explanation Of Any Unusual Circumstances Giving Rise To Such Proposal Or Any Provision Contained Therein, Relief To Be Obtained Thereby, And The Anticipated Effects On Competition Of Such Relief"

Section IV of the CIS, CIS 17-60, the bulk of the document, explains the proposed consent judgment, provision by provision, in considerable detail.  Subsection B, CIS 24-60, links the underlying theory of violation in the case ("[c]ompetition was injured in this case principally because Microsoft's illegal conduct maintained the applications barrier to entry . . . by thwarting the success of middleware that would have assisted competing operating systems"), *id.* at 24, to the primary remedial approach adopted ("the key to the proper remedy in this case is to end Microsoft's restrictions on potentially threatening middleware [and] prevent it from hampering similar nascent threats in the future" and thereby "restore the competitive conditions created by similar middleware threats").  *Id.*  The remainder of the subsection explains how particular provisions contribute to this remedial strategy, and therefore to the anticipated competitive effect of the proposed judgment.  *See*, *e.g., id.* at 33 (explaining role of required interface disclosures in overall remedial strategy and remedial impact).

_____

[28]Considerably more detail can be found in the *Findings of Fact*, *Conclusions of Law*, and the Court of Appeals' opinion, all readily available on the Internet.

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 23

Although, as commentors point out, e.g., Comments of the Progress & Freedom Foundation on the Revised Proposed Final Judgment and the Competitive Impact Statement, 16-17 (MTC # 0030606) ("P&FF Comment"), the 40-plus-page analysis offered in the CIS is less elaborated and detailed than might be required by Executive Order for a cost/benefit analysis of a major executive branch regulatory analysis, that is irrelevant because the analysis plainly satisfies the requirements of the Tunney Act. The CIS meets the statutory requirement and provides "the basic data about the decree to enable [members of the public] to understand what is happening and make informed comments o[r] objections to the proposed decree." Tunney Remarks, 119 Cong. Rec. at 3452.[29] There has been no sign that any alleged inadequacy handicapped potential commentors. P&FF, for example, was able to reach its conclusion — with which we disagree — that the RPFJ is not an adequate remedy despite these alleged inadequacies of the CIS. The Court will have ample information to conclude that entry of the decree is in the public interest.[30]

4. **"The Remedies Available To Potential Private Plaintiffs Damaged By The Alleged Violation In The Event That Such Proposal For The Consent Judgment Is Entered In Such Proceeding"**

Section 6 of the CIS, CIS at 63, identifies the remedies available to private plaintiffs, with concise reference to damage actions under the federal antitrust laws, which may provide some

---

[29]No Executive Order governs the content of a CIS, and the Tunney Act nowhere refers to cost/benefit analysis. We are also unaware of any requirement that a court, before imposing a remedy in a case litigated to final judgment or before entering a consent judgment, either itself perform such an analysis or insist that the parties do so.

[30]For purposes of its public interest determination, the Court, of course, is not limited to the information in the CIS, but instead has available as well the trial record, the Court of Appeals' decision, the public comments, and the United States' response to public comments. And the Court can easily obtain additional information, whether by requesting it from the parties, or though the flexible procedures specified in the Tunney Act, *see* 15 U.S.C. § 16(f).

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 24

private plaintiffs with a remedy.[31]  The proposed judgment does not itself provide any remedy that can be invoked by potential private plaintiffs who may have been damaged by violations alleged in this case, and so the CIS does not refer to any such remedy.  The description complies with the terms of the statute, and there is no ground for requiring more.

It has been suggested that the CIS should go into more details with respect to private remedies and, specifically,[32] that it should address any impact the RPFJ might have on the collateral estoppel effect of the findings of fact and the conclusions of law in this case, and on the prima facie evidence effect of a final judgment under the Clayton Act, *see* 15 U.S.C. § 16(a). But nothing in the language of the Tunney Act requires the United States to offer, in the CIS or elsewhere, its views about legal questions that may arise in subsequent litigation.[33]  The Tunney Act does not direct the United States to discuss the effect of the proposed judgment on private litigation; rather, it requires only a recital of the remedies available to private plaintiffs.  The evidentiary or collateral estoppel effect of determinations this Court makes is a question to be addressed by the courts in which future litigants might seek to use those determinations.  *See*

---

[31]The CIS does not address potential remedies available under state law or the laws of foreign countries.  We do not believe that the Tunney Act plausibly can be read to require this. Indeed, requiring that the United States in effect provide legal advice regarding the laws of 50 states, let alone over a hundred foreign jurisdictions, would be unreasonably burdensome, take us far outside our area of expertise, and provide little or no benefit to anyone.

[32]This point was raised, for example, in a lawsuit filed by one commentor, the American Antitrust Institute, *American Antitrust Institute v. Microsoft Corp.*, No. 02-CV-0138 (CKK) (D.D.C., filed Jan. 24, 2002) ("*AAI*"), and in a Memorandum filed in this Court and attached to a filed comment, Comments of Relpromax Antitrust Inc., Ex. 11, at 3 (MTC # 00030631).

[33]The United States did, however, discuss related issues recently.  *See* Memorandum of Plaintiff United States in Response to the California Plaintiffs' Motion for Intervention, or in the Alternative, for Leave to File a Brief Amicus Curiae in the Tunney Act Settlement Proceedings Currently Pending in this Court, at 4-8 (Feb. 11, 2002).

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 25

*AT&T*, 552 F. Supp. at 211 (declining to "enter any specific decision or finding regarding" applicability of prima facie evidence aspect of § 16(a) because "the ultimate decision with respect to this issue must rest with the court in which such litigation may be brought"); *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979) (granting trial courts broad discretion to determine whether offensive collateral estoppel should be applied in matters before them).  It is not a question for this Court or for the United States to determine.  The United States does not seek to inject itself into private litigation by making public statements in other forums, and its views with respect to matters contested in such cases carry no determinative legal effect.

### 5.    "A Description Of The Procedures Available For Modification Of Such Proposal"

Section VII of the CIS, CIS at 63-65, notes that the United States may withdraw its consent to the RPFJ prior to its entry and informs the public of procedures for submitting written comments regarding the RPFJ.  That describes the procedure available for modifying the proposal prior to entry of the judgment, as required.  The section then describes, briefly, the procedure for modifying the judgment after entry.  We are aware of no suggestion that this description is inadequate or otherwise fails to satisfy the statutory requirement.

6. **"A Description And Evaluation Of Alternatives To Such Proposal Actually Considered By The United States"**

Section V of the CIS, CIS at 60-63, describes alternatives the United States considered and rejected,[34] and indicates the reasons why they were rejected. It explains why we viewed the RPFJ as a superior alternative to continued litigation. *See id.* at 60-61. It describes why, following remand, the United States decided not to continue to seek a break-up of Microsoft, a remedy that would have required further litigation and delay and would likely not have been achieved. *See id.* at 61; *see also* pages 63-65 below. The CIS explains the reasons for differences between the interim conduct provisions of the Initial Final Judgment (vacated by the Court of Appeals) and the provisions of the RPFJ. *See id.* at 61-62; *see also* pages 66-70 below. And it lists a number of other remedy proposals, the criteria used to evaluate them, and the results of that evaluation. *Id.* at 63.

To be sure, the description and the evaluations of alternatives presented are brief.[35] But they are consistent with Senator Tunney's purpose of providing "basic data about the decree to enable [members of the public with a direct interest] to understand what is happening and make informed comments o[r] objections to the proposed decree," Tunney Remarks, 119 Cong. Rec. at 3452, and with his understanding that the statutory requirements would not be burdensome. *See*

---

[34]As the CIS makes clear, CIS at 63, it does not describe literally *every* remedial proposal considered, no matter how fleetingly, and rejected. The statute does not impose such a requirement, which would be unduly burdensome and serve no useful purpose. As Senator Tunney said, the CIS ought to provide "*some* of the alternatives that were considered by the Department." Senate Hearings at 108 (remarks of Sen. Tunney) (emphasis added).

[35]The CIS does not document the evaluative process, as might be suitable in a technical report or an article prepared for publication in a scholarly journal of economics. Instead, the CIS reports the "result of evaluating," Webster's Third International Dictionary 786 (1981) (defining "evaluation"), together with evaluative criteria.

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 27

Tunney Statement, Senate Hearings at 3.  Indeed, the sheer volume and comprehensiveness of the comments received suggest that the level of detail was more than adequate to stimulate informed public comment about the proposed remedy and about the relative merits of alternative remedies.

A commentor contends, in separate litigation, that the CIS is inadequate because it "failed to explain adequately how alternative remedies (those not being pursued in the [R]PFJ) would have affected competition in the marketplace." *AAI*, Complaint ¶ 19.  *See also* P&FF Comment, at 15 (criticizing CIS for failing to evaluate likely impacts on competition of alternative remedies).  The Tunney Act, however, does not require *any* explanation of how alternative remedies would have affected competition in the marketplace.  That is no accident.  The version of Senator Tunney's bill reported out of the Senate Committee would indeed have required that CIS recitations include "the anticipated effects on competition of such alternatives."  Senate Report at 9 (proposed 15 U.S.C. § 16(b)(6)).  But on the Senate floor, Senator Hruska offered an amendment to strike that requirement, stating:

> There is no reason . . . to require the staff of the Antitrust Division . . . to make a public prediction as to the competitive effects of various alternatives which it has considered.  It is sufficient if the various alternatives are disclosed to the court and to the public.

119 Cong. Rec. 24,604 (1973).[36]  Senator Tunney agreed with the amendment's "basic intent," and the Senate adopted it by voice vote.  *Id.*

---

[36] Senator Hruska explained that "[t]hese anticipated effects quite clearly can be speculated upon by the district court considering a proposed consent judgment or by other interested parties." 119 Cong. Rec. 24,604 (1973).

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 28

### 7.    Including Information Not Required By The Tunney Act Cannot Result In A Noncompliant CIS

Several commentors contend that the CIS is inadequate because it contains material beyond that required by the statute and the additional material is incorrect or insufficient. That some commentors wish that the CIS contained more or different material, even though not required by statute, provides no basis for concluding that the CIS is deficient. Thus, Section VIII, CIS at 65-68, provides a brief discussion of the standards courts apply in determining whether entry of a proposed consent judgment is in the public interest. Intended to provide general information to the public, *cf.* pages 35-46 below (more substantial discussion of legal standard intended for the Court), Section VIII has been the target of several commentors. *E.g.,* Comments of Software & Information Industry Association on Proposed Final Judgment, at 11 (MTC # 0030614) ("SIIA Comments") (contending that legal standard commentor finds in CIS is "simply the wrong standard of review for the remedy in *this* case"). The Court will determine the standard of review it will apply and, as discussed below, *see* pages 35-46, the appropriate standard of review corresponds to the standard expressed in the CIS. But because there is no requirement that the CIS discuss the standard of review at all, any alleged shortcomings of that discussion in the CIS are no basis for finding that the CIS fails to satisfy the statutory requirements.

Similarly, the CIS contains two sentences explaining that the United States is not filing any determinative documents in this case because there are none within the meaning of the statute. CIS at 68. One commentor has alleged, in a separate lawsuit, that the CIS is deficient because the disclosure in this discussion is inadequate, AAI Complaint ¶ 27, and in particular because that discussion does not include our "definition or interpretation" of the word

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 29

"determinative," *id.* ¶ 28.  Because the CIS is not required to discuss determinative documents (and the statute does not require the United States to provide an interpretation or definition of the term "determinative"), this allegation provides no basis for concluding that the CIS fails to comply with the statute.

### C.    The United States Fully Complied With All Tunney Act Requirements Regarding Determinative Documents

The United States did not file any determinative documents with the Court, *see* 15 U.S.C. § 16(b), did not otherwise make determinative documents available to the public, and did not list any determinative documents in the required newspaper notices, *see id.* § 16(c)(iii), for one simple reason:  there are no such documents in this case.  Moreover, although not required to do so, we stated as much in the CIS.  *See* CIS at 68.

Commentors have nevertheless, and without any basis, questioned our compliance.  One commentor, without further explanation, suggests we failed to comply with the statute because "no documents considered determinative in formulating the RPFJ throughout the negotiation process were disclosed as required by 15 U.S.C. § 16(b)."  Relpromax Comment, Ex. 11, at 3.  As noted above, another, in a separate lawsuit, challenged our failure to provide a definition of "determinative" in the CIS, implying that under the commentor's preferred definition, there were in fact determinative documents.  *See* Memorandum in Support of Motion for Preliminary Injunction and Expedited Hearing at 16-19 (Jan. 31, 2002), *AAI*.

There are no "determinative" documents in this proceeding.  The Court of Appeals addressed the definition of "determinative documents" in a recent Tunney Act case.  *See Mass. School of Law at Andover, Inc. v. United States*, 118 F.3d 776 (D.C. Cir. 1997) ("*MSL*").  The United States had argued that the statute referred to documents "'that individually had a

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 30

significant impact on the government's formulation of relief — i.e., on its decision to propose or accept a particular settlement.'" *Id.* at 784 (quoting brief of the United States). The court concluded that the statutory language "seems to point toward the government's view . . . and confines § 16(b) at the most to documents that are either 'smoking guns' or the exculpatory opposite." *Id.* The court added that "[t]he legislative history in fact supports the government's still narrower reading." *Id.* In this case, the United States did not consider *any* document to be a "smoking gun or its exculpatory opposite" with a significant impact on our formulation of our decision regarding the RPFJ, and so there were no determinative documents.[37]

### D.     The United States Fully Complied With All Tunney Act Requirements Regarding Publication of Summaries In Newspapers

As noted above, the United States published notices in three newspapers for the periods required by the Tunney Act and this Court's Order of November 8, 2001. The notice (the text of which is attached as Appendix B) contained "a summary of the terms of the proposal for the consent judgment" as required by 16 U.S.C. § 16(c)(i), and "a summary of the competitive

---

[37]In the separate lawsuit it filed, a commentor relies on the concept of determinative documents applied in *United States v. Central Contracting Co.*, 537 F. Supp. 571, 575 (E.D. Va. 1982), under which, even if documents are individually not determinative, they can be determinative "in the aggregate." AAI Mem. at 17 n.10. We do not believe there are determinative documents in this case even under *Central Contracting*. But in any event, *Central Contracting*'s broad definition of determinative documents has not been followed by any Tunney Act court, has been squarely repudiated by one district court, *United States v. Alex. Brown & Sons*, 169 F.R.D. 532, 541 (S.D.N.Y. 1996) ("*Central Contracting*'s broad definition of 'determinative documents' may conflict with Congress's intent to maintain the viability of consent decrees") (cited with approval in *MSL*, 118 F.3d at 785), *aff'd sub nom. United States v. Bleznak*, 153 F.3d 16 (2d Cir. 1998), and cannot be reconciled with decisions of this Circuit and the Second Circuit. *See MSL*, 118 F.3d at 784; *Bleznak*, 153 F.3d at 20 (citing *MSL* and quoting "'smoking gun' or exculpatory opposite" with approval). *Central Contracting* is simply not good law in this regard.

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 31

impact statement" as required by 16 U.S.C. § 16(c)(ii).[38]  Although required to do so by neither statute nor Order, the notice also stated where copies of the complaint, the RPFJ, and the CIS could be viewed and obtained and where comments could be sent.  Because there were no determinative documents, the notice did not list them.  *See* 15 U.S.C. § 16(c)(iii).  The United States complied with the newspaper notice requirements of the Tunney Act, and no commentor has suggested otherwise.

E.     **The United States Has Fully Complied With The Tunney Act Requirement That It Respond To Public Comments**

The Tunney Act requires that the United States respond to public comments and file its response with the Court "[a]t the close of the period during which such comments may be received."  15 U.S.C. § 16(d).  The statutory language allows the United States "some additional time after the end of  [the comment period] to prepare and file responses," *United States v. Bechtel Corp.*, 648 F.2d 660, 664 (9th Cir. 1981), and this Court allowed 30 days.  Nov. 8 Order at 3.  The comment period closed on January 28, 2002, and we are filing our responses with the Court, concurrently with this Memorandum, on February 27, 2002, thereby complying with the requirement.

---

[38]The summary of the CIS included in the notice is brief, but sufficient to serve what we understand to be its purpose.  The Senate Judiciary Committee added the newspaper provision to a bill that already included *Federal Register* publication of the CIS and proposed decree.  Senate Report at 1-2 (Amendment No. 5).  It did so "to enhance the degree of notice afforded the public," since "[p]ublication in the Federal Register alone was not felt to be meaningful public notice."  *Id.* at 3.  The notice in this case was plainly sufficient to put the public on notice of a proposed settlement of a major antitrust case potentially of interest; of the availability of additional information concerning that settlement; and of the opportunity to comment on the proposed judgment.  Whatever else may be true of *United States v. Microsoft*, it is surely true that the proposed settlement has been amply noticed by the public at large.

**F.     The United States Will Fully Comply With the Tunney Act Requirement That It Publish the Comments and Response**

In light of the Court's Memorandum and Order of February 22, 2002, denying as non-justiciable at that time the United States' Motion for Leave of Court to Adopt an Alternative Procedure for Comment Publication ("Alternative Procedure Motion"), the United States will pursue two parallel approaches to compliance with the remaining requirement of the Tunney Act, publication of the public comments and our response thereto in the *Federal Register*.  Approach 1 will consist of the steps set forth in our Alternative Procedure Motion and the United States' Supplement to Prior Motion for Leave of Court to Adopt an Alternative Procedure for Comment Publication ("Supplement"), filed February 21, 2002, with one difference in timing.  Even with the additional demands of simultaneously pursuing Approach 2, described below, the posting of the full text of the 32,329 public comments described in the Alternative Publication Motion[39] on the Department of Justice's website will likely be accomplished by March 4, 2002.  We estimate that all of the other steps described in our Alternative Procedure Motion and Supplement will be completed by March 15, 2002.  In the view of the United States, completion of these steps will constitute full, and certainly no less than substantial,[40] compliance with the statutory requirement that comments be published in the *Federal Register*, for the reasons set forth in our Alternative Procedure Motion and Supplement.[41]

---

[39]*See* Alternative Publication Motion at 6 (descriptions of comments to be published and of a small category of wholly unrelated or duplicate comments that will not be published).

[40]*See supra* note 15.

[41]*See* Alternative Publication Motion at 2, 9-11; Supplement at 2-3 & n.1.

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 33

Approach 2, which we will pursue in addition to and simultaneous with Approach 1, consists of publication in the *Federal Register* of the full text of the public comments. We will begin the process of publication of the comments in their entirety by providing the full text to the *Federal Register* no later than March 1, 2002; the *Federal Register* will then commence its process of preparing the text for publication.[42] We estimate that publication of the full text of the comments in the *Federal Register*, if ultimately necessary, will occur approximately six weeks after submission to the *Federal Register*.

### G. The Second Revised Proposed Final Judgment Needs No Separate Round Of Public Comment And Response

The Tunney Act does not require a new round of publication and comment in light of the SRPFJ. The publication and comment provisions of the Act serve "to enable the district court to make" its public interest determination. *Hyperlaw, Inc. v. United States*, 1998 WL 388807, at *3, 159 F.3d 636 (D.C. Cir. 1998) (unpublished table decision). Accordingly, a "court should treat notice and comment under the Tunney Act as analogous to agency rulemaking notice and comment." *Id.* (quotation marks omitted). Applying that analogy, "there is no need for successive rounds of notice and comment on each revision," provided the final decree "is a 'logical outgrowth' of the proposed decree. . . . Further notice and comment should be required only if it 'would provide the first opportunity for interested parties to offer comments that could persuade the agency to modify its [proposal].'" *Id.* (quoting *American Water Works Ass'n v. EPA*, 40 F.3d 1266, 1274 (D.C. Cir. 1974)).

---

[42]During approximately the first three to four weeks of this period before publication occurs, it would still be possible to terminate the remaining publication process and save a significant portion of the total cost of full publication.

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 34

The proposed decree as modified is a logical outgrowth of the RPFJ and so requires no further notice and comment. As explained in the United States' Memorandum Regarding Modifications Contained in Second Revised Proposed Final Judgment, each of the modifications clarifies decree language in response to public comments on the RPFJ. They thus are in fact a natural outgrowth of the notice and comment process. Taken separately or together, the modifications do not fundamentally change the RPFJ. All contribute to the public interest. The purpose of the notice and comment has thus been well satisfied, and further notice and comment would merely delay the court's public interest determination without sound reason.[43]

## III.  THE COURT MUST ENTER THE PROPOSED DECREE IF IT IS WITHIN THE REACHES OF THE PUBLIC INTEREST

Courts have long applied a public interest standard in determining whether to enter an antitrust consent decree. S*ee, e.g.*, *United States v. RCA*, 46 F. Supp. 654, 655 (D. Del. 1942) (decision to enter a consent decree "involves a determination by the chancellor that it is equitable and in the public interest"), *appeal dismissed*, 318 U.S. 796 (1943). That standard is now embodied in the Tunney Act, 15 U.S.C. § 16(e) ("the court shall determine that the entry of such judgment is in the public interest" before entering it); *see AT&T*, 552 F. Supp. at 149 n.74 (Tunney Act "represents an endorsement of the line of cases in which courts examined proposed consent decrees to determine whether they were in the public interest"); House Report at 11,

---

[43]Entry of a decree following modification without a new round of notice and comment is conventional in Tunney Act practice. For example, after notice and comment in *AT&T*, the court said it would enter the decree as in the public interest if the parties agreed to a number of modifications, and the Court entered the modified decree without a new round of notice and comment. *AT&T*, 552 F. Supp. at 225-26; *see also MSL*, 118 F.3d at 778.

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 35

1974 U.S.C.C.A.N. at 6542 ("Preservation of antitrust precedent, rather than innovation in the usage of the phrase, 'public interest,' is, therefore, unambiguous").

The court of appeals in *United States v. Microsoft Corp.*, 56 F.3d 1448 (D.C. Cir. 1995) ("*Microsoft I*"), set forth the factors that a Tunney Act court's public interest determination entails. That inquiry differs fundamentally from the inquiry a court conducts in resolving, by adjudicated judgment, a dispute between the litigants before it. Regardless of the stage at which the parties resolved their disputes and reached a settlement in this case, the Court's task is to determine whether it would be in the public interest to enter that settlement as a judgment, not to devise its own remedy.

### A.     Whether The Proposed Decree Is Within The Reaches Of The Public Interest Is Determined By The Test Of *Microsoft I*

In determining whether the proposed decree is in the public interest,[44] a district court properly considers whether "the remedies [are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest.'" *Microsoft I*, 56 F.3d at 1461. In *Microsoft I*, and again in *MSL*, 118 F.3d at 783, the D.C. Circuit explained that this inquiry entails consideration of four specific factors:

> The district court must examine the decree in light of the violations charged in the complaint and should withhold approval only [1] if any of the terms appear ambiguous, [2] if the enforcement mechanism is inadequate, [3] if third parties will be positively injured, or [4] if the decree otherwise makes "a mockery of judicial power." See [*Microsoft I*, 56 F.3d] at 1462.

*MSL*, 118 F.3d at 783.

---

[44]The statute lists a number of factors a court "*may* consider," 15 U.S.C. § 16(e) (emphasis added); *id.* § 16(e)(1)-(2) (listing factors), but consideration of these factors is entirely discretionary. Senate Report at 6.

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 36

The inquiry with respect to the first two factors, ambiguity and enforceability, is straightforward and governed by a reasonableness standard, not a search for perfection.  As the Court of Appeals explained, "the district judge who must preside over the implementation of the decree is certainly entitled to insist on that degree of precision concerning the resolution of known issues as to make his task, in resolving subsequent disputes, reasonably manageable." *Microsoft I*, 56 F.3d at 1461-62.  Similarly, the Court's consideration of the "compliance mechanisms," *id.* at 1462 — *see also* 15 U.S.C. § 16(e)(1) ("provisions for enforcement") — is addressed to real and foreseeable problems relating to "actual compliance."  *Microsoft I*, 56 F.3d at 1462.

The third factor a Tunney Act court properly considers is whether a decree would inflict "positive injury" on third parties, *id.* at 1461 n.9, 1462.  In so doing, the Court must distinguish between positive injury and injury from a decree's "mere failure to secure better remedies for a third party" for whatever reason.  *MSL*, 118 F.3d at 780.  The Court "should not reject an otherwise adequate remedy simply because a third party claims it could be better treated." *Microsoft I*, 56 F.3d at 1461 n.9.

The heart of a district court's public interest determination, however, is whether the proposed remedy adequately meets the requirements for an antitrust remedy, *AT&T*, 552 F. Supp. at 153, or instead whether "the discrepancy between the remedy and undisputed facts of antitrust violations could be such as to render the decree 'a mockery of judicial power,'" *MSL*, 118 F.3d at 782 (quoting *Microsoft I*, 53 F.3d at 1462).  The requirements of an antitrust remedy are familiar. As the Court of Appeals noted in remanding this case:

> a remedies decree in an antitrust case must seek to "unfetter a market from anticompetitive conduct, *Ford Motor Co.[ v. United States*], 405 U.S. [562, ] 577

[(1972)], to "terminate the illegal monopoly, deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future," *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 . . . (1968); *see also United States v. Grinnell Corp.*, 384 U.S. 563, 577 . . . (1966).

253 F.3d at 103.

As the Court of Appeals also emphasized, however, the "'[m]ere existence of an exclusionary act does not itself justify full feasible relief against the monopolist to create maximum competition.'" *id.* at 106 (quoting 3 *Antitrust Law* ¶ 650a, at 67). Thus, in *Microsoft I*, the Court of Appeals, while noting the familiar standard that an antitrust remedy should "pry open to competition a market that has been closed by defendants' illegal restraints," 56 F.3d at 1460 (quoting *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947)), clearly required that the scope of the appropriate remedy be related to the anticompetitive effects of the illegal conduct. Although an antitrust conduct remedy is not limited to enjoining precisely the conduct found to be unlawful, *e.g., Hartford-Empire Co. v. United States*, 323 U.S. 386, 409 (1945); *AT&T*, 522 F. Supp. at 150 n.80, nevertheless "the remedies must be of the 'same type or class' as the violations, and the court is not at liberty to enjoin 'all future violations of the antitrust laws, however, unrelated to the violations found by the court.'" *Microsoft I*, 56 F.3d at 1460.[45]

This Court's assessment of the adequacy of the RPFJ also must take into account the risks and uncertainties of further litigation that would be required before there could be an adjudicated final judgment, safe from further challenge on appeal, that would remedy the anticompetitive harm attributable to conduct found to violate the Sherman Act. The Court of Appeals explained

_____

[45]Nor may relief in a civil antitrust case be punitive. *See United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 326 (1961); *United States v. Oregon State Med. Soc'y*, 343 U.S. 326, 333 (1952); *United States v. Nat'l Lead Co.*, 332 U.S. 319, 338 (1947).

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 38

in *Microsoft I* that it is "inappropriate for the judge to measure the remedies in the decree as if they were fashioned after trial.  Remedies which appear less than vigorous may well reflect an underlying weakness in the government's case, and for the district court to assume that the allegations in the complaint have been formally made out is quite unwarranted."  *Id.* at 1461.[46]

This case differs from *Microsoft I* in that there have been both findings of fact and conclusions of liability affirmed on appeal.  But the difference is one of degree, not kind.  Although the Court of Appeals in this case affirmed the district court's judgment of liability for monopolization, it emphasized that neither it, nor the district court, had so far found "a causal connection between Microsoft's exclusionary conduct and its continuing position in the operating systems market," 253 F.3d at 106-07, sufficient to justify structural relief (although it did not rule out the possibility that this Court would find such a connection on remand).  Absent such a causal connection, the court continued, only conduct relief is justified.[47]  *Id.* at 106.  Moreover, the Court of Appeals vacated the district court's judgment of liability with respect to tying, *id.* at 84 (leaving open the possibility of further litigation on remand using a more demanding

---

[46]Congress intended that the statutory "public interest" concept encompass "compromises made for non-substantive reasons inherent in the process of settling cases through the consent decree procedure."  House Report at 12, 1974 U.S.C.C.A.N. at 6542.

[47]Among the goals of an antitrust decree are "terminat[ing] the illegal monopoly" and "deny[ing] to the defendant the fruits of its statutory violation."  *Microsoft*, 253 F.3d at 103 (internal quotation omitted).  But plaintiffs never alleged, and neither this Court nor the Court of Appeals found, that Microsoft *acquired* its monopoly unlawfully.  *See id.* at 58 (Microsoft "violated § 2 by engaging in a variety of exclusionary acts . . . to maintain its monopoly"); *see also Microsoft I*, 56 F.3d at 1452.  Thus, whether, and to what extent, Microsoft now has an "illegal monopoly" depends on whether its unlawful conduct increased or extended Microsoft's monopoly — that is, whether the fruits of its statutory violations included increments to the magnitude or duration of its market power.  Again, neither the district court nor the Court of Appeals found this direct causal connection between the conduct and the continuance of the monopoly.

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 39

standard); reversed as to attempted monopolization, *id.* at 80-84; and limited the scope of the conduct found to constitute illegal monopolization, *id.* at 67 (overriding of user's choice of default browser), 71 (deals with ICPs), 75 (development and promotion of a JVM), 78 (course of conduct considered separately).  The remedy ultimately imposed on remand, the court directed, "should be tailored to fit the wrong creating the occasion for the remedy."  *Id.* at 107.

In the absence of a settlement, therefore, the United States would face the prospect of extended litigation with respect to the numerous issues related to relief in this case.  An appeal likely would follow the conclusion of the proceedings in this Court.  Microsoft also might choose to seek Supreme Court review of the Court of Appeals' decision affirming its liability for monopoly maintenance.  *See* Cert. Petition at 15 (listing issues for future petition).  Despite the *Findings of Fact* and *Conclusions of Law*, and despite the Court of Appeals' affirmance of a number of the holdings, including liability for monopolization, the ultimate outcome of continued litigation is uncertain, and the path of litigated remedy proceedings would be both risky and costly in terms of resources that might otherwise be devoted to other antitrust enforcement concerns.[48]

Thus, although the litigation risks the United States faces here are not identical to the litigation risks it faces when it negotiates a settlement prior to trial, the teaching of *Microsoft I* remains applicable.  This Court's evaluation of the RPFJ is properly informed by the public interest in a certain and timely remedy for Microsoft's unlawful conduct and must take account

---

[48]*See* Note, *The Scope of Judicial Review of Consent Decrees under the Antitrust Procedures and Penalties Act of 1974*, 82 Mich. L. Rev. 153, 175 n.142 (1974) ("The legislative history of the [Tunney Act] should make the courts sensitive to the efficient allocation of the Department's resources in making their public interest determinations.")

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 40

of the uncertainties and risks of further litigation, an inquiry that properly respects the realistic choices the United States faced in deciding to settle the case on the negotiated terms of the RPFJ.

Moreover, in making its determination, the Court properly accords significant weight to the United States' predictive judgments as to the efficacy of remedial provisions. Indeed, such deference is proper even outside the consent decree context. *See Ford Motor Co, v. United States*, 405 U.S. 562, 575 (1972) ("'once the Government has successfully borne the considerable burden of establishing a violation of law, all doubts as to the remedy are to be resolved in its favor'") (quoting *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 334 (1961)). Similarly, it is proper to defer to the United States as representative of the public interest when the parties are requesting entry of an agreed-upon judgment.[49]

As the Court of Appeals has explained, the degree of deference the trial court gives to "the government's predictions as to the effect of the proposed remedies" in a Tunney Act proceeding may vary with the extent of the court's familiarity with the market and other factors, *Microsoft I*, 56 F.3d at 1461. But, as the Court of Appeals also emphasized, even a court that has extensive relevant expertise should not lightly reject the government's predictions. For example, in the case of the *AT&T* decree — "a decree the oversight of which had been the business of a district judge for several years," *Microsoft I* at 1460 — the court of appeals instructed that the district judge should not reject an agreed-upon modification of the decree unless it had "'exceptional confidence that adverse antitrust consequences [would] result — perhaps akin to the confidence that would justify a court in overturning the predictive judgments of an

---

[49]*See, e.g.*, *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 177 (1948); *United States v. Borden Corp.*, 347 U.S. 514, 518 (1954); *Bechtel*, 648 F.2d at 666.

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 41

administrative agency.'"  *Id.* (quoting *United States v. Western Elec. Co.,* 993 F.2d 1572, 1577 (D.C. Cir. 1993)).  Indeed, if courts do not give appropriate deference to the United States' views, Tunney Act proceedings will become equivalent to the proceedings that lead to adjudicated judgments with adjudicated remedies.

### B.    The Court's Task In Entering A Consent Decree Differs From Adjudicating A Remedy

The fact of settlement here determines the Court's role in this proceeding and the inquiry it must make.  Because the parties to this case have agreed to the Revised Proposed Final Judgment, the Court now faces a task that differs fundamentally from the task the Court of Appeals envisioned when it remanded *United States v. Microsoft Corp.*[50]  The Court of Appeals anticipated the necessity of  "a relief-specific evidentiary hearing," providing a basis for "judicial resolution" of factual issues in dispute between the United States and Microsoft — although it recognized that no such hearing would be required if the parties did not dispute the facts. *Microsoft*, 253 F.3d at 101.  Moreover, anticipating continued litigation between the parties over issues related to relief, the Court of Appeals contemplated that this Court would exercise its "broad discretion to enter that relief it calculates will best remedy the conduct it has found to be unlawful," *id.* at 105, in light of its findings as to the causal connection between that conduct and the maintenance of Microsoft's market power, *id.* at 103-07.  That is, the Court of Appeals envisioned that this lawsuit would terminate in an "adjudicated judgment," with the wording of that judgment "determined by the judge, who may draft it, accept the draft proposed by the

_____

[50]Some of the States that are plaintiffs in *New York v. Microsoft Corp.*, No. 98-CV-1233, have settled with Microsoft on identical terms, while others have not settled and continue to litigate.  We do not address here the nature of the task the Court now faces in *New York*.

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 42

winning party, or adopt portions of draft language proposed by any of the parties," *Janus Films, Inc. v. Miller*, 801 F.2d 578, 581-82 (2d Cir. 1986), to achieve the result the Court views as appropriate — subject to review on appeal.

The parties, however, have chosen to forgo, at least conditionally, their rights to continue litigating to an adjudicated judgment, as well as their rights to further appellate review.[51]  In order to achieve a prompt and certain resolution of this case (*see* CIS at 2, 60-61), they have chosen the alternative means of terminating litigation "by agreement of the parties," *Janus Films*, 801 F.2d at 581, a choice that is clearly permissible at this stage of the litigation.  *See Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*, 386 U.S. 129, 136 (1967) (government antitrust case in which the Supreme Court noted that it did "not question the authority of the Attorney General to settle suits after, as well as before, they reach here"); *see also Fifth & Walnut, Inc. v. Loew's Inc.*, 176 F.2d 587, 592-93 (2d Cir. 1949) (consent decrees with some defendants entered on remand, while other defendants continued to litigate, after Supreme Court affirmed liability in part and reversed in part in *United States v. Paramount Pictures, Inc.*, 334 U.S. 131 (1948)).[52]

---

[51]More particularly, each party has conditionally abandoned the right to seek from the Court a remedy order to which the other has not agreed; each has abandoned the right to seek appellate review of the remedy order; and Microsoft has abandoned the right to seek Supreme Court review of the liability determinations and factual findings in *this* case (No. 98-1232) that were affirmed by the Court of Appeals.  *See United States v. Armour & Co.*, 402 U.S. 673, 681 (1971) (parties to a consent decree "waive their right to litigate the issues involved in the case"). These abandonments are conditional, because the United States has expressly reserved the right to withdraw its consent to the RPFJ prior to entry (Stipulation ¶ 1 (Nov. 6, 2001)), and the consent of both parties is contingent upon the Court's approval of the RPFJ (*id.* ¶ 2).

[52]In principle, the parties could have simply agreed between themselves on a purely contractual version of the RPFJ and terminated the litigation, without the Court's further action, by stipulation of dismissal, *see* Fed. R. Civ. P. 41(a)(1)(ii); *Janus Films*, 801 F.2d at 582; Michigan Note, 83 Mich. L. Rev. at 168 n.98 (as an alternative to a consent decree, government could "settle the case by contract with the defendant"); *see also In re IBM Corp.*, 687 F.2d 591,

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 43

In these circumstances, the parties themselves have resolved their differences, and the Court therefore does not have the classic judicial task of "[r]esolving contested disputes" of fact, law, and remedy. Maimon Schwarzschild, *Public Law by Private Bargain: Title VII Consent Decrees and the Fairness of Negotiated Institutional Reform*, 1984 Duke L.J. 887, 903 (1984). Rather, the Court's task is only to determine whether to perform the "judicial act," *United States v. Swift & Co.*, 286 U.S. 106, 115 (1932), of entering the decree proposed by the parties for entry as the Court's decree.

In cases involving only private interests, the decision to enter settling parties' agreements as judgments requires little judicial attention. *See United States v. City of Miami*, 614 F.2d 1322, 1330 (5th Cir. 1980) ("In what can be termed 'ordinary litigation,' that is, lawsuits brought by one private party against another private party that will not affect the rights of any other persons, settlement of the dispute is solely in the hands of the parties . . . . [T]he court need not and should not get involved"); *Janus Films*, 801 F.2d at 582 ("court normally has only a limited role so long as the dispute affects only private interests"). But in considering whether it "should enter a consent decree affecting the public interest," *Adams v. Bell*, 711 F.2d 161, 170 n.40 (D.C. Cir. 1983) (en banc), "[t]he court has a larger role." *Janus Films*, 801 F.2d at 582. Most

---

600-03 (2d Cir. 1982) (Tunney Act does not apply to stipulations of dismissal). That alternative was unacceptable to the United States, which insisted, for various reasons including the availability of enforcement "by citation for contempt of court," that the agreement carry "the legal force and character of a judgment entered after a trial." *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 518 (1986); *see Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378 (1992) (consent decree "is an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees."). *Cf. United States v. United Artists Theatre Circuit, Inc.*, 1971 Trade Cas. (CCH) ¶ 73,751, at 91,183 (E.D.N.Y. 1971) (in case where government sought preliminary injunction, government advised the court "that it was its policy not to accept stipulations unless 'So Ordered.'").

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 44

fundamentally, the reason for that larger role is that a court of equity must avoid letting its decree become "an instrument of wrong" to the public. *Swift*, 286 U.S. at 115.[53]

The Court's role in making a public interest determination differs from its role in formulating an adjudicated judgment. Because the Court "is evaluating a settlement, it is not as free to exercise its discretion in fashioning a remedy," *AT&T*, 552 F. Supp. at 151, as it would be in a case litigated to an adjudicated judgment. The Court is not "empowered to reject [the remedies sought] merely because [it] believe[s] other remedies [are] preferable." *Microsoft I*, 56 F.3d at 1460. In this procedural setting, the Court's "function is not to determine whether the resulting array of rights and liabilities 'is the one that will *best* serve society,' but only to confirm that the resulting settlement is '"within the *reaches* of the public interest."'" *Id.* (quoting *United States v. Western Elec. Co.*, 900 F.2d 283, 309 (D.C. Cir. 1990) (emphasis in original), in turn quoting *Bechtel*, 648 F.2d at 666, in turn quoting *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)).

This standard reflects not only the proper role of a court of equity asked to lend its authority to the parties' agreement, but also the critical role that consent decrees play in effective public antitrust enforcement. *See* Senate Report at 5 ("the consent decree is of crucial importance as an enforcement tool, since it permits the allocation of resources elsewhere"); 119 Cong. Rec. 24,600 (1973) (Statement of Sen. Gurney) (Tunney Act "is designed to enhance the value and effectiveness of the consent decree as a tool of public policy"). A consent decree, such

---

[53]*Cf. United States v. Microsoft Corp.*, 56 F.3d 1448, 1460 (D.C. Cir. 1995) (analogizing public interest determination to decision on decree modification, where "a court should not reject an agreed-upon modification unless 'it has exceptional confidence that adverse antitrust consequences will result'") (citation omitted).

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 45

as the RPFJ, is the product of negotiation.  The parties weigh the benefits of prompt and certain resolution of the case against the possibility that continued litigation might improve their respective positions.  Settlements potentially offer the public the benefits of more timely and certain relief, as well as significant savings in judicial and prosecutorial resources.  But if courts refused to enter any consent decree that did not match precisely the relief the court would have imposed in the absence of a settlement, "defendants would have no incentive to consent to judgment and this element of compromise would be destroyed.  The consent decree would thus as a practical matter be eliminated as an antitrust enforcement tool, despite Congress' directive that it be preserved."  *AT&T*, 552 F. Supp. at 151.

Thus, even in the *AT&T* case, a case of unparalleled public importance in which the trial court had unusual familiarity with both the evidence and the legal arguments of the parties, *see id.* at 152, the court determined to approve the parties' settlement "[i]f the [proposed] decree meets the requirements for an antitrust remedy."  *Id.* at 153.  The court made clear that it intended to follow that standard whether or not the proposed decree corresponded to the decree the court itself would have imposed had the parties pushed forward to an adjudicated judgment. *See id.* at 166 n.147 (noting that if the case "were to proceed to final judgment and liability were found, the Court might determine that [certain measures not part of the proposed decree] are appropriate remedies, either as alternatives to the divestiture of the Operating Companies or in addition to such divestiture").

IV.     **ENTRY OF THE REVISED PROPOSED FINAL JUDGMENT IS IN THE PUBLIC INTEREST**

The RPFJ is a sound and appropriate response to the violations found by the district court and affirmed by the court of appeals, recognizing, as it must, the substantial narrowing of the case that has taken place since its commencement in 1998.  In fashioning appropriate relief, the United States was bound to confine its remedial proposals to the sole basis of liability sustained by the Court of Appeals — *i.e.*, specific acts by Microsoft to impede the emergence of middleware as a threat to the operating system monopoly.  The United States also was mindful of the risks associated with tampering too greatly with market mechanisms or seeking to dictate some preferred view of how these markets should develop.  While Microsoft's violations must be redressed, the purpose of an antitrust decree is to restore and preserve competition, not to displace competition with a regulatory regime.

The RPFJ meets the goals of public antitrust enforcement.  First, it prohibits the conduct found by the court of appeals to be unlawful.  The RPFJ contains specific affirmative prohibitions addressing each of the 12 practices the court determined to be acts of monopoly maintenance.  This being a monopolization decree, the RPFJ then goes beyond the specific unlawful acts to provide fencing-in relief to address other practices that Microsoft might use to replicate the adverse effects of the offending conduct.  For example, although there was no finding that Microsoft had priced its operating systems in an unlawful manner, the RPFJ requires uniform pricing and terms to the major OEM's to prevent retaliatory discrimination against those who might promote competing middleware products.  Finally, the RPFJ takes affirmative steps to restore competition by creating favorable conditions under which competing middleware products can be developed and deployed.  Among other things, the RPFJ requires the

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 47

documentation and disclosure of applications interfaces and communications protocols to facilitate third-party development efforts and, in some instances, modifications of the operating system to accommodate competing middleware.  Again, these restorative provisions go beyond the specific findings of unlawful behavior, with the goal of creating a forward-looking and comprehensive remedial scheme.  Nothing in the RPFJ exempts Microsoft from the mandates of the antitrust laws; it continues to face antitrust exposure for conduct beyond that which has been litigated in this case.

Many commentors, especially many of Microsoft's competitors, urge the Court to withhold Tunney Act approval, advocating their own views of the public interest.  Although many such commentors assert that alternatives to the RPFJ might advance their own private strategic and financial interests, such proposals typically lack a foundation in the court's liability findings and likely would be harmful to both competition and consumers.  The most persistent complaint is that the fencing-in and restorative provisions are not absolute prohibitions on competitive activity by Microsoft or absolute requirements that Microsoft surrender its technology for the benefit of competitors.  Characterizing the RPFJ's limitations as "loopholes," these commentors fail to recognize that the limitations merely permit Microsoft to compete through actions that are not prohibited by the antitrust laws, were never at issue in this case, or were challenged under theories of liability expressly rejected by the court of appeals.

Protecting competitors from legitimate competition from Microsoft is not a goal of public antitrust enforcement.  The goal of the decree is not to secure specific advantages for particular competitors or to dictate for consumers which products or technologies will succeed.  In fashioning the RPFJ, the United States has taken pains to remedy the violations without seeking

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL
JUDGMENT - PAGE 48

to dictate market outcomes.  We have had to balance certain competing interests, recognizing that provisions benefitting firms at one level in the chain of distribution have potential effects on firms at other levels.  In striking such balances, the United States has remained faithful to the axiom that the U.S. antitrust laws protect competition not competitors.  *E.g.*, *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 812 (D.C. Cir. 2001) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977), *petition for certiorari filed*, 70 U.S.L.W. 3465 (Jan. 11, 2002), (No. 01-1050).  On that basis, the United States has concluded that further fencing-in or restorative relief based upon hypothetical concerns about Microsoft's behavior not only would be unnecessary and unwarranted, but also might be affirmatively harmful to competition.

Moreover, the RPFJ bears none of the infirmities that would justify the Court's withholding of approval.  *See MSL*, 118 F.3d at 783 (listing factors that would justify withholding approval); *Microsoft I*, 56 F.3d at 1462 (same).  The decree is comprehensive and complex, like the computer industry itself, but its terms are carefully defined and not ambiguous.[54]  The enforcement mechanisms are creative and fully adequate.  *See* pages 60-62 below.[55]  No third party has demonstrated positive injury that would flow from entry of the RPFJ.

---

[54]For a response to commentors' claims of specific ambiguities, see Response of the United States To Public Comments on the Revised Proposed Final Judgment, *passim*, *esp.* § III (Definitions) ("Response").

[55]For a response to commentors' claims of specific shortcomings of the enforcement mechanisms of the RPFJ, see Response, § VIII (Enforcement); *see also* Declaration of David S. Sibley ("Sibley Decl.") (attached as Appendix C).

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 49

**A.     The Revised Proposed Final Judgment Satisfies The Goals Of An Antitrust Remedy And Properly Addresses All Bases Of Liability Affirmed By The Court Of Appeals**

The Revised Proposed Final Judgment provides stringent, effective, enforceable, and immediate relief that fully comports with the purposes of relief in antitrust cases and with Microsoft's degree of liability as affirmed by the Court of Appeals.  Restoring competition is the "key to the whole question of an antitrust remedy," *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 326 (1961).  Competition was injured in this case principally because Microsoft's illegal conduct contributed to the applications barrier to entry into the personal computer operating system market by impeding the emergence of middleware products that had the potential to assist competing operating systems in gaining access to applications and other needed complements.  Thus, the key to the proper remedy in this case is to end Microsoft's restrictions on potentially threatening middleware, prevent it from hampering similar nascent threats in the future, and restore competitive conditions like those that existed prior to the unlawful conduct.  Moreover, in fashioning relief, the United States, as the public enforcer of the federal antitrust laws, must take care that the remedy not burden the economy or distort market outcomes through unnecessarily regulatory or otherwise inappropriate restraints.  The RPFJ responds to these concerns; it imposes a series of requirements and carefully crafted prohibitions on Microsoft's conduct that are designed to accomplish the critical goals of an antitrust remedy without damaging the economy.  *See* Sibley Decl. ¶¶ 86-90.

As instructed by the Court of Appeals and this Court (*see* Tr. 9/28/01 at 8), the United States fashioned its relief by focusing on the specific practices for which Microsoft's liability was affirmed.  Significantly, and quite properly, the RPFJ does not seek to eliminate Microsoft's

operating system monopoly, *see* Sibley Decl. ¶ 8, though many commentors suggest it should. There was never any allegation — let alone any finding — in this case that Microsoft acquired its position in operating systems unlawfully. Further, the district court and the Court of Appeals both determined that they could not conclude that, absent Microsoft's illegal actions, any middleware product or products would have succeeded in toppling the monopoly.

In fashioning the decree, the United States began with the district court's interim conduct remedies of June 2000. *See* Initial Final Judgment, 97 F. Supp. 2d at 66-69. As this Court recognized (Tr. 9/28/01 at 8), however, those remedies were based on a much wider range of liability findings than were affirmed on appeal. *See Microsoft*, 253 F.3d at 105 ("[t]his court has drastically altered the District Court's conclusions on liability"). Accordingly, the conduct restrictions of the Initial Final Judgment had to be tailored to the findings the Court of Appeals upheld. At the same time, however, because the interim conduct restrictions were designed to apply only as a stop-gap until the district court's structural remedy was implemented (Initial Final Judgment, 97 F. Supp. 2d at 66), they had to be broadened to address more fully the remedial objectives of arresting the anticompetitive conduct, preventing its recurrence, and restoring competitive conditions in the marketplace. No longer merely a stop-gap, the conduct restrictions now must stand on their own as full relief.

In addition, the remedies needed to be updated to strengthen their long-term effectiveness in the face of the rapid technological innovation that continues to characterize the computer industry. The Court of Appeals noted that the six years that had elapsed between Microsoft's initial anticompetitive conduct and the appeal was an "eternity" in this market, *Microsoft*, 253 F.3d at 49 (quoted by Order at 2 (Sept. 28, 2001)), and the facts bear that out. When the

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 51

complaint was filed in May 1998, Microsoft's then-current operating system was Windows 95.

Shortly thereafter, Microsoft revised and updated the operating system with Windows 98, which

fully integrated Internet Explorer into Windows.  In October 2001, just after the case was

remanded to this Court, Microsoft introduced the latest generation of its operating system,

Windows XP.  The remedy crafted now must be relevant in the new world of Windows XP, and

beyond.  The RPFJ accomplishes these objectives by fundamentally changing — for the ultimate

benefit of consumers — the way Microsoft deals with OEMs, IAPs, ISVs, and others in the

computer industry.

### 1.     The RPFJ Stops The Unlawful Conduct, Prevents Its Recurrence And Restores Competitive Conditions To The Market

The Court of Appeals affirmed the district court's ruling that Microsoft unlawfully

maintained its operating system monopoly through various actions designed to protect the

operating system from the potential threat posed by middleware.  However, the court reversed the

district court's finding that Microsoft was liable based upon its general "course of conduct," and

limited liability to twelve specific anticompetitive acts out of twenty found violative by the

district court.  The RPFJ provides consumers with prompt, certain, and effective relief by

stopping each of the specific acts found unlawful by the Court of Appeals, preventing their

recurrence, and restoring competitive conditions in the market.

### a.     Stops The Unlawful Conduct

Each of the twelve acts found unlawful by the Court of Appeals is listed below with a

brief description of the specific provisions of the RPFJ that effectively address the conduct.[56]

---

[56]For a fuller discussion of how the Court of Appeals addressed the twenty acts found by the district court to violate Section 2, see Appendix A (attached hereto), and Sibley Decl. ¶ 16

**_Agreements with Computer Manufacturers (OEMs)_**

**_1.     Prohibiting removal of desktop icons, folders or Start menu entries_** (*see* 253 F.3d at 61)

**Section III.H.1** of the RPFJ prevents Microsoft from engaging in this conduct by allowing end users or computer manufacturers to enable or remove access to each middleware product by displaying or removing icons, shortcuts, or menus in the Microsoft operating system in the same place they are normally displayed.  *See* Sibley Decl. ¶ 24.

**_2.     Prohibiting alteration of initial boot sequence_** (*see* 253 F.3d at 61)

**Section III.C.3** prohibits Microsoft from restricting OEMs from launching middleware automatically at the end of the initial boot sequence or subsequent boot sequences.  **Section III.C.4** prohibits Microsoft from restricting OEMs from offering users the option of launching a non-Microsoft operating system before Windows starts up.  **Section III.C.5** prohibits Microsoft from preventing OEMs from presenting their own Internet access offer in the initial boot sequence.  *See* Sibley Decl. ¶ 25.

**_3.     Prohibiting addition of icons or folders of different shape or size_** (*see* 253 F.3d at 62)

**Section III.C.1** prohibits Microsoft from preventing OEMs from installing and displaying middleware on the desktop.  **Section III.C.2** prohibits Microsoft from preventing OEMs from distributing or promoting middleware by placing on the desktop shortcuts of any size or shape, as long as they do not impair the functionality of the user interface.  **Section III.H.3** ensures that Microsoft's operating system does not automatically override the "default" settings to replace competing middleware products without first seeking confirmation from the user.  *See* Sibley Decl. ¶¶ 26, 27.

**_4.     Prohibiting use of "Active Desktop" to promote others' products_** (*see* 253 F.3d at 62)

This specific conduct is no longer at issue because Microsoft has discontinued the use of the Active Desktop.  **Sections III.C.1** and **III.C.2** nevertheless broadly restrict Microsoft from preventing OEMs from promoting rival products.  *See* Sibley Decl. ¶ 28.

———————————

(Table One).

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 53

### *Binding Internet Explorer To Windows*

5.    ***Excluding Internet Explorer from the "Add/Remove" utility*** (*see* 253 F.3d at 65)

        **Section III.H.1** requires Microsoft to allow end users and OEMs to enable or remove access to any Microsoft middleware product.  *See* Sibley Decl. ¶ 29.

6.    ***Commingling code to prevent removal of Internet Explorer*** (*see* 253 F.3d at 64-66)

        **Section III.C.1** prohibits Microsoft from preventing computer manufacturers from installing and displaying rival middleware products on the desktop.  **Section III.H.1** requires Microsoft to allow end users and computer manufacturers to remove access to any Microsoft middleware product.  *See* Sibley Decl. ¶ 30.

### *Agreements with Internet Access Providers (IAPs)*

7.    ***Placement of IAP's product on desktop in return for its agreement to exclusively promote Internet Explorer (or to limit shipments of Navigator)*** (*see* 253 F.3d at 68)

        **Section III.G.1** prohibits Microsoft from entering into any agreement with an IAP, ICP, ISV, or OEM that grants consideration on the condition that such entity distribute, promote, use, or support any Microsoft middleware or operating system exclusively or in a fixed percentage.  **Section III.G.2** prohibits Microsoft from entering into any agreement with an IAP or ICP granting placement in Windows to the IAP or ICP on the condition that it refrain from distributing, promoting, or using any product competing with Microsoft middleware.  *See* Sibley Decl. ¶ 31.

### *Agreements with Internet Content Providers, Independent Software Vendors, and Apple*

8.    ***Agreement with ISVs to make Internet Explorer their default hypertext-based user interface*** (*see* 253 F.3d at 71-72)

        **Section III.F.2** forbids Microsoft from conditioning the grant of consideration on an ISV's refraining from developing, using, distributing, or promoting software that competes with Microsoft's operating system or middleware.  **Section III.G.1** prohibits Microsoft from entering into any agreement with an IAP, ICP, ISV, or OEM that grants consideration on the

condition that such entity distributes, promotes, uses, or supports any Microsoft middleware or operating system exclusively or in a fixed percentage. *See* Sibley Decl. ¶ 32.

9. ***Threat to end support of Apple Computer's Office product unless Apple bundled Internet Explorer with the Macintosh operating system and made Internet Explorer the default browser*** (*see* 253 F.3d at 73)

**Sections III.F.1** and **III.F.2**, discussed above, prohibit Microsoft from retaliating against ISVs and IHVs, including Apple, for supporting competing products and from offering consideration to such entities for refraining from supporting competing products. In addition, **Section III.G.1** prohibits such exclusive arrangements. Sibley Decl. ¶ 33.

## *Efforts to Exclude Sun's Java*

10. ***Contracts requiring ISVs to exclusively promote Microsoft's Java product*** (*see* 253 F.3d at 75)

**Section III.F.2** forbids Microsoft from conditioning the grant of consideration on an ISV's refraining from developing, using, distributing, or promoting software that competes with Microsoft's operating system or middleware. **Section III.G.1** prohibits Microsoft from entering into any agreement with an IAP, ICP, ISV, or OEM that grants consideration on the condition that such entity distribute, promote, use, or support any Microsoft middleware or operating system exclusively or in a fixed percentage. *See* Sibley Decl. ¶ 34.

11. ***Deception of Java developers about Windows-specific nature of tools distributed to them*** (*see* 253 F.3d at 76)

**Section III.D** addresses this conduct by requiring Microsoft to disclose certain APIs required for competing middleware to interoperate with its operating system. This makes the means by which middleware producers interoperate with the operating system more transparent, and thus hinders Microsoft's ability to disadvantage these competitors. *See* Sibley Decl. ¶ 35.

12. ***Coercion of Intel to stop assisting Sun in improving its Java technology*** (*see* 253 F.3d at 77)

**Sections III.F.1** and **III.F.2**, discussed above, prohibit Microsoft from retaliating against ISVs and IHVs, including Intel, for supporting

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 55

competing products and from offering consideration to such entities for refraining from supporting competing products. *See* Sibley Decl., ¶ 36.

Thus, the RPFJ effectively stops each of the specific acts found unlawful by the Court of Appeals. *See* Sibley Decl. ¶ 40.

### b.     Prevents Recurrence Of Unlawful Conduct

In addition to stopping and preventing the recurrence of the specific acts found unlawful by the Court of Appeals, the RPFJ guards against the broad range of potential strategies Microsoft might develop to impede the emergence of competing middleware products. *See* Sibley Decl. ¶¶ 41-51.

***Middleware Definition.*** The various definitions of middleware within the RPFJ (*see* **"Microsoft Middleware"** (Section VI.J), **"Microsoft Middleware Product"** (Section VI.K) **"Non-Microsoft Middleware"** (Section VI.M), and **"Non-Microsoft Middleware Product"** (Section IV.N)) are broad. They cover not only the middleware products addressed by the Court of Appeals — Internet browsers and Java — but also additional current middleware products, such as email client software, networked audio/video client software, and instant messaging software, as well as future middleware products not yet in existence. *See* Sibley Decl. ¶¶ 41-42. To ensure inclusion of future products, the definitions set forth an objective test for products not yet existing; the definitions are qualified, however, in recognition that not all software that exposes APIs qualifies as competitively significant "middleware." Consequently, third-party software that, like Web browsers or Java, has the potential to create a competitive threat to Microsoft's operating system monopoly, will be covered in the future.

***Non-Discrimination and Non-Retaliation.*** **Sections III.A, III.B,** and **III.F** impose broad prohibitions and obligations on Microsoft to ensure that it cannot implement new forms of

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 56

exclusionary behavior against middleware.  *See* Sibley Decl. ¶¶ 41-42, 51.  **Section III.A** of the

RPFJ ensures that OEMs have contractual and economic freedom to make decisions about

distributing and supporting non-Microsoft middleware products without fear of coercion or

retaliation by Microsoft, by broadly prohibiting retaliation against a computer manufacturer that

supports or distributes alternative middleware or operating systems.  Because the Court of

Appeals agreed with the district court's conclusion that OEMs are a crucial channel of

distribution for competing products (*see* 253 F.3d at 60-61), it is critical that OEMs are free to

choose to distribute and promote competing middleware products without interference from

Microsoft.  **Section III.B** strengthens Section III.A further by requiring Microsoft to provide

uniform licensing terms to the twenty largest and most competitively significant OEMs.

Windows license royalties and terms are inherently complex, making it easy for Microsoft to use

them to coerce OEM conduct.  By eliminating the opportunity for Microsoft to use license terms

as a club, the provision ensures that OEMs can make their own choices.  **Section III.F** prohibits

Microsoft from retaliating against ISVs and IHVs or conditioning consideration on a developer's

refraining from developing, distributing, or writing to software that competes with Microsoft

platform software.  At the same time, it allows Microsoft to enter into lawful agreements with

software developers that include provisions relating to Microsoft software, as long as the

provisions are limited and reasonably necessary to effectuate the bona fide contractual

relationship.

### c.     Restores Competitive Conditions To The Market

The RPFJ restores competitive conditions to the market by requiring Microsoft to, among

other things: (1) disclose APIs and license communications protocols that will give ISVs the

opportunity to match Microsoft's middleware and server software functionality; and (2) allow

OEMs and end users to replace Microsoft middleware and preserve "default" settings that will

ensure that Microsoft's middleware does not override the selection of competing middleware

products. *See* Sibley Decl. ¶ 52 & Table Two.

   *APIs and Communications Protocols.* **Section III.D** of the RPFJ requires Microsoft to

disclose all of the interfaces and related technical information, including APIs, that Microsoft's

middleware uses to interoperate with the Windows operating system. This includes APIs and

other information that Microsoft has not previously disclosed. This Section creates the

opportunity for ISVs, IAPs, ICPs, and OEMs to develop new middleware products that compete

directly with Microsoft on a function-by-function basis, assured that their products will

interoperate with the Windows operating system.

   **Section III.E** requires Microsoft to license the communications protocols that are

necessary for software located on a computer server to interoperate with the Windows operating

system. This means that ISVs will have full access to, and be able to use, the protocols that are

necessary for software located on a server computer to interoperate with, and fully take

advantage of, the functionality provided by the Windows operating system. The competitive

significance of most non-Microsoft middleware, including the browser and Java technologies —

against which much of Microsoft's illegal conduct was directed — was and will continue to be

highly dependant on content, data, and applications residing on servers and passing over

networks (such as the Internet or corporate networks) to that middleware running on personal

computers. Section III.E prevents Microsoft from incorporating into Windows features or

functionality with which only its own servers can interoperate, and then refusing to make

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL
JUDGMENT - PAGE 58

available information about those features that non-Microsoft servers need in order to have the same opportunities to interoperate with the Windows operating system. Although plaintiffs presented limited evidence about servers at trial, and no server-related violations were alleged or found, the United States believed that the RPFJ's effectiveness would be undercut unless it addressed the rapidly growing server segment of the market.

**Section III.I** requires Microsoft to offer the necessary related licenses of the intellectual property that are required to disclose and license under the RPFJ. Section III.I ensures that Microsoft's obligations to disclose the technical information in Sections III.D and III.E are meaningful. This Section ensures that Microsoft cannot use its intellectual property rights in such a way that undermines the competitive value of its disclosure obligations, while at the same time permitting Microsoft to take legitimate steps to prevent unauthorized use of its intellectual property.

**Section III.J** permits Microsoft to take certain limited acts to address security-related issues that may arise from the broad disclosures required in Sections III.D and III.E. Section III.J provides a narrow exception for disclosure of APIs and other information for disclosures that would compromise system security. *See* Sibley Decl. ¶ 65.

***Power to Replace Microsoft Middleware and Preserve Defaults.*** **Section III.H** further ensures that OEMs will be able to offer and promote, and consumers will be able to use, competing middleware products. Section **III.H.1** requires Microsoft to allow end users and OEMs to enable or remove access to each Microsoft middleware product. Thus, all middleware products will have equal opportunity for desktop placement. **Section III.H.2** requires Microsoft to allow end users, OEMs, and Non-Microsoft Middleware Products to designate non-Microsoft

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 59

middleware to be invoked in place of the Microsoft middleware. This will allow competing programs to be launched automatically, as defaults, in numerous competitively significant instances.

### 2.    The RPFJ Contains Stringent Enforcement Mechanisms

**Sections IV, V, and VII** of the RPFJ contain some of the most stringent enforcement provisions ever contained in any modern consent decree. **Sections IV and VII** provide that the United States' full enforcement powers are available to enforce the judgment. As with any other decree, the United States will have prosecutorial access powers to monitor compliance, and authority to bring: (1) both civil and criminal contempt petitions; (2) petitions for injunctive relief to halt or prevent violations; (3) motions for declaratory judgment to clarify or interpret particular provisions; and (4) motions to modify the Final Judgment, as appropriate.[57] Though not required by the RPFJ, the United States has charged a core team of lawyers and economists experienced in the software industry with enforcing the RPFJ. Section IV also provides, as the United States typically requires, that Microsoft maintain an antitrust compliance program to help ensure compliance with the RPFJ. Microsoft is required to appoint an internal compliance officer responsible for supervising the review of Microsoft's activities to determine whether they comply with the RPFJ and for ensuring that Microsoft undertakes internal notification and education responsibilities as required.

But the enforcement provisions do not stop there; rather, they contain two other, aggressive features. First, the RPFJ establishes the Technical Committee, a full-time, on-site compliance team of software design and programming experts, with the means to hire its own

---

[57]Of course, each Settling State also has authority to enforce the RPFJ.

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 60

staff and consultants, as needed. The Technical Committee will facilitate enforcement by monitoring compliance with the RPFJ and reporting violations to the United States. Additionally, the Technical Committee is available to mediate compliance issues in a manner that will not supplant legal enforcement by the United States. This dispute resolution function reflects the recognition that the market will benefit from rapid, consensual resolution of issues, whenever possible, more so than litigation under the United States' contempt powers. Dispute resolution complements, but does not supplant, the other methods of enforcement. Furthermore, should the United States bring an enforcement action against Microsoft, it will not have to start from scratch. Rather, it will have the Technical Committee's work product, findings, and recommendations to help start any investigation.

In order to fulfill these important responsibilities, the Technical Committee will have complete access to Microsoft's records, facilities, systems, equipment, and personnel. Significantly, this includes access to Microsoft's source code and related materials, which will assist in resolving or identifying any disputes relating to Microsoft's disclosure obligations. The Technical Committee will also have the benefit of written reports and data, which Microsoft must prepare.

Second, under **Section V**, the RPFJ is scheduled to terminate in five years, but may be extended by two years if the Court finds that Microsoft has engaged in a pattern of wilful and systemic violations. The five-year duration provides sufficient time for the remedies to take effect in this evolving market and to restore competitive conditions to the greatest extent possible. And, because Microsoft will have an incentive to get out from under the RPFJ's

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 61

restrictions and affirmative obligations as soon as possible, the prospect that it might face a two-year extension will provide an extra incentive to comply.

### 3. The RPFJ Fully Addresses The Unlawful Conduct While Avoiding An Unnecessarily Regulatory Decree That Would Distort Market Outcomes

As discussed above, the United States carefully crafted the RPFJ to fully address the conduct found unlawful by the Court of Appeals.  In doing so, the United States was mindful not to implement an overly broad, unnecessarily regulatory decree that would interfere with competitive conditions in the market.  As discussed more fully in the Response to Comments, many commentors seek remedies that preordain market outcomes, require extensive on-going regulation, are vulnerable to manipulation by Microsoft's rivals, or are simply crafted to weaken Microsoft as a competitor.[58]  Such remedies would create inefficiencies in the market and likely result in harm to consumer welfare.  *See* Sibley Decl. ¶¶ 19-21, 86-88.

---

[58]For example, several commentors have urged that the RPFJ require Microsoft to distribute Sun-compatible Java products with each copy of the Windows operating system shipped by Microsoft. *E.g.*, SIIA Comments, at 49-51;Comments of SBC Communications, Inc. on the Proposed Final Judgment, at 145 (MTC # 00029411) ("SBC Comment"); ProComp Comment, Att. A, at A18-19 (Declaration of Kenneth J. Arrow) ("Arrow Decl.").  This remedy would go beyond restoring the competitive conditions existing prior to Microsoft's unlawful conduct — where Sun's Java product *competed* for space on Windows — and instead preordain the market outcome by ensuring Java placement on the operating system. *See* Sibley Decl. ¶ 80. As another example, a commentor proposes that Microsoft be required to offer, at a lower price, a separate, "stripped down" version of Windows that does not include Microsoft middleware products.  SBC Comment, at 48-49.  However, determining the appropriate discount for each of the middleware products stripped out of Windows, including an accounting for the shared costs between multiple projects, would result in a highly regulatory pricing apparatus susceptible to further litigation. *See* Sibley Decl. ¶¶ 71-74.

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 62

**B.    The Revised Proposed Final Judgment Compares Favorably To The Initial Final Judgment**

In the Joint Status Report filed September 20, 2001, plaintiffs informed the Court that their proposal for relief would be modeled on the conduct restrictions in the Initial Final Judgment.  Joint Status Report at 2 (Sept. 20, 2001).  A week later, the Court admonished plaintiffs to determine which relief was no longer appropriate given the Court of Appeals' narrowing of the underlying liability.  *See* Tr. 9/28/01 at 8.  Although some commentors have argued that any relief short of the Initial Final Judgment is inadequate, that is contrary to the Court's statements, as well as the Court of Appeals' ruling.

The RPFJ parallels the Initial Final Judgment in many ways, provides for greater relief in some respects, and, in light of the Court of Appeals' decision, omits some provisions.  A comparison of the two decrees highlights why the RPFJ is in the public interest.

**1.    The Revised Proposed Final Judgment Relies On Conduct Restrictions, Rather Than Structural Relief**

The most significant difference between the Initial and Revised Proposed Final Judgment is that the former required a break-up of Microsoft while the latter does not.  *See* IFJ §§ 1-2.  Shortly after remand, plaintiffs informed Microsoft and this Court that, in light of the Court of Appeals' decision, we would no longer seek to break up the company.  Joint Status Report 2 (Sept. 20, 2001).  Thus, even if the United States had not entered into a negotiated settlement and instead litigated a remedy, we would not have sought structural relief.  Plaintiffs abandoned the effort to break up Microsoft for both legal and practical reasons.

First, although the Court of Appeals merely vacated — but did not reverse — the Initial Final Judgment, it also made clear that it viewed structural relief in this case skeptically, at best.

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 63

The court questioned whether plaintiffs had "established a sufficient causal connection between Microsoft's anticompetitive conduct and its dominant position in the [operating system] market" to justify divestiture. *Microsoft*, 253 F.3d at 106. The court continued that "[a]bsent such causation, the antitrust defendant's unlawful behavior should be remedied by 'an injunction against continuation of that conduct.'" *Id.* (quoting 3 *Antitrust Law* ¶ 650a, at 67). The court also suggested that the necessary causation might be lacking, noting that even the district court "expressly did *not* adopt the position that Microsoft would have lost its position in the [operating system] market but for its anticompetitive behavior." *Id.* at 107 (quoting *Findings of Fact*, ¶ 411) (emphasis added). Moreover, the Court of Appeals accepted Microsoft's argument that divestiture is usually reserved for "dissolution of entities formed by mergers and acquisitions," and directed this Court to "reconsider" whether "divestiture is appropriate with respect to Microsoft, which argues that it is a unitary company." *Id.* at 105. And the court emphasized that, when fashioning a new remedy, the district court should bear in mind that the Court of Appeals had "drastically" altered the basis of liability (*id.* at 105, 107) and that the new remedy should reflect the "limited ground of liability" upheld on appeal. *Id.* at 107.

Second, if plaintiffs had pursued structural relief on remand, Microsoft would have been entitled to present evidence challenging a "wide range of plaintiffs' factual representations, including the feasibility of dividing Microsoft, the likely impact on consumers, and the effect of divestiture on shareholders." *Id.* at 101. This not only would have been time consuming — both in the district court and then, assuming this Court actually ordered structural relief anew, again in the Court of Appeals — but also would have permitted Microsoft to introduce a plethora of new

evidence.  Foregoing a structural remedy permitted plaintiffs to speed along the remand

proceedings and obtain quicker relief and relief that was more likely to be affirmed on appeal.

### 2.     Remedying Tying Is No Longer An Objective

The Revised Proposed Final Judgment also departs significantly from the Initial Final

Judgment by omitting a prohibition on tying.  *See* IFJ § 3.f ("Ban on Contractual Tying").  The

Court of Appeals vacated Microsoft's liability on the tying claim (*Microsoft*, 253 F.3d at 84-97),

and soon thereafter plaintiffs informed Microsoft and this Court that, in light of the appellate

court's decision, we would no longer pursue allegations of tying.  Joint Status Report 2 (Sept. 20,

2001).  Thus, even if the United States had not entered into a negotiated settlement and instead

continued its litigation, we would not have pursued the tying claim.  As with structural relief,

plaintiffs abandoned the tying claim for both legal and practical reasons.

The Court of Appeals vacated and remanded, rather than reversed, the tying claim, but

left clear instructions on what it expected on remand.  See *Microsoft*, 253 F.3d at 95-97.  First,

plaintiffs would have to pursue the claim under the rule of reason — with its rigorous proof

requirements — rather than the per se rule, which obviates many difficult problems of proof.  *Id.*

at 89-95.  Second, plaintiffs would be required to show that Microsoft's conduct "unreasonably

restrained competition . . . in the tied good market," but would be "precluded from arguing any

theory of harm that depends on a precise definition of browsers or barriers to entry . . . other than

what may be implicit in Microsoft's tying arrangement."  *Id.* at 95.  Plaintiffs considered these to

be significant legal hurdles.

Of course, pursuing the tying claim on remand also would have raised many of the same

practical difficulties as discussed with respect to pursuing structural relief on remand.  For

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL
JUDGMENT - PAGE 65

example, continued pursuit of tying would have delayed the remand proceedings significantly, thereby further delaying any relief for consumers. Also, Microsoft would have been entitled to introduce a whole host of new evidence relating to its claimed procompetitive justifications for its actions. Thus, the decision to abandon the tying claim was a sound exercise of prosecutorial discretion.

The United States' decision to abandon the tying claim, coupled with the Court of Appeals' decision to reject the attempted monopolization count, had a significant impact on the scope of relief the United States could obtain. The tying and attempted monopolization claims were the only two considered by the Court of Appeals that asserted a direct anticompetitive impact in the market for Web browsers. The remaining count, monopoly maintenance, asserted an anticompetitive impact in the operating system market. The only connection that Web browsers had to this claim was that they were one of the nascent middleware threats that Microsoft had impeded. Therefore, without a claim asserting a direct impact in the Web browser market, the United States' was entitled to relief that restored nascent threats like those that Web browsers had presented, not relief that addressed some broader injury in the browser market.

>   **3.**    **The New Conduct Restrictions Compare Favorably To Those In The Initial Final Judgment**

The Revised Proposed Final Judgment is based on the interim conduct restrictions of the Initial Final Judgment of June 7, 2000.

>   **a.**    **Substantive Provisions Included In Both The Initial Final Judgment And The Revised Proposed Final Judgment**

Both decrees prohibit Microsoft from retaliating against OEMs that support non-Microsoft products. *Compare* IFJ § 3.a.i *with* RPFJ § III.A. Both decrees also require Microsoft

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 66

to license its Windows operating system products to the 20 largest OEMs on uniform terms.

*Compare* IFJ § 3.a.ii, *with* RPFJ § III.B.  The Initial Final Judgment also afforded OEMs

flexibility in product configuration, as does the Revised Proposed Final Judgment.  *Compare* IFJ

§ 3.a.iii, *with* RPFJ § III.C.  The Initial Final Judgment also barred Microsoft from prohibiting

OEMs from automatically launching a substitute user interface upon completion of the boot

process (IFJ § 3.a.iii(3)), but the Court of Appeals expressly rejected this basis for liability

(*Microsoft*, 253 F.3d at 63), so the Revised Proposed Final Judgment has no equivalent

provision.  And both decrees require Microsoft to provide OEMs and consumers the means to

remove access to any Microsoft middleware that comes with Windows so that rival middleware

may be substituted.  *Compare* IFJ§ 3.g.i, *with* RPFJ § III.H.

Section 3.b of the Initial Final Judgment required Microsoft to disclose to ISVs and

OEMs all Windows APIs necessary for interoperation, including interoperation with servers;

Sections III.D and III.E of the RPFJ accomplish the same result.  The Initial Final Judgment also

required Microsoft to establish a "secure facility" where ISVs, OEMs, and others could "study,

interrogate and interact" with the Windows source code to help ensure interoperability.  *See* IFJ

§ 3.b.  The RPFJ omits this provision, but provides for affirmative disclosure of interfaces and

protocols, and empowers the Technical Committee to ensure that those disclosures are being

made.  *See* RPFJ § IV.B.  This approach strikes the appropriate balance by ensuring that

developers will have the access they need, while protecting Microsoft's intellectual property from

misappropriation.

Both decrees also comprehensively address Microsoft's relations with ISVs and IHVs to

ensure that developers can create or use rival software.  Both decrees accomplish this objective

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL
JUDGMENT - PAGE 67

by broadly prohibiting Microsoft from threatening or retaliating against ISVs or IHVs' actual or contemplated action to develop, use, distribute, promote, or support software that competes with Microsoft middleware or operating system software. *Compare* IFJ §§ 3.d, 3.h, *with* RPFJ § III.F. Similarly, both decrees prohibit Microsoft from entering into exclusive agreements with third parties that would require them to refrain from distributing, promoting, using, or supporting rival software. *Compare* IFJ § 3.e, *with* RPFJ § III.G.

There are also similarities with respect to enforcement of the two decrees. For example, both decrees require Microsoft to maintain an internal antitrust compliance program (*compare* IFJ § 4, *with* RPFJ § IV.C), and both give plaintiffs access to Microsoft's source code, books, correspondence, personnel, etc. and the right to require Microsoft to submit written reports under oath. *Compare* IFJ § 5, *with* RPFJ § IV.A.2.

> **b.**    **The RPFJ Contains Provisions Not Included In The Initial Final Judgment**

Although the Initial Final Judgment required Microsoft to disclose its APIs to facilitate interoperation (IFJ § 3.b), the RPFJ goes further by requiring Microsoft to offer the necessary related licenses for the intellectual property that Microsoft must disclose. *See* RPFJ §§ III.I.1, III.I.4. This ensures that Microsoft cannot use its intellectual property rights to undermine the competitive value of its disclosure obligations.

The RPFJ also significantly enhances enforcement of the decree as compared to the Initial Final Judgment. As previously discussed (*see* page 60 above), the RPFJ establishes a Technical Committee — a full-time, on-site compliance team of computer experts, complete with its own staff and the power to hire consultants — to monitor compliance with the decree, report violations to the Department, and attempt to resolve technical disputes under the disclosure

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 68

provisions. RPFJ §§ IV.B.8, IV.D.4. The Technical Committee will have complete access to Microsoft's source code (RPFJ § IV.B.8.c), records, facilities, and personnel. Its dispute resolution responsibilities (RPFJ § IV.D) reflect the recognition that the market will benefit from rapid, consensual resolution of issues whenever possible, more so than litigation under the Department's contempt powers. The dispute resolution process complements, but does not supplant, ordinary methods of enforcement. Complainants may still bring their inquiries directly to the Department, and need not go first to the Technical Committee (RPFJ § IV.D.1). The Technical Committee represents an innovation in consent decrees that the United States believes will improve the speed and quality of enforcing a decree in a field as technical and fast-paced as the computer industry.

The Revised Proposed Final Judgment provides for extending the decree's duration in the event Microsoft is found to have engaged in a "pattern of willful and systematic violations" of its terms. RPFJ § V.B. This potential threat is yet another means to ensure that Microsoft will comply with all of the decree's provisions, to the ultimate benefit of consumers.

Finally, the United States updated the RPFJ in several key ways to improve the clarity of the decree and account for changes in the industry since the IFJ was proposed. First, the RPFJ contains a new provision in Section III.H.3 that prohibits Microsoft from designing Windows to automatically alter an OEMs middleware configurations on the desktop without first seeking confirmation from the user no sooner than 14 days after the consumer has first booted the computer. This provision was included in response to Microsoft's inclusion of the Clean Desktop Wizard product in Windows XP that "sweeps" the unused icons that the OEM has chosen to place on the desktop. Second, the definition of middleware products in the RPFJ was

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 69

updated by including the actual names of the current Microsoft middleware products — Internet Explorer, Microsoft's Java Virtual Machine, Windows Media Player, Windows Messenger and Outlook Express.  (RPFJ § VI.K).  This significantly improves the clarity of the decree because the IFJ had not explicitly indicated which current Microsoft products constituted middleware. The RPFJ's middleware definitions were also updated to account for the increased emphasis on downloading as a distribution mechanism in the market.

### C.    The Revised Proposed Final Judgment Creates Competitive Conditions

There can be no guarantee that consumers and industry participants will prefer rival middleware over Microsoft's software, or that rival middleware will ever displace — or facilitate the displacement of — Microsoft's monopoly position, but the RPFJ restores competitive conditions that foster such threats.  Indeed, even the district court, in its extensive findings of fact and conclusions of law, expressly disclaimed the conclusion that but for Microsoft's anticompetitive acts, Netscape's browser and/or Sun's Java technologies *necessarily* would have eroded Microsoft's monopoly position.  *See Findings of Fact*, ¶ 411; *Microsoft*, 253 F.3d at 107. Thus, consistent with the antitrust laws, the RPFJ refrains from picking winners and losers, and sticks to restoring the competitive conditions.  Consumers benefit from competition, and the goal of the antitrust laws is to protect it, not weight it to a particular result.

### V.    THE COURT SHOULD MAKE ITS PUBLIC INTEREST DETERMINATION AND ENTER THE DECREE AS EXPEDITIOUSLY AS POSSIBLE

Time is of the essence.  When the Court five months ago ordered the parties to "expend and concentrate all of their resources upon resolving these cases through a fair settlement for all parties," Order at 2 (Sept. 28, 2001), the Court recognized:

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 70

> The claims by Plaintiffs of anticompetitive conduct by Microsoft arose over six years ago, and these cases have been litigated in the trial and appellate court for over four years.  As the Court of Appeals has noted, the relevant time frame for this dispute spans "an eternity in the computer industry."

Order at 2 (Sept. 28, 2001).  The public has waited long enough.  The Court should make a determination that entry of the proposed final judgment is in the public interest, and then enter it as expeditiously as possible.

### A.    The Court Should Not Hold An Evidentiary Hearing

As the Court has recognized, the Tunney Act does not require an evidentiary hearing as part of this proceeding,[59] Tr. at 20 (Feb. 8, 2002), although the Court left open the possibility that it will decide to hold one.  *Id.* at 20-21.  The question lies within the Court's sound discretion, guided by the principle that "the trial judge will adduce the necessary information through the least complicated and least time-consuming means possible."  Senate Report at 6; *accord* House Report at 8.

In our view, at the conclusion of the one- or two-day hearing the Court has ordered, Order (Feb. 15, 2002); *see* Tr. 2/15/02 at 5, at which the Court is considering allowing oral argument by

---

[59]The various materials the Tunney Act does require, *see* 15 U.S.C. § 16(b), together with any record created prior to settlement, will usually suffice.  *See United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) ("Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); Senate Hearings at 152-53 (testimony of Hon. J. Skelly Wright) ("an experienced judge, who does have the facility of getting to the point and getting others to get to the point, can arrive at a public interest determination in most cases without using" additional tools); Senate Report at 6 ("[w]here the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized").  Even absent a settlement, no evidentiary hearing on relief is required where there are "no disputed factual issues regarding the matter of relief."  *Microsoft*, 253 F.3d at 101.

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 71

third parties, *id.* at 9, the Court will have more than ample information on which to base its public interest determination. The Court should not hold an evidentiary hearing.

First, the very length and size of this case, to which some commentors point as justification for an evidentiary hearing, actually show that there is no need for one. The Court already has available to it a massive trial record — including testimony and thousands of exhibits — plus tens of thousands of comments (some including affidavits, technical reports, and other evidentiary presentations) submitted as part of the Tunney Act process. This record contains extensive information about the competitive structure of the industry and myriad other matters relevant to the public interest determination. Little if anything more would be learned from live witnesses and cross-examination than is already known from the record, comments, and the United States' responses to the comments.[60]

Second, the most analogous precedent, *AT&T*, does not support an evidentiary hearing. In that case, considering the entry of a decree that would massively restructure the entire telecommunications industry, Judge Greene held two days of hearings, permitting some organizations to "present[] oral argument" *AT&T*, 552 F. Supp. at 147 n.65. But the court "concluded that none of the issues before it require[d] an evidentiary hearing. That being so, there [was] obviously no need, nor indeed any occasion, for the presentation by a third party of

---

[60]For example, commentor ProComp submitted a lengthy declaration from Professor Arrow, Arrow Decl., in opposition to the RPFJ, but fails to identify, in either its comments, ProComp Comment, or its filed memorandum, ProComp's Memorandum in Support of Its Motion for Limited Intervention or Tunney Act Participation (Feb. 7, 2002), anything specific that Professor Arrow would say at an evidentiary hearing beyond what already appears in his declaration. *Cf. American Can Co. v. Mansukhani*, 814 F.2d 421, 425 (7th Cir. 1987) (defendants not entitled to a hearing on remedies because they failed "to explain to the district court what new proof they would present to show" that the proposed remedy was unwarranted).

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 72

its own witnesses or for the cross-examination of adverse witnesses." *Id.* at 219. *See also id.* at 188 n.233 (rejecting contention that "the Court should not assess the propriety of the restrictions without holding evidentiary hearings with regard to the need therefor").[61]

Third, it is clear that much of the impetus behind the call for an evidentiary hearing comes from commentors who want that hearing to inquire into the Department of Justice's decision to enter into a settlement. The drive to challenge the propriety of prosecutorial decisions provides no warrant for an evidentiary hearing, because "the district court is not empowered to review the actions or behavior of the Department of Justice; the court is only authorized to review the decree itself." *Microsoft I*, 56 F.3d at 1459. *See also Maryland v. United States*, 460 U.S. 1001, 1005-06 (1983) (Rehnquist, J., dissenting) (considerations that led the Department of Justice to settle are not amenable to judicial review).

Fourth, an evidentiary hearing would further complicate the Tunney Act process and invite unwarranted delay in entering the RPFJ. Given the number of commentors and persons interested in participating in the Tunney Act process, it could prove difficult to manage an evidentiary hearing equitably without causing substantial delay. The public interest in achieving a prompt resolution of this case and rapid implementation of remedies[62] should not be frustrated absent a showing of very good cause.

---

[61]Judge Greene also denied all motions to intervene prior to the court's public interest determination. *AT&T*, 552 F. Supp. at 146 & n.61.

[62]Although Microsoft has agreed to be bound by much of the RPFJ pending its entry (Stipulation ¶ 2 (Nov. 6, 2001)), some important provisions become effective only after entry. *See, e.g.,* RPFJ § IV.B (Technical Committee must be created "[w]ithin 30 days of entry of this Final Judgment"); *id.* § IV.C (Microsoft's internal compliance program begins "within 30 days of entry").

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 73

### B.    The Court Should Not Delay Entry Of The Decree Pending The Remedies Hearing In *New York v. Microsoft*

The remedies hearing in *New York v. Microsoft Corp.*, No. 98-CV-1233, is currently scheduled to begin on March 11, 2002.  Some commentors have suggested that the Court delay its public interest determination in this case pending the results of that hearing, evidently so that the record, and perhaps the Court's adjudicated judgment, in *New York* can be imported into this Tunney Act proceeding.  The suggestion that the Court link the two proceedings in this manner is legally flawed and ill-advised.  Were the Court to follow the suggestion, it would undermine the foundations of the Tunney Act, bring into question the authority of the Department of Justice to settle lawsuits, threaten the viability of the consent decree as a tool of antitrust enforcement, and risk serious damage to federal/state cooperation in the prosecution of antitrust cases.  It would be an unfortunate precedent for this Court to set.

### 1.    Linking This Case To The Remedies Hearing In *New York* Would Be Bad Law And Bad Policy

Linking this case to the remedies hearing, and outcome, in *New York* would transform the nature of this proceeding in ways Congress did not intend and the law does not countenance.  The Tunney Act establishes a complete framework for review and entry of a consent decree in a civil antitrust suit brought by the United States, a framework that does not encompass separate litigation brought by other plaintiffs.  The Court's role in this case is to determine whether the judicial act of entering a proposed decree arrived at by agreement of the parties is "within the reaches of the public interest."  *Microsoft I*, 56 F.3d at 1458 (quotation marks and emphasis omitted).  In contrast, the role of the Court in *New York* is that of judicially resolving disputes between the parties — according to the applicable evidentiary standard — and ultimately

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 74

imposing an adjudicated judgment.  The Court's ability to play different roles in the two cases is not in doubt.  But the Tunney Act does not provide for mixing those roles.

To the extent the Court delays this proceeding so as to rely on the *New York* record or result, the Court brings adversary litigation, with all that entails, into the Tunney Act process, which is intended to be something quite different.  The Tunney Act, intended "to encourage[] settlement by consent decrees as part of the legal policies expressed in the antitrust laws," *United States v. Alex. Brown & Sons*, 963 F. Supp. 235, 238-39 (S.D.N.Y. 1997) (quoting House Report at 6, 1974 U.S.C.C.A.N. at 6537), *aff'd sub nom. United States v. Bleznak*, 153 F.3d 16 (2d Cir. 1998), would become the continuation of litigation by other means.

Linking the two proceedings would also leave the United States with two equally improper alternatives.  Either the United States would have to participate, through intervention or other means, in litigation in *New York* (where it is too late to participate in remedy-phase discovery), or if not, it would have to let the outcome of its own case turn on a litigation record to which it is a stranger.  Each alternative effectively deprives the United States of its ability to resolve a case by consent decree.  Each deprives the Department of Justice of its authority to settle cases, Supreme Court precedent to the contrary notwithstanding, *see Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*, 386 U.S. 129, 136 (1967) (Court does "not question the authority of the Attorney General to settle suits after, as well as before, they reach here"), because the case effectively continues in full litigation despite the settlement agreed to by the parties.  The only difference between the alternatives left to the government is that the first continues to draw upon the resources a settlement should have freed up for use in other antitrust enforcement as the

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL
JUDGMENT - PAGE 75

price of continued influence over the outcome of the government's own case, while the second provides a resource savings, but at the cost of that very influence.

Both the United States and antitrust defendants would have a substantially reduced incentive to settle cases at all if Tunney Act proceedings could be linked to other litigation. Why settle, if the entry of judgment in the "settled" case could be delayed pending the outcome of parallel litigation that remains unsettled, and if the result in the "settled" litigation could depend on what happens in the remaining litigation? That result may satisfy those who think government antitrust cases in general, or at least this government antitrust case in particular, should not be settled, but it is inconsistent with the Tunney Act policy favoring settlement as a viable tool in the antitrust enforcement arsenal.

The possibility of this linking comes about here only because the United States, 20 States, and the District of Columbia joined forces in a cooperative effort to challenge anticompetitive conduct by a monopolist. This case and *New York* were consolidated for all purposes, and the plaintiffs worked closely to bring the matter to a successful resolution.[63] Last November, the remaining plaintiffs reached a point where they could not all agree on the next step; the United States and nine States settled with Microsoft, while the other nine plaintiff States (including the District of Columbia) chose to continue litigating. If that fact means, as a result of linkage between the remedy phase of *New York* and this Tunney Act proceeding, that the United States effectively has been prevented from settling its own lawsuit, the United States surely will view

---

[63]Had the plaintiffs not embarked on this creative collaboration, it is highly unlikely that two cases against Microsoft would have gone forward, parallel but separate, with each reaching more or less the same result at more or less the same time.

the prospect of future such collaborative enforcement efforts in a less favorable light.  Such a result would be exceedingly unfortunate for the future of antitrust enforcement.

Finally, of course, linkage inevitably would delay entry of a final judgment, thereby further thwarting the public interest in prompt resolution of this case.  *Cf. AT&T*, 552 F. Supp. at 213 (deferring approval of the proposed decree "would be unfair to the parties and to the public"; delay "can only multiply the costs of uncertainty that have plagued the industry far too long").

### 2.      The Claimed Benefits Of Linkage Are Illusory

Perhaps these costs of linkage would be acceptable if the gains to be had were substantial. They are not.

Some argue that delaying this proceeding until after the remedies phase of *New York* will avoid the risk that the Court will prejudge that remedies phase by its determination here.  But that risk is trivial.  What the two cases share is one defendant (Microsoft), and a common record as of November 6, 2001.  Two things principally set them apart.  One is their different records from November 6 forward.  The other, more important, distinction is that the Court faces two radically different tasks and addresses two radically different questions in the two proceedings.  *See* pages 42-46, above.  The Court's task here is to determine whether entry of a negotiated settlement is in the public interest according to a deferential standard of review; its task in *New York* is to enter an adjudicated judgment, perhaps devised by the Court itself, that the Court, in the exercise of its "broad discretion . . .[,] calculates will best remedy the conduct it has found to be unlawful," *Microsoft*, 253 F.3d at 105, in light of the facts proven before it.  The risk that its determination here would lead the Court to prejudge the result in *New York* is therefore minuscule.

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 77

Some also suggest that delay here until a remedy is determined by adjudication in *New York* will avoid the risk of inconsistent remedies in the two cases. This risk, too, is small. Although it is quite possible that the remedy in *New York* might impose on Microsoft requirements not imposed here, or not impose on Microsoft requirements that are imposed here, that possibility need not give rise to inconsistency. Only if the two remedies actually conflict — for example, one remedy requires Microsoft to do something the other prohibits, or one remedy requires Microsoft to provide access to a facility the other takes away from Microsoft — is there a troubling inconsistency. There is no reason to expect such an inconsistency to arise, especially given that the Court will be well aware of the specific terms of the RPFJ when it eventually enters judgment in *New York*. If an inconsistency does arise, however, there are ample means to deal with it. *See, e.g.,* RPFJ § VII (Court retains jurisdiction to modify decree).

Finally, some have suggested that delaying the proceedings here would conserve judicial resources. But apart from study of the existing record, which is necessary for both cases, judicial resources in the two proceedings will be devoted primarily to the remedies trial in *New York* and to the review of the public comments and the United States' response in this matter. The Court could not properly reduce the resources it devotes to these two tasks whatever the sequence of the two proceedings. Moreover, the Tunney Act provides the Court broad latitude to streamline its review process, 15 U.S.C. § 16(f). Linking that review to separate litigation makes the Tunney Act review dependent on trials or hearings that are far less flexible, which can only complicate and delay the Tunney Act review.

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 78

## CONCLUSION

The proposed final judgment satisfies all of the requirements of an antitrust remedy, complies with the decision of the court of appeals, and, most importantly, is in the public interest. Accordingly, the Court should enter the decree as soon as possible.

Respectfully submitted,

_____

CHARLES A. JAMES
  *Assistant Attorney General*
DEBORAH P. MAJORAS
  *Deputy Assistant Attorney General*
PHILLIP R. MALONE
RENATA B. HESSE
DAVID BLAKE-THOMAS
PAULA L. BLIZZARD
KENNETH W. GAUL
ADAM D. HIRSH
JACQUELINE S. KELLEY
STEVEN J. MINTZ
BARBARA NELSON
DAVID SEIDMAN
DAVID P. WALES
  *Attorneys*

U.S. Department of Justice
Antitrust Division
601 D Street N.W., Suite 1200
Washington, D.C. 20530
(202) 514-8276

PHILIP S. BECK
  *Special Trial Counsel*

February 27, 2002

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL
JUDGMENT - PAGE 79

## APPENDIX A

### COMPARISON OF COURT OF APPEALS' FINDINGS ON LIABILITY TO PROVISIONS OF THE REVISED PROPOSED FINAL JUDGMENT

## I.    LIABILITY FINDINGS AFFIRMED BY THE COURT OF APPEALS

### *Agreements with Computer Manufacturers ("OEMs")*

1.    Microsoft prohibited OEMs from removing any desktop icons, folders, or "Start" menu entries, thereby "thwart[ing] the distribution of a rival browser by preventing OEMs from removing visible means of user access to IE."  *United States v. Microsoft Corp.*, 253 F.3d 34,  61, 64 (D.C. Cir. 2001).

   *RPFJ Provisions*:
   - **Section III.H.1** requires Microsoft to "[a]llow end users (via a mechanism readily accessible from the desktop or Start menu such as an Add/Remove icon) and OEMs (via standard preinstallation kits) to enable or remove access to each Microsoft Middleware Product . . . .  The mechanism shall offer the end user a separate and unbiased choice with respect to enabling or removing access . . . and altering default invocations . . . with regard to each such Microsoft Middleware Product . . . ."

2.    Microsoft prohibited OEMs from "modifying the initial boot sequence . . ., thus prevent[ing] OEMs from using that process to promote the services of IAPs . . . ."  253 F.3d at 61-62, 64.

   *RPFJ Provisions*:
   - **Section III.C.3** prohibits Microsoft from restricting OEMs from "[l]aunching automatically, at the conclusion of the initial boot sequence or subsequent boot sequences, or upon connections to or disconnections from the Internet, any Non-Microsoft Middleware . . . ."

   - **Section III.C.4** prohibits Microsoft from restricting OEMs from "[o]ffering users the option of launching other Operating Systems . . . or a non-Microsoft boot-loader or similar program . . . ."

   - **Section III.C.5** prohibits Microsoft from restricting OEMs from "[p]resenting in the initial boot sequence its own IAP offer . . . ."

3.    Microsoft prohibited OEMs from "adding icons or folders different in size or shape from those supplied by Microsoft," thereby preventing OEMs from "promot[ing] rival

browsers, which keeps developers focused upon the APIs in Windows." 253 F.3d at 62, 64.

*RPFJ Provisions*:
- **Section III.C.1** prohibits Microsoft from restricting OEMs from "[i]nstalling, and displaying icons, shortcuts, or menu entries for, any Non-Microsoft Middleware . . . on the desktop or Start menu, or anywhere else in a Windows Operating System Product where a list of icons, shortcuts, or menu entries for applications are generally displayed . . . ."

- **Section III.C.2** prohibits Microsoft from restricting OEMs from "[d]istributing or promoting Non-Microsoft Middleware by installing and displaying on the desktop shortcuts of any size or shape . . . ."

- **Section III.H.3** requires Microsoft to "[e]nsure that a Windows Operating System Product does not (a) automatically alter an OEM's configuration of icons, shortcuts or menu entries . . . pursuant to Section III.C of this Final Judgment without first seeking confirmation from the user and (b) seek such confirmation . . . until 14 days after the initial boot up of a new Personal Computer. . . ."

4.     Microsoft prohibited OEMs from "using the 'Active Desktop' feature to promote third-party brands," thereby preventing OEMs from "promot[ing] rival browsers, which keeps developers focused upon the APIs in Windows." 253 F.3d at 62, 64.

*RPFJ Provisions*:
- **Section III.C.1** prohibits Microsoft from restricting OEMs from "[i]nstalling, and displaying icons, shortcuts, or menu entries for, any Non-Microsoft Middleware . . . on the desktop or Start menu, or anywhere else in a Windows Operating System Product where a list of icons, shortcuts, or menu entries for applications are generally displayed . . . ."

- **Section III.C.2** prohibits Microsoft from restricting OEMs from "[d]istributing or promoting Non-Microsoft Middleware by installing and displaying on the desktop shortcuts of any size or shape . . . ."

### Binding of Internet Explorer to Windows

5.     Microsoft excluded IE from the "Add/Remove Programs" utility, thereby "reduc[ing] the usage share of rival browsers not by making Microsoft's own browser more attractive to consumers but, rather, by discouraging OEMs from distributing rival products." 253 F.3d at 65, 67.

*RPFJ Provisions*:

COMPARISON OF APPELLATE LIABILITY FINDINGS AND RPFJ - PAGE A-2

> • **Section III.H.1** requires Microsoft to "[a]llow end users (via a mechanism readily accessible from the desktop or Start menu such as an Add/Remove icon) and OEMs (via standard preinstallation kits) to enable or remove access to each Microsoft Middleware Product . . . . The mechanism shall offer the end user a separate and unbiased choice with respect to enabling or removing access . . . and altering default invocations . . . with regard to each such Microsoft Middleware Product . . . ."

6.   Microsoft "'plac[ed] code specific to Web browsing in the same files as code that provided operating system functions'" (253 F.3d at 65 (quoting *Findings of Fact* ¶ 161)), thus "deter[ring] OEMs from pre-installing rival browsers, thereby reducing the rivals' usage share and, hence, developers' interest in rivals' APIs as an alternative to the API set exposed by Microsoft's operating system." 253 F.3d at 66.

   *RPFJ Provisions*:
   > • **Section III.C.1** prohibits Microsoft from restricting OEMs from "[i]nstalling, and displaying icons, shortcuts, or menu entries for, any Non-Microsoft Middleware . . . on the desktop or Start menu, or anywhere else in a Windows Operating System Product where a list of icons, shortcuts, or menu entries for applications are generally displayed . . . ."

   > • **Section III.H.1** requires Microsoft to "[a]llow end users (via a mechanism readily accessible from the desktop or Start menu such as an Add/Remove icon) and OEMs (via standard preinstallation kits) to enable or remove access to each Microsoft Middleware Product . . . . The mechanism shall offer the end user a separate and unbiased choice with respect to enabling or removing access . . . and altering default invocations . . . with regard to each such Microsoft Middleware Product . . . ."

### *Agreements with Internet Access Providers ("IAPs")*

7.   Microsoft "agreed to provide easy access to IAPs' services from the Windows desktop in return for the IAPs' agreement to promote IE exclusively and to keep shipments of internet access software using Navigator under a specific percentage, typically 25%." 253 F.3d at 68. Such agreements ensure "that the 'majority' of all IAP subscribers are offered IE either as the default browser or as the only browser . . . ." *Id.* at 71.

   *RPFJ Provisions*:
   > • **Section III.G.1** prohibits Microsoft from entering into any agreement with "any IAP, ICP, ISV, IHV, or OEM that grants Consideration on the condition that such entity distributes, promotes, uses, or supports, exclusively or in a fixed percentage, any Microsoft Platform Software . . . ."

COMPARISON OF APPELLATE LIABILITY FINDINGS AND RPFJ - PAGE A-3

- **Section III.G.2** prohibits Microsoft from entering into any agreement with "any IAP or ICP that grants placement on the desktop or elsewhere in any Windows Operating System Product to that IAP or ICP on the condition that the IAP or ICP refrain from distributing, promoting or using any software that competes with Microsoft Middleware."

### Agreements with Internet Content Providers ("ICPs"), Independent Software Vendors ("ISVs") and Apple

8.    In dozens of "First Wave" agreements, Microsoft "'promised to give preferential support, in the form of early Windows 98 and Windows NT betas, other technical information, and the right to use certain Microsoft seals of approval, to important ISVs that agree to certain conditions.  One of these conditions is that the ISVs use Internet Explorer as the default browsing software for any software they develop with a hypertext-based user interface.'"  253 F.3d at 71-72 (quoting *Findings of Fact* ¶ 339).  In so doing, Microsoft kept "rival browsers from gaining widespread distribution (and potentially attracting the attention of developers away from the APIs in Windows) . . . ."  *Id.* at 72.

  *RPFJ Provisions*:
- **Section III.F.2** prohibits Microsoft from "condition[ing] the grant of any Consideration on an ISV's refraining from developing, using, distributing, or promoting any software that competes with Microsoft Platform Software or any software that runs on any software that competes with Microsoft Platform Software . . . ."

- **Section III.G.1** prohibits Microsoft from entering into any agreement with "any IAP, ICP, ISV, IHV, or OEM that grants Consideration on the condition that such entity distributes, promotes, uses, or supports, exclusively or in a fixed percentage, any Microsoft Platform Software . . . ."

9.    Microsoft agreed to continue development of Mac Office, a suite of business productivity applications needed by Apple, only when Apple agreed to make Internet Explorer the default browser on Apple's operating system and to refrain from positioning icons for non-Microsoft browsing software on the desktop of new Apple Macintosh computers or Mac OS upgrades.  253 F.3d at 73.  "Microsoft's exclusive contract with Apple has a substantial effect in restricting distribution of rival browsers . . ."  *Id.* at 73-74.

  *RPFJ Provisions*:
- **Section III.F.1** prohibits Microsoft from retaliating against any ISV or IHV because of that ISV's or IHV's "developing, using, distributing. promoting or supporting any software that competes with Microsoft Platform Software or any software that runs on any software that competes with Microsoft Platform Software."

COMPARISON OF APPELLATE LIABILITY FINDINGS AND RPFJ - PAGE A-4

- **Section III.F.2** prohibits Microsoft from "condition[ing] the grant of any Consideration on an ISV's refraining from developing, using, distributing, or promoting any software that competes with Microsoft Platform Software or any software that runs on any software that competes with Microsoft Platform Software . . . ."

- **Section III.G.1** prohibits Microsoft from entering into any agreement with "any IAP, ICP, ISV, IHV, or OEM that grants Consideration on the condition that such entity distributes, promotes, uses, or supports, exclusively or in a fixed percentage, any Microsoft Platform Software . . . ."

*Efforts to Exclude Sun's Java*

10.     In dozens of "First Wave" agreements with ISVs, Microsoft "conditioned receipt of Windows technical information upon the ISVs' agreement to promote Microsoft's JVM [Java Virtual Machine] exclusively . . . ." 253 F.3d at 75.  Such agreements "foreclosed a substantial portion of the field for JVM distribution and . . ., in so doing, they protected Microsoft's monopoly from a middleware threat . . . ." *Id.* at 76.

*RPFJ Provisions*:
- **Section III.F.2** prohibits Microsoft from "condition[ing] the grant of any Consideration on an ISV's refraining from developing, using, distributing, or promoting any software that competes with Microsoft Platform Software or any software that runs on any software that competes with Microsoft Platform Software . . . ."

- **Section III.G.1** prohibits Microsoft from entering into any agreement with "any IAP, ICP, ISV, IHV, or OEM that grants Consideration on the condition that such entity distributes, promotes, uses, or supports, exclusively or in a fixed percentage, any Microsoft Platform Software . . . ."

11.     Microsoft "deceived Java developers regarding the Windows-specific nature" of Microsoft's Java software development tools.  Thus, "developers who relied upon Microsoft's public commitment to cooperate with Sun and who used Microsoft's tools to develop what Microsoft led them to believe were cross-platform applications ended up producing applications that would run only on the Windows operating system."  253 F.3d at 76.

*RPFJ Provisions*:
- **Section III.D** requires Microsoft to disclose to all ISVs "the APIs and related Documentation that are used by Microsoft Middleware to interoperate with a Windows Operating System Product."

COMPARISON OF APPELLATE LIABILITY FINDINGS AND RPFJ - PAGE A-5

12.   Microsoft threatened Intel, which was developing a high-performance cross-platform Windows-compatible JVM, that if Intel "did not stop aiding Sun on the multimedia front, then Microsoft would refuse to distribute Intel technologies bundled with Windows." 253 F.3d at 77.

*RPFJ Provisions*:
- **Section III.F.1** prohibits Microsoft from retaliating against any ISV because of that ISV's "developing, using, distributing.  promoting or supporting any software that competes with Microsoft Platform Software or any software that runs on any software that competes with Microsoft Platform Software."

- **Section III.F.2** prohibits Microsoft from "condition[ing] the grant of any Consideration on an ISV's refraining from developing, using, distributing, or promoting any software that competes with Microsoft Platform Software or any software that runs on any software that competes with Microsoft Platform Software . . . ."

## II.    LIABILITY FINDINGS REJECTED BY THE COURT OF APPEALS

1.   Microsoft prohibited OEMs from "causing any user interface other than the Windows desktop to launch automatically." 253 F.3d at 62.  The court of appeals found that this restriction had an anticompetitive effect (*id.*), but does *not* violate Section 2 because "a shell that automatically prevents the Windows desktop from ever being seen by the user is a drastic alteration of Microsoft's copyrighted work, and outweighs the marginal anticompetitive effect of prohibiting the OEMs from substituting a different interface automatically upon completion of the initial boot process."  *Id.* at 63.

2.   Microsoft designed Windows 98 to "override the user's choice of a default browser in certain circumstances." 253 F.3d at 67.  The court of appeals found that plaintiffs had failed to rebut Microsoft's proffered technical justification that such overriding was necessary in a "few" circumstances, e.g., invoking the Windows 98 Help system, Windows Update feature, or accessing the Internet through "My Computer" or "Windows Explorer."  *Id.*

3.   Microsoft offered Internet Explorer free of charge to IAPs and ISVs.  The court of appeals held that "the antitrust laws do not condemn even a monopolist for offering its product at an attractive price, and we therefore have no warrant to condemn Microsoft for offering . . . IE . . . free of charge or even at a negative price."  253 F.3d at 68 (giving IE to IAPs); *see also id.* at 75 (giving IE to ISVs).

4.   Microsoft offered "IAPs a bounty for each customer the IAP signs up for service using the IE browser."  253 F.3d at 67.  The court of appeals held that "the antitrust laws do not

condemn even a monopolist for offering its product at an attractive price, and we therefore have no warrant to condemn Microsoft for offering . . . IE . . . free of charge or even at a negative price." *Id.* at 68.

5.    Microsoft developed the IE Access Kit (IEAK), a "software package that allows an IAP to 'create a distinctive identity for its service in as little as a few hours by customizing the [IE] title bar, icon, start and search pages,'" and offered the IEAK to IAPs for free. 253 F.3d at 68 (quoting *Findings of Fact* ¶ 249). The court of appeals held that "the antitrust laws do not condemn even a monopolist for offering its product at an attractive price, and we therefore have no warrant to condemn Microsoft for offering . . . the IEAK . . . free of charge or even at a negative price." *Id.*

6.    Microsoft entered into exclusive dealings with ICPs, which develop websites, in exchange for the ICPs' agreement to distribute, promote, and rely on IE rather than Netscape's Navigator browser. 253 F.3d at 71. The court of appeals found that "plaintiffs failed to demonstrate that Microsoft's deals with the ICPs have a substantial effect upon competition . . . ." *Id.*

7.    Microsoft developed a JVM that "allows Java applications to run faster on Windows than does Sun's JVM, . . . but a Java application designed to work with Microsoft's JVM does not work with Sun's JVM and vice versa." 253 F.3d at 74. The court of appeals held that "a monopolist does not violate the antitrust laws simply by developing a product that is incompatible with those of its rivals." *Id.* at 75.

8.    The court of appeals reversed the district court's finding that Microsoft was liable based on its "general 'course of conduct'" apart from specific acts that violated Section 2. 253 F.3d at 78.

COMPARISON OF APPELLATE LIABILITY FINDINGS AND RPFJ - PAGE A-7

## APPENDIX B

## UNITED STATES v. MICROSOFT CORP. — NEWSPAPER NOTICE

Department of Justice

Antitrust Division

Take notice that a revised proposed Final Judgment as to Microsoft Corporation has been filed in a civil antitrust case, United States of America v. Microsoft Corporation, Civil No. 98-1232. On May 18, 1998, the United States filed a Complaint alleging that Microsoft, the world's largest supplier of computer software for personal computers, restrained competition in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2. Following a 78-day trial in late 1998 and early 1999, the United States District Court for the District of Columbia found that Microsoft had violated both Sections 1 and 2 of the Sherman Act. On appeal, the United States Court of Appeals for the District of Columbia unanimously affirmed portions of the district court's finding and conclusion that Microsoft illegally maintained its operating system monopoly in violation of Section 2 of the Sherman Act, but reversed and remanded other portions of the district court's determinations. Specifically, the court of appeals reversed the district court's determination that Microsoft violated Section 2 by illegally attempting to monopolize the Internet browser market and remanded the district court's determination that Microsoft violated Section 1 of the Sherman Act by unlawfully tying its browser to its operating system. The court of appeals also vacated the district court's remedial order, including its order that Microsoft be split into separate operating systems and applications businesses, and remanded the case to a new district court judge for further proceedings. Following intensive mediation efforts, the United States and Microsoft subsequently reached the agreement embodied in the revised proposed Final Judgment, which would impose injunctive relief to enjoin continuance and prevent recurrence of the violations of the Sherman Act by Microsoft that were upheld by the court of appeals.

The revised proposed Final Judgment, filed November 6, 2001, will stop recurrence of Microsoft's unlawful conduct, prevent recurrence of similar conduct in the future and restore competitive conditions in the personal computer operating system market by, among other things, prohibiting actions by Microsoft to prevent computer manufacturers and others from developing, distributing or featuring middleware products that are threats to Microsoft's operating system monopoly; creating the opportunity for independent software vendors to develop products that will be competitive with Microsoft's middleware products; requiring Microsoft to disclose interfaces in order to ensure that competing middleware and server software can interoperate with Microsoft's operating systems; ensuring full compliance with the revised proposed Final Judgment; and providing for swift resolution of technical disputes. A Competitive Impact Statement has been filed by the United States describing the Complaint, the revised proposed Final Judgment, the industry, and the remedies available to private litigants who may have been injured by the alleged violation. Copies of the Complaint, revised proposed Final Judgment and Competitive Impact Statement are available for inspection at the Department of Justice in

Washington, D.C. at Antitrust Documents Group, 325 7th Street N.W., Ste. 215 North, Washington, D.C. 20530 (please call 202-514-2481, for appointments only), on the Department of Justice Web site at http://www.usdoj.gov/atr, and at the Office of the Clerk of the United States District Court for the District of Columbia, 333 Constitution Avenue, N.W., Washington, D.C. 20001.

Interested persons may address comments to Renata Hesse, Trial Attorney, Suite 1200, Antitrust Division, Department of Justice, 601 D Street, N.W., Washington, D.C. 20530; (facsimile) 202-616-9937 or 202-307-1454; or (email) microsoft.atr@usdoj.gov within 60 days of the date of publication of the revised proposed Final Judgment and Competitive Impact Statement in the Federal Register. While comments may also be sent by regular mail, in light of recent events affecting the delivery of all types of mail to the Department of Justice, including U.S. Postal Service and other commercial delivery services, and current uncertainties concerning when the timely delivery of this mail may resume, the Department strongly encourages, whenever possible, that comments be submitted via email or facsimile.

NEWSPAPER NOTICE - PAGE B-2

APPENDIX C

DECLARATION OF DAVID S. SIBLEY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

        Plaintiff,

    v.

MICROSOFT CORPORATION,

        Defendant

Civil Action No. 98-1232 (CKK)

Next Court Deadline: March 6, 2002
                Tunney Act Hearing

**DECLARATION OF DAVID S. SIBLEY**

### DECLARATION OF DAVID S. SIBLEY

## I.  Qualifications and Introduction

1.     My name is David S. Sibley.  I am the John Michael Stuart Centennial Professor of Economics at the University of Texas at Austin.  I received the degree of B.A. in Economics from Stanford University in 1969 and a Ph.D. in Economics from Yale University in 1973.  In addition to my current teaching responsibilities, I have taught graduate level courses in economics at the University of Pennsylvania and Princeton University.  Prior to joining the University of Texas, I was Head of the Economics Research Group at Bell Communications Research.  I have also served as a Member of the Technical Staff in economics at Bell Laboratories.  During the last thirty years, I have carried out extensive research in the areas of industrial organization, microeconomic theory, and regulation.  My publications have appeared in a number of leading economic journals, including the *Journal of Economic Theory, Review of Economic Studies*, *Rand Journal of Economics*, *American Economic Review*, *Econometrica*, and the *International Economic Review*, among others.  I am also the co-author (with Steven J. Brown) of a leading textbook on monopoly pricing, THE THEORY OF PUBLIC UTILITY PRICING, which was first published by Cambridge University Press in 1986.

2.     I have consulted extensively for various firms and agencies, both in the United States and abroad, on antitrust and regulatory matters.  In 1998, I was retained by the U.S. Department of Justice ("DOJ") to examine the competitive effects of contractual restrictions in agreements between Microsoft Corporation ("Microsoft") and personal

computer original equipment manufacturers ("PC manufacturers" or "OEMs"), Internet access providers ("IAPs"), and Internet content providers ("ICPs"). The declaration that I filed in May 1998 on behalf of the Antitrust Division of the DOJ summarized my economic analysis.[1] Appendix A contains a copy of my *curriculum vitae*.

3.  I have been asked by the DOJ to review the terms of its proposed settlement with Microsoft and to provide an opinion as an independent economist as to whether the antitrust remedy embodied in the settlement is in the "public interest." It is my understanding that key components of the public interest standard of the Tunney Act are satisfied when the antitrust remedy is sufficient to (1) stop the offending conduct, (2) prevent its reoccurrence, and (3) restore competitive conditions.[2]

4.  In conducting this analysis, I examined the following documents: (1) the *Revised Proposed Final Judgment,*[3] the *Second Revised Proposed Final Judgment*, including the accompanying memorandum regarding modifications,[4] and the *Competitive*

---

[1] Declaration of David S. Sibley, *United States v. Microsoft Corp*., Civ. Action No. 98-1232 (D.D.C. May 18, 1998) (hereinafter "May 1998 Sibley Decl."). *See also* David S. Sibley, Michael J. Doane, and Ashish Nayyar (2001), "Economic Issues in U.S. v. Microsoft," UWLA LAW REVIEW, Symposium: Cyber Rights, Protection, and Markets, 103-136.

[2] My declaration does not address the compliance and enforcement procedures contained in the proposed remedy.

[3] Revised Proposed Final Judgment, *United States v. Microsoft Corp*., Civ. Action No. 98-1232 (CKK) (D.D.C. Nov. 6, 2001).

[4] Second Revised Proposed Final Judgment, *United States v. Microsoft Corp*., Civ. Action No. 98-1232 (CKK) (D.D.C. to be filed Feb. 27, 2002) (hereinafter "SRPFJ"); United States' Memorandum Regarding Modifications Contained in Second Revised Proposed Final Judgment, *United States v. Microsoft Corp*., Civ. Action No. 98-1232 (CKK) (D.D.C. to be filed Feb. 27, 2002).

*Impact Statement* of the DOJ;[5] (2) the *Findings of Fact* and *Conclusions of Law* issued by Judge Jackson;[6] (3) the decision issued by the U.S. Court of Appeals for the D.C. Circuit in June of 2001;[7] (4) the record from the U.S. Senate Judiciary Committee's December 12, 2001, hearing regarding the proposed settlement, including the responses to follow-up questions posed to Assistant Attorney General Charles James;[8] (5) the DOJ's written response to questions regarding the proposed settlement raised by Senator Orrin Hatch;[9] (6) the Litigating States Proposed Final Judgment; (7) comments on the settlement filed by third parties, including declarations submitted by other economists; and (8) public documents and websites containing relevant information.

5.    My conclusions are summarized as follows.

- Any economic analysis of the SRPFJ must have as its starting point a clear delineation of the conduct found to be unlawful. The remedy presently under consideration must therefore focus attention on and fully resolve the appellate court finding that Microsoft engaged in specific anticompetitive acts to maintain its operating system monopoly.

- In developing this remedy, it is necessary to balance two broad factors: (1) the need to impose constraints on Microsoft's current and future behavior so that the unlawful acts stop and do not recur, and competitive conditions

---

[5]  Competitive Impact Statement, *United States v. Microsoft Corp.*, Civ. Action No. 98-1232 (CKK) (D.D.C. Nov. 15, 2001) (hereinafter "CIS").

[6]  *See* Findings of Fact, *United States v. Microsoft Corp.*, 84 F. Supp.2d 9 (D.D.C. Nov. 5, 1999); Conclusions of Law, *United States v. Microsoft Corp.*, 87 F. Supp.2d 30 (D.D.C. Apr. 3, 2000).

[7]  *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. June 28, 2001).

[8]  *See* United States Senate, Senate Committee on the Judiciary Documents for the December 12 Hearing on "The Microsoft Settlement: A Look to the Future"; Office of the Assistant Attorney General, United States Department of Justice, Response to written follow-up questions posed to Assistant Attorney General Charles James (Jan. 24, 2002).

[9]  *See* Office of the Assistant Attorney General, United States Department of Justice, Response to Senator Hatch's letter of November 29, 2001 (Dec. 11, 2001).

are restored; and (2) the requirement that these constraints not be so intrusive and complex that they themselves distort market outcomes.

- The SRPFJ achieves the right balance. Broadly defined provisions banning exclusivity, discrimination, and retaliation fundamentally alter the way Microsoft does business, and eliminate the artificial entry barriers erected by Microsoft that are the source of competitive concern. At the same time, the SRPFJ does not create market distortions, such as over-extensive regulation of Microsoft that may invite inefficient rent-seeking by Microsoft's competitors, and make Microsoft a less efficient competitor.

- Microsoft erected artificial entry barriers to slow or halt the natural tendency of the marketplace to provide certain alternative technologies (known as "middleware") that have the potential to erode Microsoft's operating system monopoly. The proposed decree aims to restore and enhance competitive conditions by removing technical barriers between Microsoft and rival middleware suppliers. This is the appropriate conduct to be remedied, not the existence of the monopoly itself, or barriers which arise naturally in software markets.

- The proposals of other commentators fail to strike the right balance. In an attempt to eliminate all theoretical ways in which Microsoft could harm competition, they propose a complex regulatory program that is likely to be slow-moving, litigious, and vulnerable to manipulation by Microsoft's competitors, to say nothing of Microsoft itself.

- In analyzing the SRPFJ, I have had the benefit of reviewing a number of thoughtful and probing comments on the proposed decree. I found that most of the potential problems raised by the various commentators are, in fact, not problems at all, but are met by the SRPFJ upon careful analysis. My review of their criticisms reveals the potential loopholes that are theoretical possibilities are either unimportant, or rely on strategies that Microsoft would not have the incentive to undertake.

- In light of the above, in my opinion, the SRPFJ is in the public interest.

6.    I have organized my declaration as follows: In Section II, I discuss the specific anticompetitive acts that are the focus of this inquiry and provide an overview of the proposed remedy embodied in the SRPFJ. This section also reviews the characteristics of software markets that are relevant to an economic analysis of the

4

proposed decree.  Section III presents my analysis of the SRPFJ and discusses why, in

my opinion, the proposed decree meets the public interest requirement of the Tunney Act.

Section IV addresses the main suggestions for additional remedy provisions discussed by

various commentators.  My conclusions are presented in Section V.

## II.   Microsoft's Unlawful Conduct<br>and Proposed Remedy in the SRPFJ

7.     Any economic analysis of the SRPFJ must have as its starting point a clear

delineation of the conduct found to be unlawful.  To be in the "public interest," an

antitrust remedy must stop the offending conduct, prevent its recurrence, and restore

competitive conditions.  The remedy presently under consideration must therefore focus

attention on and fully resolve the appellate court finding that Microsoft engaged in

specific anticompetitive acts to maintain its monopoly position in the market for

operating systems designed to run on Intel-compatible personal computers ("PCs").

8.     To assess the remedial effectiveness of the SRPFJ, it is useful for two

reasons to review the characteristics of software markets that gave rise to the Microsoft

operating system ("OS") monopoly.  First, as discussed below, certain economic forces

can lead naturally to dominance by a single firm, even apart from anticompetitive

conduct.   It was alleged, and both the District Court and the Court of Appeals agreed,

that Microsoft's conduct erected artificial entry barriers on top of those that occur

naturally in software markets.  These artificial entry barriers were added to slow or halt

the adoption of alternative technologies (known as "middleware") that have the potential

to erode Microsoft's OS monopoly.  This is the conduct to be remedied, not the existence

of the monopoly itself.

9.    Second, there is widespread agreement that the middleware threat to the Microsoft operating system posed by the Netscape Web browser (i.e., Navigator) and the Java programming technology was a "nascent" one.[10]  While there is no question that Microsoft's conduct was aimed at eliminating that threat, there is significant uncertainty regarding when Microsoft's OS monopoly would have been substantially eroded (if at all).  Thus, the appropriate remedy in this case is to restore the potential threat that middleware provides, not to eliminate natural entry barriers that are not in themselves a cause for competitive concern.  This point has been overlooked by those critical of the proposed decree who argue the appropriate antitrust remedy in this case calls for the elimination of the applications barrier to entry.

A.    *Characteristics of Software Markets*

10.    In many software markets, including OS markets, there are fundamental forces that may lead to one firm being dominant at a given time and that tend to create barriers to entry.  These forces have been widely discussed in the economics and computing literature.  The first is the presence of *scale economies*.  For complex software such as an OS, the initial or "first-copy" costs to writing software are often very large, whereas the incremental cost of producing additional copies is small.  Hence, average cost declines as the scale of output rises.  The second is *increasing returns in consumption*.  The larger the market share of a particular OS, the more independent software vendors ("ISVs") will tend to write applications for that OS.  The more this happens, the more attractive will customers find that OS, further increasing its market share, which leads to the development of more new software applications, and so forth.

---

[10] *United States v. Microsoft Corp.*, 253 F.3d 34, 79 (D.C. Cir. June 28, 2001).

Thus, increasing returns in consumption induce a series of feedback effects, which tend to make a dominant OS more dominant over time.[11]

11.     Economies of scale and increasing returns to consumption give rise to a phenomenon that lies at the heart of antitrust analysis of network industries: monopoly tipping.[12]  If a large set of users adopts a new network technology, then that technology becomes more attractive to everyone else as a result of increasing returns in consumption. As more users join, the technology becomes still more attractive until it becomes dominant; in economic terminology, the market has "tipped" to the new technology. Because users invest time and money in learning to use a given technology proficiently, for a newer technology to succeed, it would have to offer a substantial improvement in performance – i.e., enough of an improvement at least to overcome the switching costs associated with the change.  In the normal course of markets and competition, such improvements do in fact occur.  One example is the displacement of slide rules by pocket calculators.

12.     The economic theory of network effects describes well the performance of the OS market.  As an operating system gains popularity, the incentive to develop

---

[11] Increasing returns to consumption is often discussed as an important consequence of *network effects*.  First formalized by Rohlfs, there is a network effect whenever the value to existing users of a network increases as the network expands with new users.  *See* Jeffrey H. Rohlfs (1974), "A Theory of Interdependent Demands for Communications Service," 5 BELL JOURNAL OF ECONOMICS AND MANAGEMENT SCIENCE 16-37.  *See also* Michael Katz and Carl Shapiro (1985), "Network Externalities, Competition and Compatibility," 75 AMERICAN ECONOMIC REVIEW 424-440; Michael Katz and Carl Shapiro (1986), "Technology Adoption in the Presence of Network Externalities," 94 JOURNAL OF POLITICAL ECONOMY 822-841.

[12] *See*, *e.g.,* Joseph Farrell and Garth Saloner (1986), "Installed Base and Compatibility: Innovation, Product Differentiation, and Predation," 76 AMERICAN ECONOMIC REVIEW 940-955; Joseph Farrell and Garth Saloner (1985), "Standardization, Compatibility, and Innovation," 16 RAND JOURNAL OF ECONOMICS 70-83.

software for that operating system grows since the number of potential customers for the application developer is larger.  This, in turn, increases the value of the operating system to end users (and likely its market share), which is determined by the quality and variety of software applications written for it.  As the OS gains market share, software developers find it even more advantageous to produce additional applications for that system.  This feedback effect explains why the number of complementary software applications and the installed base of these applications serve as natural barriers to entry, and also why alternative operating systems already in the market at a small scale are not effective competitors.  This feature of software markets has become known as the applications barrier to entry.[13]

13.    Microsoft's dominant market share was a predictable consequence of the applications barrier to entry.  At trial, it was documented that Microsoft's market share in each period from 1991 to 1997 held consistently at about ninety percent.  Further, it was documented that Microsoft's OS dominance was stable, that it had hardly fluctuated in the face of determined attempts at entry by rival operating systems, and that it was forecast to remain stable in the future.[14]

B.    *The Middleware Threat to the Microsoft OS*

14.    The above discussion suggests that, to enter with a product consumers would want installed on their PCs, OS vendors would have to create or induce others to

---

[13]    In my May 1998 Declaration, I argued that the application barrier to entry occurs naturally in certain software markets and is not, by itself, a source of antitrust concern. By contrast, I stated "[t]he bundling and other contractual browser restrictions that Microsoft insists upon in its agreements with OEMs, IAPs, and ICPs add artificial entry barriers to those that occur naturally, and are therefore a source of competitive concern." *See* May 1998 Sibley Decl. at ¶19.

[14]    Government Exhibit No. 1.

create an extensive set of software applications to go with it.  Alternatively, the product would have to emulate the Windows applications programming interfaces ("APIs") needed to run existing Windows applications.  APIs permit software applications running on an OS to access the basic computing functions performed by that operating system, such as opening a file, executing a print command, drawing a box, etc.  The Netscape Web browser was a new class of software – called middleware – that itself exposed a broad range of APIs to which software developers could write applications.  This middleware product threatened Microsoft's OS dominance because the browser could serve as a software applications platform independent of the underlying OS.[15]  Thus, a new entrant in the OS market would not have to create an installed base of software applications for its OS comparable in size and use to those of Microsoft in order to succeed.  Instead, applications written to the browser platform (perhaps using the Java programming technology of Sun Microsystems, Inc. ("Sun")) would be accessible to a user using any OS supporting that browser.  Application developers would have the incentive to write to these browser APIs because their applications would then run on Windows plus the operating systems that were previously unprofitable for these ISVs to write applications.  This would ultimately make it less important for users to which operating systems were installed on their computers.  As Bill Gates stated: "[t]hey [Netscape] are pursuing a multi-platform strategy where they move the key [APIs] into the client [browser] to commoditize the underlying operating system."[16]

---

[15]  *See* May 1998 Sibley Decl. at ¶¶ 18-19, 30, and 49-50.

[16]  Government Exhibit No. 20, Email from Bill Gates to the Microsoft Executive Staff and Direct Reports (May 26, 1995).

15.    As the evidence in this case demonstrates, Microsoft engaged in specific anticompetitive actions intended to displace the Netscape browser with its own Web browser, Internet Explorer ("IE").    In particular, the commingling and contractual browser restrictions that Microsoft insisted upon in its agreements with OEMs, IAPs, ICPs, and Independent Software Vendors ("ISVs") impeded the growth of the Netscape Web browser by adding artificial entry barriers to those that occur naturally.    Such restrictions are therefore a source of competitive concern.

16.    In challenging Microsoft's commingling and contractual practices, the plaintiffs' antitrust complaint alleged the following: (1) Microsoft engaged in a series of anticompetitive acts to maintain its OS monopoly; (2) Microsoft attempted to monopolize the Web browser market; (3) Microsoft illegally tied IE to its operating system; and (4) Microsoft entered into unlawful exclusive dealing arrangements.    The District Court sustained claims (1) through (3).    The appellate court, however, sustained only the monopoly maintenance claim, and with fewer anticompetitive actions than the District Court had found.[17]    Thus, the focus of the SRPFJ is on remedying the twelve specific anticompetitive actions the appellate court found Microsoft to have taken to maintain its OS monopoly.  (See Table One.)    In addition, the SRPFJ includes measures designed to enhance the ability of rival middleware vendors to interoperate with the Microsoft OS. As addressed in Sections III and IV below, many critics of the proposed decree appear to have ignored the fact that the government's case had been significantly narrowed.

---

[17] The appellate court reversed both the attempted monopolization and tying claims (remanding the tying claim for further hearing under the rule of reason standard) and vacated the Final Judgment that called for a structural remedy and interim conduct remedies.

TABLE ONE
SUMMARY OF FINDINGS OF ANTICOMPETITIVE ACTS

| Anticompetitive Findings of District Court | Appellate Court Agreement? |
|---|:---:|
| *Agreements with OEMs* | |
| 1.  Prohibition on OEM removing desktop icons, folders, or Start Menu entries | Yes |
| 2.  Prohibition on OEM altering initial boot sequence | Yes |
| 3.  Prohibition on OEM allowing alternative user interface to launch automatically | No |
| 4.  Prohibition on OEM adding icons or folders in different size or shape | Yes |
| 5.  Prohibition on OEM using Active Desktop to promote others' products | Yes |
| *Binding of IE to Windows* | |
| 6.  Excluding IE from the "Add/Remove" utility | Yes |
| 7.  Designing Windows to override users' choice of default browser other than IE | No |
| 8.  Commingling code to eliminate OEM choice of removal of IE from Windows | Yes |
| *Agreements with IAPs* | |
| 9.  Licensing IE for free | No |
| 10. Payment for use of IE with IAP service signup | No |
| 11. Developing IE Access Kits and offering them for free | No |
| 12. Placement of IAP's product on desktop in return for IE exclusivity (or limit to Navigator shipments) | Yes |
| *Agreements with ICPs, ISVs, and Apple* | |
| 13. Exclusive agreements with ICPs | No |
| 14. Agreements with ISVs to make IE the default hypertext interface | Yes |
| 15. Threat to end support of Office on MAC platform as "a club" to coerce Apple to use IE as default browser with MAC OS | Yes |
| *Efforts to Contain and Subvert Java* | |
| 16. Design of Java Virtual Machine ("JVM") that was incompatible with Sun's product | No |
| 17. Exclusive agreements to promote Microsoft's JVM | Yes |
| 18. Deceived Java developers about Windows-specific nature in Microsoft Java | Yes |
| 19. Coerced Intel to stop aiding Sun by threats to support Advanced Micro Devices, Inc. ("AMD") | Yes |
| *Course of Conduct* | |
| 20. Apart from specific acts, Microsoft's general course of conduct violated Section 2 of the Sherman Act | No |

C.     *Summary of SRPFJ Provisions*

17.     Given the appellate court findings, the SRPFJ focus is appropriately on middleware.  Each of the twelve anticompetitive acts were directed toward eliminating the middleware threat to the Microsoft OS.  However, by its nature, the proposed decree must be forward looking, and this requirement imposes challenges as to how middleware should be defined.  As the appellate court noted, "[s]ix years has passed since Microsoft engaged in the first conduct plaintiffs alleged to be anticompetitive.  And as the record in this case indicates, six years seems like an eternity in the computer industry."[18]  The anticompetitive actions taken by Microsoft targeted the middleware threat posed by the Netscape Web browser and Java.[19]  However, there is general agreement that Microsoft has won the "browser war."  Relief focusing only on this threat is thus likely to be ineffective.  Moreover, the characteristics of middleware products today focus not on access to the Internet but on the range of offerings that access to the Internet can provide.  Thus, middleware is properly defined in the proposed decree to encompass present and future middleware threats.  In particular, middleware is broadly defined in the SRPFJ to capture almost any software that exposes a range of APIs.  For example, as defined, middleware captures Internet browsers, email client software, networked audio/video client software, and instant messaging software.

18.     As shown in Table Two, to stop the unlawful conduct found by the appellate court, the SRPFJ targets Microsoft's business practices by broadly banning exclusive dealing, providing OEMs more control of the desktop and initial boot

---

[18] *United States v. Microsoft Corp.*, 253 F.3d 34, 6 (D.C. Cir. June 28, 2001).

[19] *See*, *e.g.*, May 1998 Sibley Decl. at ¶¶ 18-19.

sequences, and prohibiting retaliatory conduct by Microsoft. The remedy for preventing recurrence of that conduct consists of provisions for non-discrimination and non-retaliation. With regard to lost competition, the SRPFJ seeks to restore the potential middleware threat. This is to be accomplished primarily through provisions requiring API disclosure and the licensing of communication protocols embedded in the OS. This will enable independent software developers to more effectively interoperate with Windows and thus compete with the middleware functionality offered by Microsoft. Middleware developers are also aided by (1) the requirement that Microsoft create and preserve default settings when Windows launches or invokes rival middleware in certain cases, and (2) the requirement that Microsoft create "add/delete" functionality that makes it easier for OEMs and users to replace end-user access to Microsoft Middleware functionality with rival middleware.

TABLE TWO
SUMMARY OF SRPFJ PROVISIONS

| Provision | Section in SRPFJ |
|---|---|
| *Remedy to Stop Offending Conduct* | |
| Prohibits retaliatory conduct | III.A.1-3  III.F.1 |
| Broadly bans exclusive dealing | II.F.2  III.G.1-2 |
| Provides OEMs more control of desktop and initial boot sequence | III.C.1-6 |
| *Remedy to Prevent Recurrence* | |
| Non-discrimination and non-retaliation provisions | III.A.1-3, III.B.1-3  III.F.1 |
| *Remedy to Restore Competitive Conditions* | |
| If Microsoft middleware products rely on an API, then that API must be disclosed. | III.D  III.I |
| Microsoft required to create and preserve default settings, such that certain of Microsoft's  integrated middleware functions will not be able to over-ride the selection of third-party middleware products. | III.H.2 |
| Microsoft required to create add/delete functionality that makes it easier for OEMs and users to replace Microsoft middleware functionality with independently developed middleware. | III.H.1 |
| Microsoft required to license communications protocols embedded in the OS, but the company's ability to deploy proprietary technology provided separately is preserved. | III.E  III.I III.J.1-2 |

19.     The difficult task is to create a balanced remedy that constrains anticompetitive behavior by Microsoft without limiting competition on the merits.  Thus, in developing an antitrust remedy in this case, it is necessary to balance two broad factors: (1) the need to impose constraints on Microsoft's current and future behavior so that the unlawful business practices stop and do not recur, and competitive conditions are restored and (2) the requirement that these constraints not be so intrusive and complex that they themselves distort market outcomes.

20.     By focusing on Microsoft's anticompetitive business practices, the provisions in the SRPFJ eliminate the artificial barriers to entry erected by Microsoft that are the source of competitive concern.  The provisions in the proposed decree aim to

deter conduct that (1) seeks exclusivity or (2) is backed by retaliatory threats. The SRPFJ also aims to restore and enhance competitive conditions by removing technical barriers to competition between Microsoft and rival middleware suppliers. As discussed above, from an economic standpoint, middleware is important because it can expose APIs and has the potential to become an applications platform distinct from the Windows OS.

21.    At the same time, the SRPFJ does not attempt to preordain market outcomes or to weaken Microsoft as a legitimate competitor. Overly broad remedies can create socially wasteful costs by eliminating efficiencies, and remedies designed to "manage" the competitive process can indirectly reduce consumer welfare. In particular, over-extensive government regulation of Microsoft may result in inefficient rent-seeking by Microsoft's competitors,[20] and make Microsoft a less efficient competitor. As discussed below, in my opinion, the SRPFJ achieves the right balance.

### III.  Economic Analysis of the SRPFJ in Light of the Tunney Act Requirements

22.    It is my understanding that key components of the public interest standard of the Tunney Act are satisfied when the antitrust remedy is sufficient to (1) stop the offending conduct, (2) prevent its recurrence, and (3) restore competitive conditions. In this section, I examine the extent to which the SRPFJ satisfies this three-part test. In so doing, I respond to many of the thoughtful comments on the proposed decree that were submitted during the public comment period recently concluded.

---

[20] Rent seeking involves the use of real resources to obtain favorable treatment or rules.

15

A.    *Does the SRPFJ Stop the Offending Conduct?*

23.    To answer this question it is first necessary to review both the specific acts of Microsoft that were held to be anticompetitive and the linkage between those acts and the provisions in the SRPFJ.  Table Three identifies the twenty specific acts related to the monopoly maintenance claim that were found to be anticompetitive by the District Court and the twelve claims upheld by the appellate court.  The right-hand column of Table Three presents the provisions in the SRPFJ that I believe likely would effectively prevent those acts from occurring.  I begin my analysis by examining the acts of Microsoft found to be unlawful by the appellate court.

24.    *Prohibition on OEM removing desktop icons, shortcuts, or Start Menu entries*.  If the SRPFJ had been in effect when Microsoft imposed this requirement on OEMs, Microsoft would have been in violation of Section III.H.1.a of the proposed decree.  This section of the SRPFJ specifically allows either end users or OEMs to enable or remove access to each Middleware Product by displaying or removing icons, shortcuts, or menu entries anywhere in a Windows Operating System Product that a list of icons, shortcuts, or menu entries is normally displayed.  According to the SRPFJ, the mechanism that accomplishes this task must be readily accessible from the desktop or the Start Menu entries, and it must be available to OEMs using standard pre-installation kits.

TABLE THREE
PROVISIONS IN SRPFJ THAT ADDRESS ANTICOMPETITIVE ACTS

| Anticompetitive Findings of District Court | Appellate Court Agreement? | Addressed in SRPFJ Section |
|---|---|---|
| *Agreements with OEMs* | | |
| 1.  Prohibition on OEM removing desktop icons, folders, or Start Menu entries. | Yes | III.H.1 |
| 2.  Prohibition on OEM altering initial boot sequence. | Yes | III.C.3-5 |
| 3.  Prohibition on OEM allowing alternative user interface to launch automatically. | No | |
| 4.  Prohibition on OEM adding icons or folders in different size or shape. | Yes | III.C.1-2 III.H.3 |
| 5.  Prohibition on OEM using Active Desktop to promote others' products. | Yes | III.C.1-2 |
| *Binding of IE to Windows* | | |
| 6.  Excluding IE from the "Add/Remove" utility | Yes | III.H.1 |
| 7.  Designing Windows to override users' choice of default browser other than IE. | No | III.H.2 |
| 8.  Commingling code to eliminate OEM choice of removal of IE from Windows | Yes | III.C.1  III.H.1 |
| *Agreements with IAPs* | | |
| 9.  Licensing IE for free | No | |
| 10. Payment for use of IE with IAP service signup | No | |
| 11. Developing IE Access Kits and offering them for free | No | |
| 12. Placement of IAP's product on desktop in return for IE Exclusivity (or limit to Navigator shipments) | Yes | III.G.1-2 |
| *Agreements with ICPs, ISVs, and Apple* | | |
| 13. Exclusive agreements with ICPs | No | III.G.1-2 |
| 14. Agreements with ISVs to make IE the default hypertext user interface | Yes | III.F.2  III.G.1 |
| 15. Threat to end support of Office on MAC platform as "a club" to coerce Apple to use IE as default browser with MAC OS | Yes | III.F.1-2 III.G.1 |
| *Efforts to Contain and Subvert Java* | | |
| 16. Design of Java Virtual Machine ("JVM") that was incompatible with Sun's product. | No | |
| 17. Exclusive agreements to promote Microsoft's JVM | Yes | III.F.2  III.G.1 |
| 18. Deceived Java developers about Windows-specific nature in Microsoft Java tools | Yes | III.D |
| 19. Coerced Intel to stop aiding Sun by threats to support AMD | Yes | III.F.1-2 |
| *Course of Conduct* | | |
| 20.  Apart from specific acts, Microsoft's general course of conduct violated Section 2 of the Sherman Act | No | |

25.  *Prohibition on OEM altering the initial boot sequence.*  This Microsoft prohibition would have violated Sections III.C.3-5 of the proposed decree.  These sections require that OEMs be allowed to alter the initial boot sequence in certain ways to promote rival middleware.  Section III.C.3 allows OEMs to launch rival middleware in place of a Microsoft Middleware Product at the end of the initial boot sequence.  Section III.C.4 allows OEMs to offer machines that dual boot to two different operating systems.  Section III.C.5 allows OEMs to present Internet access offers which may promote rival software.

26.  *Prohibition on OEM adding icons or folders in different size or shape.*  Microsoft began to impose this restriction, which was intended to prevent OEMs from pre-installing Netscape Navigator, in its first Windows 95 contracts.  Under the proposed decree, the only restrictions that Microsoft would now be able to place on the icons, shortcuts, and menu entries placed by an OEM are those described in Section III.C.1-2.  These sections state that Microsoft can restrict the OEM from placing such icons, shortcuts, and menu entries in any list in Windows that is described in the Windows documentation as being for particular types of functions.  These provisions would, however, apply also to Microsoft's own placement of icons, menu entries, and shortcuts and do not restrict the OEM from choosing the size and shape of its shortcuts.[21]

27.  I note that Section III.H.3 of the SRPFJ is also relevant with regard to Microsoft's prohibition against the addition of OEM-specified icons, shortcuts, and menu entries.  This section states that Microsoft cannot alter an OEM's desktop configuration

---

[21]  The size and shape of an icon is fixed and cannot be changed by the OEM or Microsoft.  Section III.C.2 prohibits Microsoft from restricting the OEM's selection of the size and shape of shortcuts, including shortcuts placed on the desktop.

of icons, etc. without end-user actions, and, in any case, it cannot even ask the user to undertake such action for fourteen days after the initial boot. Based on my reading of the *Competitive Impact Statement* (which serves as an explanation of SRPFJ provisions) and on conversations with personnel from the DOJ, the only existing Microsoft technology to which this section refers is the Desktop Cleanup Wizard, which currently exists only on Windows XP. The Desktop Cleanup Wizard simply asks the end user if he or she wants to retain infrequently-used icons on the desktop, whether or not these icons refer to rival software. The SRPFJ requires that it treat Microsoft and Non-Microsoft icons in an unbiased manner.

28. *Prohibition on OEMs using Active Desktop to promote others' products*. It is my understanding that this prohibition is no longer a relevant concern because the Active Desktop is no longer significantly in use. Indeed, I note that the Microsoft pre-installation kit for Windows XP instructs the OEM not to activate the Active Desktop. However, should features similar to the Active Desktop exist in the future, Sections III.C.1-2 would prevent similar types of restrictions by providing OEMs more control and flexibility over the desktop.

29. *Exclusion of Internet Explorer from the "Add/Remove" utility*. This violation would clearly have been prevented by Section III.H.1 of the proposed decree. Section III.H.1 requires Microsoft to allow the removal of the means of access to Microsoft Middleware Products.

30. *Commingling of code to eliminate OEM choice of removal of IE from Windows*. This offense is addressed by Sections III.H.1 and III.C.1 of the proposed decree. Section III.H.1 requires Microsoft to allow the removal of the means of end-user

access to Microsoft Middleware Products, which would include IE.  Section III.C.1 allows the OEM to install and display icons, shortcuts, and menu entries that facilitate easy end-user access to middleware offered by Microsoft rivals.  From the standpoint of most end-users, a software product, such as a browser, has been removed and is not present if there are no visible means to access it.  Accordingly, Section III.C.1 and III.H.1 together enable the OEM or end user to select another browser as the default browser, without IE being visible to the end user.  I do not interpret the appellate court decision as requiring that code internal to Windows be removed without regard to the competitive significance of its removal merely because it is also used in Web browsing.  The appellate court stated that such removal of code would be needed if such removal was required to permit OEMs to remove the means of access to Microsoft products, since their inability to do so resulted in the exclusion of rival products.  Thus, because the SRPFJ requires Microsoft to make it possible for OEMs effectively to remove Microsoft Middleware Products by removing access to them and to install rival products, the actual removal of code is not necessary.

31.     *Placement of an IAP's product on the desktop in return for IE exclusivity (or limit to Navigator shipments)*.  This offense would have been prevented by Sections III.G.1 and III.G.2 of the proposed decree.  With one exception, these sections prevent Microsoft from entering into an agreement with any IAP, ICP, ISV, independent hardware vendor ("IHV"), or OEM requiring either exclusivity for a Microsoft Middleware product or that such software be distributed in a fixed percentage, irrespective of consumer choice.  The exception is that fixed percentage agreements that provide Microsoft preferential status are permitted under the SRPFJ as long as it is

commercially feasible for the OEM, IAP, etc. to give equivalent treatment to rival middleware.   When preferential status for Microsoft necessarily excludes rival middleware, Section III.G.1 implies that preferential status from Microsoft cannot extend to more than fifty percent of the shipments of the OEM, IAP, etc.  Also, Microsoft cannot grant an IAP or ICP placement on the desktop or any other favored place in Windows in return for the IAP or ICP refraining from distributing, promoting, or using any software that competes with Microsoft Middleware.

32.    *Agreements with ISVs to make IE the default hypertext user interface.* Such exclusive agreements are ruled out by Sections III.F.2, and III.G.1.  Section III.F.2 prevents Microsoft from rewarding ISVs for refraining from developing, promoting, or using software that competes with Microsoft middleware and operating systems. Provision III.G.1 prohibits Microsoft from entering into agreements which give Microsoft preferential status (e.g., fixed percentage agreements) when an ISV or IHV is unable to offer an equivalent status to a rival product.   Fixed percentage agreements are permissible, however, when it is commercially feasible for the other party to the agreement to provide at least the same level of promotion to the rival middleware.

33.    *Threat to end support of Office on MAC platform as "a club" to coerce Apple to use IE as default browser with MAC OS.*  For the purpose of the SRPFJ, Apple is considered an ISV.  One of the historical incidents involving Microsoft and Apple was that Microsoft threatened to end the support of Office on the MAC platform if Apple continued to promote Netscape's Web browser.  Section III.F.1 forbids retaliation of the kind Microsoft threatened.   This restriction would have rendered the threat itself ineffective.  Microsoft also signed an agreement with Apple which ported Office to the

MAC and made IE the default browser and relegated Netscape's browser to a folder. This agreement would have violated Section III.F.2 because it represented consideration in return for Apple's refraining from promoting the Netscape browser. Finally, because Apple could not have made both IE and Navigator the default browser on the MAC, the agreement would have violated Section III.G.1.

34.    *Exclusive agreements to promote Microsoft's JVM*. These agreements between Microsoft and ISVs gave those ISVs advance information on new Microsoft APIs in return for writing to the Microsoft version of the Java Virtual Machine ("JVM"). Section III.F.2 would have prevented Microsoft from offering the ISV consideration, in the form of advance information, in return for promoting the Microsoft JVM over the Sun JVM. Section III.G.1 would also block such a transaction since the ISVs were being asked to promote the Microsoft JVM exclusively.

35.    *Deception of Java developers regarding the Windows-specific nature of Microsoft Java.* To the extent that such deceit on the part of Microsoft involved the disclosure of additional APIs developed by Microsoft for its JVM that worked only on Windows, this behavior would have been blocked by the API disclosure requirement of Section III.D. However, I see nothing in the SRPFJ that speaks directly to the issue of deceit.

36.    *Coerced Intel to stop aiding Sun by threats of support to AMD.* Microsoft's interaction with Intel in this regard contained a threat. Section III.F.1 forbids retaliation against an IHV, so that had the SRPFJ been available at the time, the threat of retaliation would have been without force. Section III.F.2 would have been invoked by the Microsoft offer of consideration, which essentially took the form of increased support

for Intel's microprocessors.  Thus, this conduct would have been prevented by the SRPFJ.

37.    In addition to likely preventing the anticompetitive acts upheld as illegal by the appellate court, the SRPFJ also provides at least partial protection with regard to two Microsoft behaviors found to be unlawful by the District Court but not upheld as such on appeal.  (See Table One, items 7, and 13.)  In this regard, the SRPFJ addresses actions that go beyond the violations upheld by the appellate court.

38.    *Designing Windows to override a user's choice of default browser other than IE*.  Section III.H provides partial protection against this act.  To restore this access would take positive action by the end user and could not be initiated and completed by Microsoft otherwise.   Section III.H.2 allows end users and OEMs to select a Non-Microsoft Middleware Product to be launched automatically whenever the Microsoft Middleware would have been launched in a Top-Level Window and have displayed either all of the user interface elements or the trademark of the Microsoft Middleware Product.[22]  This requirement forces Microsoft to have default in some circumstances and provides a "bright line" rule in a situation where previously Microsoft had complete discretion.

39.    *Exclusive agreements with ICPs*.  Although the appellate court did not find these agreements to be unlawful, Section III.G.1 of the proposed settlement prevents exclusive and "fixed percentage" agreements for Microsoft Middleware products with ICPs.  In addition, Section III.G.2 outlaws an exchange of placement of the ICP's icon on

---

[22] The term "Non-Microsoft Middleware Product" is used only in Section III.H of the SRPFJ, and my use of the term applies only in reference to that section of the proposed decree.  Elsewhere, I use the term "rival middleware."

the desktop for the ICP refraining from using, distributing, or promoting middleware offered by Microsoft's rivals.

40.     Based on the above analysis, I conclude that the SRPFJ is likely to stop effectively the Microsoft conduct found to be unlawful by the appellate court. The proposed decree also is likely to address two areas that were originally found to be unlawful by the District Court but reversed on appeal.

### B.     Does the SRPFJ Prevent Recurrence of the Offending Conduct?

41.     In addition to preventing the recurrence of acts similar to those that occurred in the past, the SRPFJ contains provisions to guard against future acts that differ substantially from those listed in Table Three but would also be anticompetitive. The SRPFJ identifies non-Microsoft products whose distribution and usage cannot be impeded by Microsoft's actions. Covered products, such as Microsoft Middleware Products, are described in terms of their general functionalities and not just with reference to specific products now commercially available.

42.     In particular, "Microsoft Middleware Product" is broadly defined in the decree to cover the functionality provided by Internet Explorer, Microsoft's Java Virtual Machine, Windows Media Player, Windows Messenger, Outlook Express, as well as their successors. In addition, new and yet-undreamed-of products in the general categories of Internet browsers, email client software, networked client audio/video client software, and instant messaging software are also covered. The SRPFJ also covers any new Microsoft Middleware distributed separately from a Windows Operating System Product that is similar to the functionality of a rival middleware product and is either trademarked or distributed by Microsoft as a major version of a Microsoft Middleware

Product.  In this last category, the new Microsoft Middleware Product need not even be something currently recognized as middleware.  This definition is not perfectly general, and it is possible to imagine future Microsoft products that would not fall under this definition but nevertheless would still compete with rival middleware.  However, the middleware definition does appear broad enough to capture the types of middleware threats most likely to emerge during the term of the proposed decree.  Similarly, provisions in the proposed decree regarding non-discrimination and non-retaliation (i.e., Sections III.A, III.B, and III.F) are broad and go beyond the specific acts found to be unlawful by the appellate court.

43.    During the effective period of the decree, the Technical Committee and other compliance and enforcement measures set out in the SRPFJ should work to prevent a recurrence of the offending acts.  However, before reaching a conclusion about the SRPFJ's compliance with this part of the Tunney Act's requirements, there remains the issue of possible "loopholes" and "overly-broad exclusions," which was commented upon in many thoughtful submissions provided during the public comment period just concluded.  I will discuss below those comments pertaining to provisions in the SRPFJ that are intended to prevent recurrence of acts such as those described at trial, in the general areas of retaliation and exclusive dealing.  (Potential loopholes in the general area of disclosure of APIs and other technical interfaces are discussed in Section III.C of this document.)

44.    *Claimed Loopholes.*  The SRPFJ contains various provisions (Sections III.A and III.F) that protect parties from retaliation by Microsoft in those cases involving a middleware product that competes with a Microsoft Middleware Product and operating

system.  These provisions do not address explicitly the possibility that Microsoft may have a competitive concern involving rival middleware that has no counterpart at present among Microsoft's suite of middleware products.  In this situation, Microsoft might retaliate against an OEM, ISV, or IHV that supported the product in question, perhaps to prevent it from ever becoming a serious threat to its OS monopoly.  However, there are several reasons why this is unlikely to occur.

45.    First, this action would be blocked by Section III.A.1, which forbids Microsoft from retaliating against an OEM supporting, or contemplating supporting, any rival software that competes with Microsoft Platform Software whether or not Microsoft has a counterpart to the rival software.  Section III.F.1 contains similar protection for ISVs and IHVs.  While it is not possible at first glance to rule out the occurrence of such an event, further analysis suggests that such an event is unlikely to occur.  This is because as discussed in Section II above, Microsoft's strength is derived from having an operating system that runs many applications, and, in the past, Microsoft has consistently supported applications that do not compete with its own applications.  The Microsoft Software Developer's Network and the many developer seminars that Microsoft sponsors are evidence in support of this position.  Second, if Microsoft were to adopt this strategy, the strategy itself would impose a cost on Microsoft in that the company would have to refrain from developing its own version of the threatening software.  This would encourage other, non-Microsoft developers to produce another version of the competing product and end-users to use the non-Microsoft middleware product.  Also, there remains the issue of exactly how Microsoft would retaliate and against whom.

46.     Previously, Microsoft has retaliated against OEMs by charging uncooperative OEMs a higher price for Windows. However, this form of retaliation is ruled out by Section III.B, which requires that OEMs pay royalties pursuant to uniform license agreements that can be viewed by other OEMs and by the plaintiffs for monitoring purposes. If retaliation were to take the form of manipulation of other types of consideration (e.g., MDA discounts), such action would make it impossible for Microsoft to comply with Section III.B.3.a of the proposed decree, which states that such discounts must be offered to all covered OEMs, including OEMs that cooperate with Microsoft.

47.     Based on Microsoft's past practices, Microsoft might withhold APIs, documentation, or access to communications and security protocols. Such behavior is likely to be an ineffective means of retaliation or control. There are thousands of published APIs, and the very existence of a Non-Microsoft Middleware Product that prompts retaliation implies such a product was built around published APIs and technologies, in addition to whatever its developer may have invented and embodied in the product. Attempting to manipulate these APIs would invariably harm products that are complementary to the Microsoft OS and enhance its value. For all these reasons, I believe that Microsoft's incentives would be not to retaliate against an ISV regarding a product without a Microsoft counterpart. In my opinion, reliance on incentives will be superior, in this instance, to detailed regulation.

48.     A second possible loophole is that Microsoft could provide special treatment or discriminatory prices on other (non-middleware) products as rewards or retaliation, presumably for a third party's favoring or impeding a Non-Microsoft

Middleware product. (See Declaration of Joseph Stiglitz and Jason Furman, hereafter "Stiglitz and Furman Decl." at 31, and Declaration of Kenneth J. Arrow, hereinafter "Arrow Decl.," at ¶ 41.) Regarding special treatment, I note that if such treatment refers to non-monetary consideration of some kind, this behavior would be ruled out by Section III.A.1 of the proposed decree. This section of the SRPFJ prohibits Microsoft from retaliating against or withholding newly developed forms of non-monetary compensation from an OEM because the OEM is developing, promoting, or using software that competes with Microsoft Platform Software.

49.    I also consider the possibility that special treatment might take the form of monetary discounts on other Microsoft products, such as Microsoft Office. I will assume that the alleged discrimination takes the form of requiring the OEM to establish the Microsoft Middleware Product as the default on all of its computers. This action violates Section III.A.1 and III.A.3 because linking the price of Office to an OEM's promotion of rival middleware would represent an alteration in Microsoft's commercial relationship with that OEM in connection with that OEM's promotion of rival middleware, and the withholding of such a discount would occur because it was known to Microsoft that the OEM was exercising options provided for by Section III.H (e.g., making rival middleware the default). Furthermore, this would be a case of preferential treatment within the meaning of Section III.G. Since only one middleware product in a given category can by definition be the default on a given computer, the OEM could not represent that it was commercially feasible for it to give greater or equal distribution to the Non-Microsoft Middleware Product.

50.    The third loophole cited in the comments pertains to Section III.A and the process that governs how Microsoft must proceed if it wants to terminate dealings with an OEM.  In the past, Microsoft has had the ability to cancel an OEM's Windows license without prior notice.  The SRPFJ adds constraints to Microsoft's ability to terminate an OEM.  The SRPFJ requires that Microsoft provide any one of the top twenty OEMs (defined by volume) written notice of its intent to cancel, in which it must specify the deficiency prompting the cancellation, as well as a 30-day opportunity to cure the deficiency.  Because Microsoft must provide a reason in the written notice and an opportunity for a cure, it obviously cannot terminate an OEM for conduct authorized under the SRPFJ.  Again, Microsoft does not have to do this currently.  Because Microsoft cannot terminate an OEM's license for conduct consistent with the SRPFJ, the presumption is that, if an OEM is terminated, the cause must be related to a normal commercial dispute.  Viewed in this light, I do not agree with Stiglitz and Furman when they allege that Section III.A provides Microsoft "substantial leverage" to force an OEM to distort its choice among competing middleware products.  (See Stiglitz and Furman Decl. at 31-32.)  I do not believe that detailed regulation would achieve a better outcome.

51.    This discussion has summarized the major comments on the SRPFJ Sections III.A, III.B, and III.F as they relate to retaliation and discrimination.  On balance, I conclude that these provisions are likely to fulfill the Tunney Act requirement that the SRPFJ prevent a recurrence of the offending conduct.

C.    *Will the SRPFJ Restore Competitive Conditions?*

52.    As discussed above, the SRPFJ's focus is on restoring the competitive threat provided by middleware (see Table Two).  This is accomplished by providing

middleware developers the means to create competitive products through: (1) provisions for API disclosure; (2) provisions that require Microsoft to create and preserve default settings, such that Microsoft's integrated middleware functions will not be able to override the selection of third-party middleware; (3) the creation of "add/delete" functionality that make it easier for OEMs and end-users to replace Microsoft middleware functionality with independently developed middleware; and (4) requirements for Microsoft to license communications protocols embedded in the OS while maintaining Microsoft's ability to deploy proprietary technology provided separately. These provisions are discussed more fully below.

53.     The SRPFJ requires Microsoft to release certain types of technical information to rival middleware suppliers. This information is to be provided in order to enable rival software developers to configure their products so that they are able to use the same Windows capabilities that Microsoft Middleware uses. To better evaluate these provisions, recall from above that Microsoft has published thousands of APIs, which are used by software developers to allow their products to run on Windows. Microsoft rivals (e.g., RealNetworks) use those APIs to build products to run on Windows and compete with Microsoft products. Microsoft has many more APIs that it does not publish or otherwise make available to ISVs. Potentially, some of these unpublished APIs give Microsoft products capabilities or features that rival products cannot easily duplicate. When these APIs are used by Microsoft Middleware Products, the SRPFJ obliges Microsoft to disclose them to ISVs, IHVs, IAPs, ICPs, and OEMs meeting certain requirements. The same obligation applies to certain types of communications protocols and security features developed by Microsoft that are used in connection with its Window

Operating System products.  The sections of the SRPFJ dealing with technical disclosure are III.D, III.E, III.I, and III.J.

54.     The API disclosure provisions of the SRPFJ have attracted perhaps more comments than any others in the proposed decree.  Criticisms of these provisions generally follow two lines of argument:  (1) the proposed decree provides too much latitude, enabling Microsoft to delay the release of APIs until a Microsoft product has a decisive first-mover advantage over the competition; and (2) Microsoft could evade the intent of the proposed decree and avoid releasing this information at all.  I will first describe the relevant sections of the SRPFJ dealing with the API disclosure provisions and then evaluate their likely effectiveness.

### 1.     API Disclosure and Communications Protocol Provisions

55.     Section III.D of the proposed decree specifies the main process for releasing the APIs and the documentation used by Microsoft Middleware to interoperate with Windows.  Starting with the release of Service Pack 1 for Windows XP or twelve months after the submission of the SRPFJ to the Court (whichever is earlier), Microsoft must disclose APIs and documentation used in association with Microsoft Middleware.  Going forward, there are to be disclosures occurring in a "Timely Manner" whenever there is a new version of a Windows operating system product or a new major version of Microsoft Middleware.[23]

56.     Section III.E pertains to the use of Microsoft's client-server communications protocols.  It does not apply to the use of communications protocols

_____

[23] The term "Timely Manner," which governs the release date of APIs pursuant to Section III.D, means the time Microsoft first releases a beta version of a Windows Operating System Product, either through the MSDN or with a distribution of 150,000 or more copies.

between other types of Microsoft products.   The basis for the client-server focus is that there is now a growing number of applications that run on servers, rather than on the desktop.  I discussed this factor in my May 1998 Declaration.[24]  It represents a strong source of competition to Microsoft in the business computing segment and may yet make a serious attack on the applications barrier to entry in the desktop PC market.  Therefore, it is important that rival middleware be able to operate with Microsoft server operating systems.  It is equally important that a non-Microsoft server be able to operate with Windows as efficiently as would a Microsoft server.  Communications protocols are essential for that purpose and are just as necessary to rival middleware developers as is access to Windows APIs.  By contrast, I have not yet seen an argument that clearly articulates why the applications barrier to entry would be threatened by the disclosure by Microsoft of communications between other types of Microsoft software.

57.    Under Section III.E, starting nine months after the submission of the SRPFJ to the Court, Microsoft shall make available to qualifying third parties any communications protocol implemented in a Windows Operating System Product (on or after the date of SRPFJ submission), installed on a client and used to interoperate or communicate with a Microsoft server operating system product.  This will have both of the effects discussed above.  It will enable rival middleware to communicate with a Microsoft server and also will allow a non-Microsoft server operating system to communicate effectively with a Windows operating system.  To protect Microsoft intellectual property rights, Microsoft may charge for the use of these protocols as long as it does so on "reasonable and non-discriminatory terms."  (See SRPFJ at Section III.E.)

---

[24]  See May 1998 Sibley Decl. at ¶ 19.

32

Section III.E also references Section III.I, which says that Microsoft must offer to license any intellectual property that it owns and that is needed to allow ISVs, IHVs, IAPs, ICPs, or OEMs to exercise their rights under the SRPFJ.  The SRPFJ also states that all terms governing payment must be reasonable and non-discriminatory.

58.    Section III.J can be viewed as "carving out" exceptions to Section III.D and III.E.  Section III.J.1 states that Microsoft cannot be required to disclose portions of APIs, documentation, or portions of communications protocols if disclosure would "compromise the security of a particular installation or group of installations" in the general areas of anti-piracy, anti-virus, software licensing, digital rights, encryption, or authentication systems, "including, without limitation, keys, authorization tokens or enforcement criteria."  (See SRPFJ at Section III.J.1.)  Section III.J.2 similarly allows Microsoft to condition the licensing of any API, documentation, or communications protocol relating to anti-piracy, anti-virus, license enforcement mechanisms, authentication/authorization security, or third party IP protection.  Microsoft may require that a licensee:  (a) have no history of software piracy, counterfeiting, etc.; (b) have a "reasonable business need" for the API, documentation, or communications protocol for a planned or shipped product; (c) meets "reasonable, objective standards" established by Microsoft for certifying the authenticity and viability of its business; and (d) agrees to have a third party verify that its product complies with the technical specifications for whatever Microsoft APIs or interfaces it may use.

59.    Before evaluating these sections of the SRPFJ, one observation is in order.  The API disclosure required under Section III.D is triggered by the existence of Microsoft Middleware, meaning that a version of a Microsoft Middleware Product is

distributed apart from the operating system. Thus, if Microsoft bundles a piece of middleware with the operating system and does not distribute this middleware in some other way (e.g., by download), then Microsoft need not disclose the APIs used by that piece of middleware. There is a current example of this situation: Windows Media Player version 8.0 is available only with Windows XP. Therefore, Microsoft under the SRPFJ does not have to disclose the APIs applicable to Windows Media Player version 8.0. However, as discussed below, it would be impractical for Microsoft to affect competition in this way.

> 2. *Comments Regarding API Disclosure and Communications Protocol Provisions*

60. This group of decree provisions attracted a large number of thoughtful comments. Rather than address all of the commentators, I will discuss the major comments which tend to recur in the various submissions. As noted above, a potential loophole in the SRPFJ is that Microsoft's disclosure obligations only begin when it distributes a piece of middleware separately from the operating system. If Microsoft chooses to bundle this product and does not create a redistributable version, the APIs used by that product need not be disclosed. (See Stiglitz and Furman Decl. at 29-30, and Comment of Rebecca M. Henderson (hereinafter "Henderson Comment") at 5-6, and 9, and Comments of Software Information Industry Association at 26.) In theory, this feature of the SRPFJ could allow Microsoft to avoid disclosing APIs on new products and major new versions of current products.

61. In my opinion, this concern has little practical significance. If Microsoft were to follow such a strategy as a matter of broad policy to deter competition, it would come at a high price. First, none of the installed base of Windows users would have the

new product, which alone would impose a large cost on Microsoft, if the product's use were at all competitively significant, as was the case in 1995 with the browser. Second, since competing providers would continue to innovate, as RealNetworks has done, at some point Microsoft would face the danger (since most users tend not to replace their operating system readily) that the Windows user's best option becomes obtaining the relevant piece of middleware from Microsoft's competition. Had Microsoft refrained from any separate distribution of IE in 1995, the effect would have been to solidify Netscape's hold on the browser market. Third, this problem is substantive only if the bundled Microsoft product uses an API that is not published. Even then, there are thousands of published APIs to which competing ISVs can and do write. RealNetworks, for example, has always written to these publicly available APIs, unless it could persuade Microsoft to produce or reveal a particular proprietary API. Based on the comments submitted by RealNetworks in this proceeding, its main API concern is not over unpublished APIs that only Windows Media Player 8.0 may use (if any), but about the Secure Audio Path API, sometimes called SAP. This API is used by a previous version of Windows Media Player that was distributed separately from the operating system, so Microsoft will have to disclose SAP under the SRPFJ. For these reasons, I do not believe that the ability of Microsoft to withhold API disclosure by a bundling-only strategy is likely to lead to significant competitive harm.

62.     The definition of "Non-Microsoft Middleware Product" has also been criticized because of the requirement that the middleware product have had at least one million copies distributed in the previous year. For example, RealNetworks objected to this as "a huge number of copies . . . that will take a great deal of time, money and

resources for most middleware companies to reach." (See Comments of RealNetworks, at 13, and Comments of SBC at 40-41.) The comments of RealNetworks also note that the above definition of "Non-Microsoft Middleware Product" does not state whether new versions are to be counted separately. My understanding is that the word "product" refers for this purpose to an aggregation of versions. Thus, if in the course of a single year, version 1 of a product had 200,000 copies distributed, version 2 had 300,000 copies distributed, and version 3 had 500,000 copies distributed, it is my understanding that the product would qualify. Furthermore, the term "distributed" should not be confused with "sold." Under my reading of the proposed decree, mass mailings of CDs (i.e., so-called "carpet-bombing") would constitute distribution for this purpose, as would "downloads." While one million distributed copies might have been significant in the early stages of the Internet, the recent explosive growth in the Internet and its use suggests that this requirement can be easily met by most, if not all, middleware vendors.[25]

63. It has been argued that the requirement that the million copy threshold must have been reached in the previous year is a further impediment, leading to the result that the "entrepreneur will begin to gain some of the settlement rights only a year after the widespread distribution of her product. She will be entitled to information about how this new product can interact with Windows only after Microsoft has imitated the innovation."[26] However, based on my reading of the SRPFJ, this concern is misplaced.

---

[25] It is worth noting that, even in 1995, within one year of the introduction of the Mosaic browser (the first browser with a graphical user interface) there were some two million users. *See* Gina Smith*,* "Inside Silicon Valley: A High Tech Top 10 Computers & Technology," *San Francisco Chronicle* (Jan. 1, 1995).

[26] *See* Timothy F. Bresnahan, "A Remedy that Falls Short of Restoring Competition," ANTITRUST, at 69 (Fall 2001) (hereinafter "Bresnahan Article").

The million copy requirement only comes into play in Section III.H, which is the only section in which the term "Non-Microsoft Middleware Product" is used. This section is solely concerned with the ability of the end user or OEM to have a Non-Microsoft Middleware Product launch automatically or be featured on the desktop. That is, it has nothing to do with the API disclosure requirement. Furthermore, it is my understanding that, once a particular Non-Microsoft Middleware Product meets the million copy requirement and Microsoft has created a default setting, an OEM will be able to set as the default a competing product by another vendor, even if that competing product has not yet met the one million copy requirement. Thus, when RealNetworks asks, "Must [middleware distributors] accumulate one million distributions . . . before they are protected?", it betrays a misunderstanding of this section of the proposed decree.[27]

64.    The proposed release schedule for APIs and documentation has also attracted criticism. (See, e.g., Bresnahan Article at 69; and Stiglitz and Furman Decl. at 30.) The requirement in Section III.D is that, once the initial disclosure for Windows XP has taken place, Microsoft must disclose new APIs no later than the date of the last major beta release, if the disclosures are triggered by new Microsoft middleware, or in a "Timely Manner," if the disclosure is triggered by a new Windows operating system product.[28] Whether this is too long a period of time or not appears to depend on the case at hand. For an API to be published by Microsoft, it must first be "hardened," which means that it must undergo an extensive testing procedure to make sure that it works in different programming environments and in the hands of developers who may not use it

---

[27]  *See* Comments of RealNetworks at 14.

[28]  *See* definition VI.R in the SRPFJ.

in the same way that Microsoft does. If an API has been developed for a Microsoft Middleware Product and has not been hardened, it may well take some period of time before it can usefully be disclosed to ISVs and others. On the other hand, if that Microsoft Middleware Product uses APIs that have been published or that have been hardened, then the process would likely be much shorter. Thus, the appropriate disclosure period would depend on the case at hand, and my own expertise as an economist does not qualify me to opine further. I note, however, that alternatives to the SRPFJ on this matter do not appear to represent a clear improvement. For example, one alternative would be for Microsoft to disclose APIs tentatively at an earlier stage, subject to the understanding that further testing might cause Microsoft to change them. In this case, a software developer, OEM or other party that uses Microsoft APIs may have earlier access to them but may well feel reluctant to make extensive use of a very preliminary list of APIs, knowing that Microsoft may make changes at a later date. From Microsoft's standpoint, to release APIs that are only preliminary could pose legitimate risks. If Microsoft were to release a tentative new API at the alpha testing stage and were to change the API at a later date, even a Microsoft disclaimer could leave Microsoft open to charges that it was changing APIs throughout the testing process in order to deceive and manipulate. Indeed, the disclaimer would almost indemnify Microsoft for such manipulation. Its precise reasons for changing the API would then lead to litigation. For these reasons, it is unclear that preliminary, earlier disclosure is an obvious improvement to the provisions currently embodied in the SRPFJ. Indeed, it would probably extend regulation into the testing process, which seems likely to reduce and distort innovation in APIs.

65.    Other features of the proposed API disclosure process that have drawn comment include the limitations contained in Section III.J.  For example, Professor Bresnahan states that the settlement "overbroadly exempts the most competitively important protocols such as security, authentication and identity protocols."  (Bresnahan Article at 68.)  The same concern is expressed by Stiglitz and Furman.  (See Stiglitz and Furman Decl. at 30.)  These fears are unfounded, based on my understanding of the SRPFJ. In particular, I observe that Section III.J.1 exempts from disclosure portions or layers of APIs, documentation, and protocols that, if disclosed, would compromise the security of a particular actual installation.  The exemption, as described in the CIS, "is limited to specific end-user implementations of security items such as keys, authorization tokens or enforcement criteria."  (See CIS at 51.)    That is, the SRPFJ only limits disclosure of specific end-user implementation of security features.  For example, Microsoft would not have to disclose the actual key used by an actual customer.  It would not need to disclose an API written especially for an actual customer, and no other.  These limits appear reasonable.  APIs relating to general Microsoft technologies for security, etc. must be disclosed.

66.    Apart from the disclosure of APIs, there is also the issue of the disclosure of the communications protocols between Windows installed on a client and a Microsoft server.  Several commentators are of the opinion that this provision is very limiting and excludes, for example, communications between hand-held computers and servers.[29]  As discussed above, it is not clear how including such communications (e.g., in Section III.E) would reduce Microsoft's monopoly power.  I do not see a need to extend Section

---

[29] See, e.g., Bresnahan Article at 68; and Henderson Comment at 3 and 5-6.

III.E to cover non-desktop products, as proposed by the litigating states. The Microsoft operating system monopoly has always been centered on the desktop. This is why Section III.E focuses on facilitating server-based applications, which provide indirect competition to Microsoft. There is no evidence that Microsoft has monopoly power in operating systems for handheld computers, set-top boxes, etc. Indeed, the operating system sold for use in these areas, Windows CE, has been characterized by poor performance since its inception and has been out-performed by Palm OS, Blackberry, and other such competing operating systems. Similarly, Microsoft is not dominant in the server market, and it currently faces competition from servers by Linux and others. I present data confirming these claims in Section IV below. For these reasons, I am convinced that Section III.E provides the right focus. To extend Section III.E to cover additional areas would, as I have discussed, certainly increase antitrust regulation with no clear rationale or benefit.

67.      There does remain the issue of how Microsoft will decide what "reasonable and non-discriminatory" charges it will set for access to these communications protocols. This is a reasonable concern that has been raised by several commentators.[30] The basis for such license fees is apparently limited to intellectual property that Microsoft may have embedded in these protocols, as set out in Section III.I. Some guidance offered for what "reasonable and non-discriminatory" might mean is in the CIS, where it says that the "overarching goal of this Section is to ensure that Microsoft cannot use its intellectual property rights in such a way that undermines the competitive value of its disclosure obligations, while at the same time permitting

---

[30] *See, e.g.,* Bresnahan Article at 69.

Microsoft to take legitimate steps to prevent unauthorized use of its intellectual property." (CIS at 49.)  Presumably, any charging mechanism that excluded substantial numbers of ISVs, IAPs, ICPs, or OEMs would violate this requirement.  It is my understanding that previous DOJ antitrust consent decrees imply that the term "reasonable and non-discriminatory" is likely to be interpreted as not significantly excluding competitors.  On this assumption, the lack of specific rate-setting guidance in Section III.I is not likely to be a severe problem.

68.    Because Section III.B does not constrain the structure or levels of the royalty schedule beyond the uniformity requirement, some commentators have expressed the concern that Microsoft might be able to stay within the confines of this provision but still price in such a way as to be anticompetitive.  For example, RealNetworks opines that Microsoft could "establish the price of versions of Windows without its middleware set as the default at some artificially high price and the actual price Microsoft wanted to receive as a cash incentive to carry Microsoft's middleware as the default application." (See RealNetworks Comments at 27.)

69.    Contrary to RealNetwork's hypothetical, Section III.B.3.c states that Microsoft cannot discount the price of Windows based on any requirement that is inconsistent with the proposed decree.  This means that Microsoft cannot offer discounts on Windows that are tied to OEMs foregoing such options as installing non-Microsoft icons pursuant to Section III.C, or setting defaults, or removing Microsoft Middleware Products pursuant to Section III.H.  For instance, Microsoft cannot set the price of Windows at $500 but offer a cash discount of $450 if an OEM sets some Microsoft Middleware Product as the default.  Alternatively, should Microsoft offer a direct

payment based on the level of support for the Microsoft Middleware Product, this would be a case of preferential treatment within the meaning of Section III.G, so that the OEM could not give Microsoft preferential status more than fifty percent of the OEM shipments.

## IV. Issues Not Addressed by the Proposed Decree

70.    Many of the parties publicly commenting about asserted loopholes in the proposed decree also have been critical of claimed limitations to the remedy achieved by the settlement.[31]   In this section, I address the main suggestions for additional remedies discussed by these commentators.

*A.    Unbundling of Microsoft Middleware from the OS.*

71.    An issue raised in this case is that, if Microsoft proceeds to bundle application software with the OS, an available "stripped down" version of the OS without the application in question should also be released.[32]   Alternatively, when Microsoft releases a new operating system, it should continue to offer the previous version at the original price.

72.    This is a potentially important issue.   If the OEM has to pay a positive price for a rival middleware product and pays a marginal price of zero for the same functionality bundled in the operating system, then the competitive battle is stacked against the competitor (see Arrow Decl. at ¶ 27).   The critics also suggest that OEMs will

---

[31] *See generally* Stiglitz and Furman Decl.; Comment of Robert E. Litan, Roger D. Noll, and William D. Nordhaus on the Revised Proposed Final Judgment (hereinafter "Litan et al."); Arrow Decl.; and Bresnahan Article.

[32] *See*, *e.g.*, Arrow Decl. at ¶ 26.

not want to support more than one product with such functionality, even if icons were removed for the Microsoft Middleware version as permitted under the SRPFJ. With the underlying Microsoft Middleware code embedded in the system, the critics suggest that end users will still find this functionality being invoked and thus will have support concerns and needs, lessening the OEM interest in carrying the rival middleware. Further, the critics claim the availability of the commingled Microsoft Middleware code will further encourage ISVs to write applications to Microsoft products rather than to Non-Microsoft Middleware.[33] Thus, these commenting economists have urged the DOJ to require the unbundling of Microsoft Middleware from Windows Operating System Products.

73. However, on closer inspection, the requirement to have an unbundled operating system is highly regulatory and is likely to lead to more litigation. For example, to determine the appropriate discount for the unbundled operating system, the general approach would necessarily involve some estimate of the costs of the Microsoft Middleware Products that are to be removed from the bundled version. Such estimates, however, are likely to be arbitrary and complex to calculate. This is because software development efforts involve substantial shared costs between projects and benefit from common overhead expenditures. For example, suppose that a given server is used for ten development projects, both middleware and non-middleware; the cost of this server

---

[33] Arrow asserts that permitting OEMs to remove Microsoft Middleware icons but not the underlying code would further undermine OEM incentives to carry Non-Microsoft Middleware. (*See* Arrow Decl. at ¶ 37.) Litan et al. at 44 claim that permitted commingling of code will be fatal to the proposed decree by ensuring universal distribution of Microsoft Middleware code, which when compared to partial distribution of Non-Microsoft Middleware code will encourage continued enhancement of the applications barrier to entry.

would have to be allocated between projects. But such cost allocation rules are inherently arbitrary.[34] Should corporate overhead be allocated between development projects for the purpose of pricing the unbundled operating system? If so, on which of the many accounting bases should it be done? How should the cost of a computer used by one individual on three different projects be allocated between them? To answer questions such as these, regulatory agencies (e.g., the Federal Communications Commission ("FCC") and the Federal Energy Regulatory Commission ("FERC")) evolved highly complex case law over a period of decades. Speaking as a regulatory economist with nearly three decades of experience, I can assert with confidence that such pricing of the unbundled operating system would be a regulatory quagmire at least equal in complexity to those that have kept regulatory bodies such as the FCC busy for years.

74.    In its comments intended to support the notion of an unbundled operating system, SBC unintentionally discredits this proposal. In referring to the problem of pricing an unbundled version of Windows, SBC states:

> Several such mechanisms are possible. The Final Judgment provided that pricing be guided based on bytes of code. . . . SBC believes that it would be preferable to allocate costs between the operating system and the removed middleware based on measurement of "function point code." . . . Alternatively, SBC supports the use of a pricing mechanism based on the fully allocated product development costs for the operating system product and middleware products in questions. (See Comments of SBC at 143).

---

[34] *See*, *e.g.*, William J. Baumol, Michael F. Koehn, and Robert D. Willing (1987), "How Arbitrary is 'Arbitrary'? – or Toward the Deserved Demise of Full Cost Allocation," 120 PUBLIC UTILITIES FORTNIGHTLY 16-21.

In this revealing passage, SBC makes it clear that because of the numerous and subtle common costs incurred in software development, each interested party would have wide scope to select and litigate for the (arbitrary) pricing mechanism that favored it the most.

75.    In any case, it appears to be true that many applications on the desktop are not paid for by the OEM or (initially) by the end user. Indeed, all three of the current major Instant Messaging products are available without charge. I am aware of several instances in which third-party software applications are included by OEMs in their PC offerings, even though similar functionality is bundled by Microsoft in Windows XP. For example, Dell Computer offers photo imaging and CD "burning" software with Microsoft XP Home Edition-based PCs even though XP Home includes similar capabilities.[35] Dell includes Sierra Imaging's Image Expert 2000 software on some systems, pre-installing a premium version that is available to the end user for 60 days (an additional fee applies to retain premium features after this time limit).[36] Clearly,

---

[35] Dell systems shipped with CD-RW capability come with Roxio Easy CD Creator, a CD burner software product. A recent article in *Computer Shopper* addresses Windows XP's CD mastering capabilities. *See* COMPUTER SHOPPER, Feb. 2002, at 131. Another article – "Windows XP Tip: My Pictures Folder," TECHTV, Oct. 26, 2001 – reviews the photo managing capabilities Microsoft has bundled into XP. Microsoft also has a separate product, Microsoft Picture It 2002, that provides special effect and other enhanced photo management capabilities.

[36] Perhaps a more significant example is RealNetworks' RealOne media player product, comprising RealPlayer and RealJukebox, currently packaged by the OEM Sony in a Windows XP Home Edition Vaio Notebook system sold in the retail channel. In December 2001, it was also announced that Compaq will begin shipping these RealNetworks products as default media players in Presario desktop and notebook models designed for consumers. By mid-2002, Compaq will be offering the newest RealOne Player, with a RealOne icon on the desktop and memberships to the RealOne subscription services. *See* EDP'S WEEKLY IT MONITOR, Dec. 24, 2001. As discussed elsewhere, Windows XP bundles a similar media player product (Windows Media Player) in the operating system, and yet these OEMs provide the Non-Microsoft Middleware product as well.

Microsoft's bundling does not eliminate the OEM's incentive to use such alternative applications when they are offered under desirable arrangements. Generally in such cases, the business model of an ISV is to provide the software to the OEM for free with hope for future fees from Web services (or other services) provided to end users through the software or from potential upgrade revenue when end users desire premium versions of the product. For example, RealNetworks is pursuing such a strategy and by August or September 2001 was enjoying usage rates approximately twice that of Windows Media Player.[37] RealNetworks' momentum has continued despite the fact that a version of Windows Media Player has been bundled with every version of Windows since Windows 95. RealNetworks appears to have competed well with products produced by Microsoft and bundled in Windows.[38]

> B.    Protections Concerning Microsoft Office Practices

76.    Several commentators suggest it is necessary to require Microsoft to "port" Office to other operating systems, such as Apple MAC OS and Linux. For example, Stiglitz and Furman stated a concern that the proposed decree "does not address any issues relating to the pricing, distribution, or porting of Microsoft Office." (Stiglitz and Furman Decl. at 38.) Stiglitz and Furman and Litan et al. argue that the "porting" of Office is likely to reduce the applications barrier to entry (or at least reduce Microsoft's ability to raise them deliberately). (See Stiglitz and Furman Decl. at 42 and Litan et al. Comment at 71-72.) I agree that this remedy would be a more direct attack on the

---

[37] The *Wall Street Journal* reported (on Sep. 24, 2001) August 2001 usage figures: "28.8 million users accessed multimedia files on the Web in the RealNetworks format and 13 million did the same in Microsoft's format" (based on Internet measurement firm Netratings Inc. figures).

[38] *Ibid.*

applications barrier to entry.  However, Office has never been a significant part of the case brought against Microsoft.  Where Office has been an issue, it relates to Microsoft's efforts to control middleware, such as the "club" used against Apple to harm Netscape, found to be anticompetitive by the District Court and upheld by the Court of Appeals. (See Opinion at 72-74.)  The SRPFJ remedies directed at ensuring that rival middleware opportunities exist and can be freely pursued should be sufficient in this regard.[39]

  C. *Network Server, Handheld Computer and Web Services Issues*

  77. Some commentators would prefer the antitrust remedy to extend beyond middleware and the PC environment to cover such emerging product areas as servers, handheld devices, and Web services to insure Microsoft does not extend its monopoly to dominate additional markets and erect new barriers to entry.  (See Stiglitz and Furman Decl. at 38-39; Comments of SBC Communications Inc. ("SBC") at 42-43; and Arrow Decl. at ¶¶ 55, 68-70.)  Arrow, for instance, suggests that end users will access the Internet with server and handheld devices, and he concludes that the remedy should protect competing server operating systems and web services.  Given Microsoft's anticompetitive practices, he concludes it is reasonable to require parity in access to APIs, protocols, and documentation for interoperability across product areas.  (See Arrow Decl at ¶¶ 55, 68-70).  These remedies go well beyond the scope of the case brought against Microsoft (as well as the findings upheld by the appellate court) and also well beyond the desktop, where Microsoft has its proven monopoly.  Hence, regulatory intervention is not called for in these areas, as is further addressed in the following

---

[39] In light of the findings in this case overall and of the Court of Appeal's condemnation of Microsoft's conduct toward Apple regarding Office in particular, it is hard to imagine Microsoft attempting the use of the "club" again, let alone a party that would permit it without threats of litigation and complaints to regulators.

assessment of certain specific issues raised relating to corresponding Litigating States proposals in these product areas.

### 1. Servers

78.     Litan et al. point to the increasing importance of client-server networks and server-based computing and conclude that a new platform entrant must not only overcome the application advantages that Microsoft illegally obtained in the desk top OS, but must also provide compatibility with "servers which are increasingly relying on Microsoft's server operating systems" (see Litan et al. at 30.)  This suggestion is at variance with the focus of the present antitrust case, which involves Microsoft's desktop monopoly, not the server market.  In addition, there is no clear monopoly issue in the server market.  Microsoft's share of server operating systems has grown from approximately 27 percent in 1996 to 41 percent in 2000.  This gain has apparently come at the expense of other PC compatible network software providers (such as Novell), but not at the expense of competitors likely to be the more relevant factors in the future.[40] For example, according to a 1999 estimate issued by the International Data Corporation ("IDC"), Linux's server share more than doubled in 1998 to reach 17.2 percent.[41]  More recently, IDC has reported that Linux's worldwide market share in 2000 of new and upgraded operating systems for servers had climbed to 27 percent, ranking it second

---

[40] *See* Stephen Shankland, *Linux Growth Underscores Threat to Microsoft*, CNET NEWS.COM (Feb. 28, 2001); INFORMATIONWEEK, p. 86 (Apr. 21, 1997) (citing 1996 shares as reported by International Data Corp.).

[41] Steven Brody, *IDC Says Linux Likely to Lead OS Growth*, SUNWORLD (Mar. 31, 1999), *reproduced at* http://www.linuxworld.com/linuxworld/lw-1999-03/lw-03-idc.html.

behind Microsoft's share of 41 percent.[42]   Litan et al. acknowledge that "the Linux OS has made significant inroads into the server market,"[43] while IDC confirms that, excepting Microsoft and Linux, "market share declined for other server systems, including Unix" over the past year.[44]   For these reasons, I do not believe the server market by itself raises any monopoly power issues.

### 2.    Handheld Computers and Web Services

79.    Similarly, some commentators are concerned that Microsoft practices will lead to dominance in operating systems for handheld devices, removing a partial threat to at least some Windows-based personal computers.  This leads them to assert that the proposed decree improperly ignores this segment of the computer industry.  Again, this remedy seeks a penalty outside the scope of the case.  No findings were found or upheld relating to Microsoft conduct directed at handheld devices or handheld competitors.  Further, the Microsoft Windows CE operating system has not been gaining systematically on competing systems over the last several years, and there is little reason to divert the focus of the SRPFJ to this area.[45]

---

[42] *See* Elise Ackerman, *Despite a Tough Road, Linux Has Never Been More Popular*, SAN JOSE MERCURY NEWS (Nov. 25, 2001); Peter Galli, *Battle Brews Over Linux Server Share*, EWEEK (June 10, 2001), *reproduced at* http://zdnet.com.com/2102-11-503810.html (citing also Gartner Dataquest estimates of Linux as having a share of server shipments of 6 to 8.6 percent share in third quarter 2000).

[43] Litan et al. at 25.

[44] COMPUTERWORLD (Feb. 26, 2001).  *See also* Stephen Shankland, *Linux Sales Surge Past Competitors*, CNET NEWS.COM (Feb. 9, 2000),

[45] According to Gartner figures, worldwide market share for Windows CE has been between 20 percent and 25 percent over the last four years, with no significant trend.  *See Final 1998 Handheld Computer Market Results*, GARTNER DATAQUEST (May 17, 1999); *Gartner Dataquest's Worldwide PDA Forecast*, GARTNER DATAQUEST (Dec. 11, 2000); and *Handheld Computer Shipments Rebound in 4Q01*, GARTNER DATAQUEST ALERT

D.    *Restoring Java as a Competitive Threat*

80.    Some commentators have suggested that the proposed decree should require mandatory distribution of a Sun-compatible Java runtime environment with each copy of Windows (and IE) shipped by Microsoft.  Critics of the proposed decree have suggested this provision is appropriate to attempt to compensate for Sun's lost position and lost momentum as Microsoft deceived developers and discouraged distribution and use of Sun-compliant Java.  (See, e.g., Litan et al. at 25 and 71.)  Stiglitz and Furman believe this would decrease the applications barrier to entry.  (See Stiglitz and Furman Decl. at 42.)  There is no question that the cross platform potential of Java was real, but there exists significant uncertainty as to the timing and impact that Java would have had absent Microsoft's unlawful conduct, as discussed in the *Findings of Fact*.  Furthermore, if there is consumer demand for PCs that come with JVMs installed, the OEMs are free to meet that demand and are protected from retaliation by Microsoft under the SRPFJ if they do so.  Therefore, in my opinion, this "must carry" provision is disproportionate and will improperly preordain market outcomes.  Furthermore, other platforms or products, aided by the SRPFJ, will have an opportunity to serve as a carrier for Java distribution or otherwise provide alternative middleware platforms for future application developers.

E.    *Publishing IE Source Code*

81.    Similarly, critics have suggested that the proposed decree should force the open-source licensing of IE in order to reduce the applications barrier to entry and deny Microsoft one of the fruits (i.e., the dominant position of IE) of its anticompetitive

---

(Feb. 15, 2002.) While Microsoft is expected to improve this position subsequent to the introduction of Pocket PC 2002 in October 2001, Gartner continues to project Windows CE share at no more than 30 percent for 2002.  See *Microsoft Aims to Dominate With Pocket PC 2002*, GARTNER DATAQUEST (Sep. 10, 2001).

conduct. (See Stiglitz and Furman at 41-42, and Litan et al. at 71.) Litan et al. claim that third parties will then "transform IE into a true independent middleware platform," ensuring that alternative middleware will be ubiquitous even if the SRPFJ anti-retaliatory and disclosure provisions are not enough to foster such an alternative.

82.    This claim may well be true, but open-source licensing of IE will inflict economic harm on Microsoft by expropriating its intellectual property. This appears to be either an effort to collect damages from Microsoft or an exercise in competition policy well outside the confines of an antitrust case. If it is an attempt to collect damages from Microsoft, then it should be linked to an estimate of the damages caused by Microsoft's acts. I am not aware that such an estimate exists. Moreover, Microsoft is clearly subject to other punishment outside this case, as Netscape has recently filed suit seeking treble damages for losses associated with Microsoft's anticompetitive conduct aimed at eliminating Netscape's browser as a competitive threat.

F.    *Continued Licensing of the Predecessor Version of an Operating System*

83.    One proposal made by Litan et al. is that, whenever Microsoft makes a major release of a Windows Operating System Product, it must continue to license the predecessor version of the new product at its original price. Possibly, the objective is to limit Microsoft's ability to have customers upgrade to the new operating system by increasing the price of the predecessor version. Of course, there is nothing inherently anticompetitive about inducing customers to upgrade to a new major release of an operating system. However, based on my understanding of submission of Litan et al., this proposal is designed to correct a perceived loophole in the proposed decree. Litan et al. state:

> In the absence of this provision, Microsoft could frequently offer new, slightly modified versions of the OS that render the middleware based on the predecessor APIs unworkable with the new version. Middleware developers would be discouraged if they knew that Microsoft could raise their costs simply by slightly revising the operating system code in such a way that requires the middleware to be significantly modified. (Litan et al. at 72.)

84.　　It is not possible to assert that the SRPFJ prevents this from occurring, but it seems unlikely that Microsoft would find such a strategy profitable. First, it would appear to be difficult for Microsoft to limit the damage thus created to threatening middleware products. By changing APIs in the manner suggested by Litan et al., Microsoft would be requiring both ISVs and its own developers to rewrite their code substantially. Moreover, such a strategy would be counterproductive for Microsoft because it would serve to reduce the applications barrier to entry, since the new version of the OS would run fewer applications than its predecessor. This necessarily implies that Microsoft and its ISVs would have to rewrite, at least in part, the thousands of applications available prior to release and would have to coordinate the development schedule of these rewrites with each new release of the operating system. Microsoft's own spotty record in meeting and coordinating the release schedules for even one or two major products makes this outcome an unlikely event.

85.　　It may be that Microsoft would attempt a less extreme version of the Litan et al. scenario, in which only some of the APIs are changed between versions of Windows. However, there would still exist the problem of limiting the damage to only the middleware that Microsoft regards as threatening. Even moderate changes in APIs would likely lead to large failures of backward compatibility in Windows applications. Thus, to make this strategy work, Microsoft would need to reduce the number of

52

published APIs by a significant amount each year. This action would certainly "discourage" software developers, as Litan et al. suggest, but at the same time it would also discourage ISVs from writing programs for the Windows desktop.

## IV.  Conclusions

86.    The antitrust remedy in this case must focus attention on and fully resolve the appellate court finding that Microsoft engaged in specific anticompetitive acts to maintain its operating system monopoly.  In developing this remedy, it is necessary to balance two broad factors.  First, the remedy must place constraints on Microsoft's current and future behavior so that the unlawful acts stop and do not recur, and competitive conditions are restored. However, these constraints should not be so intrusive and complex that they themselves distort market outcomes.  This potential distortion can take many forms, but two of the most important are (1) over-extensive government regulation of Microsoft that may result in inefficient rent-seeking by Microsoft's competitors, or (2) requirements that make Microsoft a less efficient competitor.  Thus, the difficult task is to create a balanced remedy that constrains anticompetitive behavior by Microsoft without limiting competition on the merits.

87.    In my opinion, the SRPFJ achieves the right balance.  By focusing on Microsoft's anticompetitive business practices, its provisions eliminate the artificial barriers to entry erected by Microsoft that are the source of competitive concern.  The provisions in the proposed decree are likely to deter conduct that (1) seeks exclusivity or (2) is backed by retaliatory threats.  The SRPFJ also aims to restore and enhance competitive conditions by removing technical barriers to fair competition between

Microsoft and rival middleware suppliers. From an economic standpoint, middleware is important because it can expose APIs and has the potential to become an applications platform distinct from the Windows OS. The SRPFJ does not attempt to preordain market outcomes or to weaken Microsoft as a legitimate competitor.

88.     I have considered other proposals carefully, including that of the Litigating States. However, in my view, these proposals fail to achieve the right balance. In an attempt to erase all theoretical ways in which Microsoft could harm competition, these alternative proposals tend to require a complex regulatory program that is certain to be slow-moving, litigious, and vulnerable to manipulation by Microsoft's competitors. For example, the provision for how to price the proposed unbundled operating system invites arguments over cost allocations, and other ratemaking issues, that have the potential to slow down the competitive process.

89.     Finally, in analyzing the SRPFJ, I have had the benefit of reviewing a number of thoughtful and probing comments on the proposed decree. As the discussion in Section III demonstrates, most of the potential problems raised by the various commentators are, in fact, not problems at all, but are met by the SRPFJ. However, at first glance there does appear to exist potential ways in which Microsoft could engage in behavior that reduces competition while claiming nonetheless that it satisfied the provisions of the SRPFJ. For example, some commentators have alleged Microsoft could (1) sell middleware only as bundled with the operating system, (2) set prices for access to its client-server communications protocols so high that they exclude competition, and (3) change large numbers of APIs frequently through numerous releases of new operating systems. Although these strategies may be theoretical possibilities, my analysis shows

either that these acts would be unimportant or that Microsoft would lack the incentive to undertake such actions.

90.    In sum, in my opinion, the SRPFJ focuses attention on and fully resolves the appellate court finding that Microsoft engaged in a series of anticompetitive acts to maintain its OS monopoly. The SRPFJ contains provisions that will stop the offending conduct, prevent its recurrence, and restore competitive conditions.  In my opinion, in light of the above, the SRPFJ is in the public interest.

* * *

I declare under penalty of perjury that the foregoing is true and accurate.  Executed on

February 27, 2002 in Austin, Texas.


_____

David S. Sibley

Appendix A

Curriculum Vitae of Professor David S. Sibley

DAVID S. SIBLEY

Department of Economics
University of Texas at Austin
Austin, TX 78712
Phone: (512) 475-8545
Fax: (512) 471-8899

## Education:

1973    Ph.D. in Economics, Yale University
1969    B. A. in Economics, Stanford University

## Teaching Fields:

Industrial Organization, Economics of Information

## Research Fields:

Economics of asymmetric information, telecommunications policy, public utility pricing, models of firm's internal organization.

## Professional Experience:

March, 1992 - Present:  John Michael Stuart Centennial Professor of Economics, University of Texas at Austin.

August, 1991- March, 1992:  Edward Everett Hale Centennial Professor of Economics, University of Texas at Austin.

September, 1983 - August, 1991:  Research Manager, Bell Communications Research, Morristown, NJ.  Head of Economics Research Group.

September 1981- September 1983:  Member of Technical Staff, Bell Laboratories, Murray Hill, NJ.

September 1980 - September 1981:  Adviser to the Chairman of the Civil Aeronautics Board.

January 1980 - September 1980:  Consultant, Civil Aeronautics Board, Washington, D.C.

September 1978 - January 1980:  Senior Staff Economist, Council of Economic Advisers, Executive Office of the President, Washington, D.C.

October 1973 - September 1978:  Member of Technical Staff, Bell Laboratories, Holmdel, NJ.

**Teaching:**

September 1991 - Present:  Introductory Microeconomics, undergraduate and graduate Industrial Organization.

Fall 1989:  Visiting Lecturer, Woodrow Wilson School of Public and International Affairs, Princeton University.  Graduate course in regulation and public choice.

September 1983 - December 1983:  Adjunct Lecturer in Economics, University of Pennsylvania. Graduate course on regulation.

**Publications:**

**A.  Journal Articles:**

"Pricing Access to a Monopoly Input," (with M. J. Doane, M. A. Williams, and S. Tsai), *Journal of Public Economic Theory*, 2001 (forthcoming).

"Exclusionary Restrictions in U.S. vs. Microsoft," (with M.J. Doane and A. Nayyar), *UWLA Law Review*, 2001.

"Raising Rivals' Costs: The Entry of a Upstream Monopolist into Downstream Markets," (with D. L. Weisman), *Information, Economics and Policy* 10:451-470.

"Having Your Cake – How to Preserve Universal-Service Cross Subsidies While Facilitating Competitive Entry," (with M. J. Doane and M. A. Williams), *Yale Journal on Regulation*, Summer 1999.

"The Competitive Incentives of Vertically-Integrated Local Exchange Carriers: An Economic and Policy Analysis," (with D. L. Weisman), *Journal of Policy Analysis and Management*, Winter 1998.

"Multiproduct Nonlinear Prices with Multiple Taste Characteristics," (with P. Srinagesh), *Rand Journal of Economics*, Winter 1997.

"Optional Two-Part Tariffs:  Toward More Effective Price Discounting," (with R. Rudkin) in *Public Utilities Fortnightly*, July 1, 1997.

"A Bertrand Model of Pricing and Entry," (with W. W. Sharkey), *Economics Letters*, 1993.

"Regulatory Incentive Policies and Abuse," (with D. M. Sappington), *Journal of Regulatory Economics*, June 1993.

"Optimal Non-linear Pricing With Regulatory Preference over Customer Types," (with W. W. Sharkery), *Journal of Public Economics*, February 1993.

"Ex Ante vs. Post Pricing:  Optional Calling Plans vs. Tapered Tariffs," (with K. Clay and P. Srinagesh), *Journal of Regulatory Economics*, 1992.

"Thoughts on Nonlinear Pricing Under Price Cap Regulation," (with D. M. Sappington), *Rand Journal of Economics*, Spring 1992.

"Compensation and Transfer Pricing in a Principal-Agent Model," (with D. E. Besanko), *International Economic Review*, February 1991.

"Regulating Without Cost Information:  Some Further Thoughts," (with D. M. Sappington),  *International Economic Review*, November 1990.

"Asymmetric Information, Incentives and Price Cap Regulation," *Rand Journal of Economics*, Fall 1989.

"Optimal Two Part Tariffs for Inputs," (with J. C. Panzar), *Journal of Public Economics*, November 1989.

"Regulating Without Cost Information:  The Incremental Surplus Subsidy Scheme," (with D. M.  Sappington), *International Economic Review*, May 1989.

"Optimal Consumption, the Interest Rate and Wage Uncertainty," (with D. Levhari), *Economics Letters*, 1986.

"Reply to Lipman and Further Results," *International Economic Review*, June 1985.

"Public Utility Pricing Under Risk:  A Generalization," *Economics Letters*, June 1985.

"Optimal Non-Uniform Pricing," (with M. B. Goldman and H. E. Leland), *Review of Economic Studies*, April 1984.

"Efficiency and Competition in the Airline Industry," (with D. R. Graham and D. P. Kaplan), *Bell Journal of Economics*, Spring 1983.

"Optimal Nonlinear Pricing for Multiproduct Monopolies," (with L. J. Mirman), *Bell Journal of Economics*, Autumn 1980.

"A Dynamic Model of the Firm with Stochastic Regulatory Review," (with V. S. Bawa), *International Economic Review*, October 1980.

"Public Utility Pricing Under Risk:  The Case of Self-Rationing," (with J. C. Panzar), *American Economic Review*, December 1978.

"Regulatory Commission Behavior:  Myopic vs. Forward-Looking," (with E. E. Bailey), *Economic Inquiry*, June 1978.

"Optimal Decisions with Estimation Risk," (with L. C. Rafsky, R. W. Klein and R. D. Willig), *Econometrica*, November 1977.

"The Demand for Labor in a Dynamic Model of the Firm," *Journal of Economic Theory*, October 1977.

"Optimal Foreign Borrowing with Export Revenue Uncertainty," (with J. L. McCabe), *International Economic Review*, October 1976.

"Permanent and Transitory Income Effects in a Model of Optimal Consumption with Wage Income Uncertainty," *Journal of Economic Theory*, August 1975.

"A Note on the Concavity of the Mean-Variance Problem," *Review of Economic Studies*, July 1975.

**B.  Reports and Articles in Conference Volumes, and Other Publications**

"U.S. v. Microsoft: Were the Exclusionary Practices Anticompetitive" (with Michael J. Doane), Computer Industry Newsletter, American Bar Association, Spring 2000, Vol. 5., No. 1.

"Optional Tariffs for Access in the FCC's Price Cap Proposal," (with D. P. Heyman and W. E. Taylor), in M. Einhorn (ed.), *Price Caps and Incentive Regulation in the Telecommunications Industry*, Kluwer, 1990.

*Report to the Governor*, The Task Force on Market-Based Pricing of Electricity.  Co-authored with D. M. Sappington, Appendix III.

"An Analysis of Tapered Access Charges for End Users," (with W. E. Taylor, D. P. Heyman and J. M. Lazorchak), published in *the Proceedings of the Eighteenth Annual Williamsburg Conference on Regulation*, H. Treeing (ed.), Michigan State, 1987.

"Deregulation and the Economic Theory of Regulation," (with W. W. Sharkey), in *Proceedings of the Eleventh Annual Telecommunications Policy Research Conference*, 1983.

"Antitrust Policy in the Airline Industry," (with S. B. Jollie), Civil Aeronautics Board, October 1982. Transmitted by the CAB to Congress as part of proposed sunset legislation.

"Optimal Non-Uniform Pricing for Electricity:  Some Illustrative Examples," (with R. W. Koenker), in Sichel (ed.) *Public Utility Ratemaking in an Energy-Conscious Environment*, Praeger, 1979.

"The Dynamics of Price Adjustment in Regulated Industries," (with E. E. Bailey), in *Proceedings of IEEE Conference on Systems Control*, 1974.

**C.  Books:**

Co-editor of *Telecommunications Demand Analysis*:  *An Integrated View*, North-Holland, 1989.

*The Theory of Public Utility Pricing*, (with S. J. Brown), Cambridge University Press, 1986.  Second printing 1986.  Third printing 1989.  Revised edition planned.

**Current Research Areas:**

Telecommunications policy, especially access pricing and optional tariff design;  Design of incentive mechanisms; Organizational slack/informational asymmetries.

**Other Professional Activities:**

Associate Editor of the *Journal of Regulatory Economics*.

Consultant to the Governor of New Jersey's Task Force on Market-Based Pricing of Electricity.

Referee for National Science Foundation and numerous professional journals.

Consulting for Bell operating companies on a variety of pricing and public policy issues.

Memberships:  American Economic Association; listed in *Who's Who in the East* 1990.