# EXHIBIT P

**Microsoft's Motion In Limine to Exclude
Evidence Regarding Deliberate
Incompatibilities Between Windows and DR DOS**

**2/19/2003 Deposition - Warren-Boulton, Frederick (day 1 of 2)) MDL**

```
 1           IN THE UNITED STATES DISTRICT COURT
 2              FOR THE STATE OF MARYLAND
 3      - - - - - - - - - - - - - - - - - x
 4      IN RE MICROSOFT CORPORATION        :
 5      ANTITRUST LITIGATION               : MDL Docket No.
 6      THIS DOCUMENT RELATES TO:          :      1332
 7      All Purchaser Actions              :
 8      - - - - - - - - - - - - - - - - - x
 9
10
11          Deposition of FREDERICK WARREN-BOULTON
12                    Washington, D.C.
13                Wednesday, February 19, 2003
14                       11:00 a.m.
15
16
17
18
19
20
21      Job No.:  11-12615
22      Pages 1 through 198
23      Reported by:  Cynthia R. Simmons
24
25
```

1

**2/19/2003 Deposition - Warren-Boulton, Frederick (day 1 of 2)) MDL**

```
 1        A.  I should, but I didn't.  I know it's just
 2   dragged over and people keep telling me I should
 3   organize my life.
 4        Q.  You mentioned your conversations with
 5   Mr. Alepin were generally directed to educational,
 6   your education on technical matters, is that
 7   correct?
 8        A.  Yes.
 9        Q.  Any other topics?
10        A.  He would sometimes ask me questions about
11   economics.
12        Q.  And what was the nature of your
13   conversations with Dr. Leitzinger?
14        A.  The only things I can remember raising
15   with Dr. Leitzinger was, one, data issues.  He had
16   and his group had extensive experience, as I
17   recall, in the Caldera case.  And as a result, he
18   and his group had developed some data sources
19   which we were interested in looking at.  I'm not
20   sure whether we eventually did or didn't.
21        Q.  What were these data sources?
22        A.  I think this was on, I think he developed
23   a price series.  And I also was interested in what
24   he had done on, his earlier work on the Caldera
25   case, his rebuttal report in the Caldera case,
```

**2/19/2003 Deposition - Warren-Boulton, Frederick (day 1 of 2)) MDL**

1   actions against DR DOS, for example, in terms of
2   conclusory opinions, are the same as they were.
3         But for example, I would not have, I would
4   not have understood at the time, you know, just as
5   one example, the role of DOS extenders at the time
6   that I was working for Novell. I'm not sure that
7   any of us understood what was going on.
8         But they've been, essentially, reinforced.
9     Q.  How did you decide which allegations you
10  were going to investigate in connection with your
11  work on this case?
12        MR. THOMPSON: Do you have something
13  specific in mind with respect to allegations?
14  BY MS. NELLES:
15    Q.  Sure, the allegations set forth -- I
16  assume you've read the complaint in this case?
17    A.  Yes, although that was a long time ago.
18  So you know, if we're going to look at specific
19  allegations in the complaint, I'd have to look at
20  the complaint. If the specific allegations or
21  material is covered in the liability report, I can
22  talk about how --
23    Q.  There's several allegations contained in
24  the liability report. How did you decide which of
25  those allegations, or how did you decide to come ,

**2/19/2003 Deposition - Warren-Boulton, Frederick (day 1 of 2)) MDL**

```
 1   how did you come to decide to investigate those
 2   particular allegations?
 3        A.   Well, a fair number of them, as I've said
 4   before, are taken from prior work.  Perhaps the
 5   simplest example, the clearest example of that is
 6   pricing practices that were used to exclude rival
 7   operating systems from the OEM channel for
 8   processor licenses.  And there, as you may or may
 9   not know, most of the results from our work with
10   Novell were published as a fairly lengthy article.
11             So that was fairly easy.  In terms of
12   additional, going beyond that, many of these would
13   come from discussions with Ron Alepin, as to the
14   things that he regarded as problematic that he
15   would try to, trying to understand the technical
16   aspects of it.  And then on that basis, I would
17   decide whether or not it was something which I
18   wanted to include or not.
19             The report, in that sense, is not intended
20   to be not, the term is -- it's not exclusive, it's
21   not intended to cover everything.  And to some
22   extent, I've handled that by saying that there are
23   a number of other areas or allegations or opinions
24   that Ron Alepin covers in his report that I don't
25   necessarily cover here.
```

**2/19/2003 Deposition - Warren-Boulton, Frederick (day 1 of 2)) MDL**

1      You know, if I was writing it again today
2  and, you know, wanted to add another 15 or 20
3  pages, I would probably cover a number of other
4  areas. So I'm -- what's in the report is, I'm
5  not, what I don't want to give the impression is
6  that what's in the report is the, is the
7  boundaries of what I would plan to discuss at
8  trial.
9      MR. THOMPSON: Could you just read back
10 the last sentence in that answer?
11     (The reporter read the record as
12 requested.)
13 BY MS. NELLES:
14     Q. What is not in your report that you might
15 discuss at trial?
16     A. Well, two categories, again, sort of come
17 to mind. One is that there are a number of
18 actions by Microsoft that are discussed in Ron
19 Alepin's two reports which I would support. And
20 then, of course, the second is any further work
21 that we're able to do on disentangling competitive
22 effects.
23     Q. The actions that are set forth in
24 Mr. Alepin's report that you would support, but
25 which are not included in your report, have you

45

**2/19/2003 Deposition - Warren-Boulton, Frederick (day 1 of 2)) MDL**

```
1    performed an independent investigation of those
2    actions?
3         A.   I've spent a fair amount of time,
4    primarily with Mr. Alepin, understanding them.
5    Thinking about them.
6         Q.   Have you looked at any record evidence
7    concerning them?
8         A.   Probably some.  I mean, I would read Ron's
9    report, what's in Ron's report on a particular
10   area.  He, of course, gathers evidence on
11   particular areas.  I'll read his footnote
12   references and things like that.  Then call him up
13   and talk about it.  And he will often just, he may
14   send me more material.
15        Q.   Material that's not referenced in his
16   report?
17        A.   I don't know.  I mean, I would simply say,
18   you know, what we have, what do you have that
19   supports this.  And he would sort of send me
20   something, whether it be an excerpt from a
21   deposition or, you know, a document.  We'd talk
22   about it.
23             Often it's, with Ron it's necessary to do
24   that because a lot of what's written is very
25   difficult for a nontechnical person to understand.
```

46

**2/19/2003 Deposition - Warren-Boulton, Frederick (day 1 of 2)) MDL**

1   So it virtually needs a translator.
2       Q.  I feel the same way about economists.
3       A.  We're a piece of cake.  At least we don't
4   have alphabet soup.
5       Q.  So is it fair to say that you're relying
6   on Mr. Alepin to investigate the actions in his
7   report and collect the supporting evidence?
8       A.  Certainly not just on Mr. Alepin.  But
9   he's a, he is an important source of information.
10  Partly a source for information, but as I say,
11  even more important, as a way to understand that
12  information.
13      Q.  So what are you relying on, in addition to
14  Mr. Alepin and the documents he has collected, to
15  support the actions that are referenced in his
16  report, but not your report?
17      A.  Oh, I've actually tried to list somewhere
18  what are the areas that I left up to, that I did
19  not discuss in here.  I can probably tell you what
20  they are.
21          But basically, I would say that I'm
22  essentially relying on Ron at this point, Alepin,
23  his material.  And if he has come up with a
24  particular act or series of acts that he thinks is
25  problematic, you know, then he has some sort of

**2/19/2003 Deposition - Warren-Boulton, Frederick (day 1 of 2)) MDL**

1  supporting evidence for it.
2      So he would be the primary source of that.
3  But once an issue comes up, whether it's DOS
4  extenders or something else, then obviously, I'm
5  interested in anything that, for example, has
6  appeared in depositions or anything like that on
7  the subject.
8      Q.  Before you testify at trial with respect
9  to any of the actions that are contained in
10 Mr. Alepin's report, but not your report, do you
11 intend to undertake an independent investigation
12 of those actions?
13     A.  I intend to investigate those actions in
14 the same way I investigate every action, which is
15 to look for any information from any source on
16 that, whether it be Mr. Alepin, or any of the
17 other economists who have been screening material
18 for me.
19     Q.  Correct me if I'm wrong, but I believe you
20 said you're also undertaking some additional work
21 on disentangling competitive effects, which you
22 may testify about at trial?
23     A.  Yes.
24     Q.  Can you tell me the nature of the work
25 you're doing there?

48

FREDERICK WARREN-BOULTON                February 20, 2003

```
 1   IN THE UNITED STATES DISTRICT COURT
 2      FOR THE STATE OF MARYLAND
 3   -----------------x
 4   IN RE MICROSOFT CORPORATION    :
 5   ANTITRUST LITIGATION      : MDL Docket No.
 6   THIS DOCUMENT RELATES TO:  :   1332
 7   All Purchaser Actions       :
 8   -----------------X
 9
10       Deposition of FREDERICK WARREN-BOULTON
11                    Day 2
12              Washington, D. C.
13           Thursday, February 20, 2003
14                  10:00 a.m.
15
16   Job No.: 11-12616
17   Pages 199 through 436
18   Reported by: Cynthia R. Simmons
```
Page 199

```
 1           APPEARANCES
 2   ON BEHALF OF PLAINTIFFS:
 3       DOUGLAS G. THOMPSON, JR, ESQUIRE
 4       FINKELSTEIN, THOMPSON & LOUGHRAN
 5       1050 30th Street, Northwest
 6       Washington, D. C. 20007
 7       (202) 337-8000
 8
 9   ON BEHALF OF DEFENDANT:
10       SHARON L. NELLES, ESQUIRE
11       SULLIVAN & CROMWELL LLP
12       125 Broad Street
13       New York, New York 10004-2498
14       (212) 558-4976
15
16   ALSO PRESENT: ALAN G. WHITE
```
Page 201

```
 1       Continued deposition of FREDERICK
 2   WARREN-BOULTON held at the offices of:
 3
 4       SULLIVAN & CROMWELL
 5       1701 Pennsylvania Avenue, Northwest
 6       Seventh Floor
 7       Washington, D. C. 20036
 8
 9       Pursuant to agreement, before Cynthia R.
10   Simmons, Registered Merit Reporter, Certified
11   Realtime Reporter and Notary Public in and for
12   the District of Columbia.
```
Page 200

```
 1              CONTENTS
 2   EXAMINATION OF FREDERICK WARREN-BOULTON   PAGE
 3   By Ms. Nelles              203
 4
 5
 6
 7           EXHIBITS
 8            (None)
```
Page 202

1 (Pages 199 to 202)

Combs & Greenley, Inc., A LegaLink Company (415) 359-2040

FREDERICK WARREN-BOULTON          February 20, 2003

Page 211

1  evidence shows very strongly that their reasons
2  for doing that, and the effects of their not
3  supporting VCPI, were in fact anti-competitive.
4      And I think that Microsoft did it for the
5  wrong reasons. But nevertheless, bringing in DPMI
6  itself, I think, is something which is -- I would
7  certainly not argue with. It's more the timing of
8  how they did it.
9      Q. But you agree that bringing in DPMI has a
10 procompetitive justification?
11     A. It's an improvement, yes, yes. The
12 question is, how they did it and what they did
13 with it. For example, refusing to support DPMI in
14 the client clearly hurt OS/2. I see no
15 justification for that. They, in fact, had it in
16 there, they yanked it out. It's not as if it
17 actually cost them something to put it in. They
18 made it available to other people. It's clearly
19 a -- it's clearly an attempt to just harm a
20 competitor with no social benefit at all.
21     Vaporware issues with MS-DOS --
22     Q. If I can hold you for just a moment, I'm
23 sorry. And again, in terms of these technical
24 compatibilities issues, is the evidence you're
25 relying on for reaching your conclusions that

Page 212

1  which is -- only that which is listed in your
2  report?
3      A. My report, Ron Alepin's report,
4  conversations with Ron Alepin. What's the legal
5  term, can I adopt Ron Alepin's report?
6      Q. You can sure try.
7      A. Okay.
8      Q. Which really was my question, which is,
9  with respect to the technical compatibility or
10 incompatibility portions of your report, how much
11 of that is relying on Mr. Alepin and, as opposed
12 to how much of it is a result of your own
13 investigation and review of the record?
14     A. Well, I only met Mr. Alepin -- as I say,
15 I've been doing this for 10 years, so I only met
16 Mr. Alepin late in the game. So, almost by
17 definition, most of what I know up until the
18 browser case, of course, came from other sources.
19 Ron was the industry expert in the browser case,
20 and he was absolutely invaluable.
21     So some of -- to give you an example, I
22 would say that my understanding, even in the
23 earlier period behavior on DOS extenders comes
24 from Ron Alepin. We simply didn't understand what
25 was going on with Ron Alepin -- or with DOS

Page 213

1  extenders back when I was working for, you know,
2  on the FTC case.
3      So he's certainly added to a large number
4  of elements of what's going on. I mean, it's the
5  usual process. I'm an economist and I do the
6  economics and he's a technical expert. But that
7  doesn't mean that, you know, Ron says something
8  and I think it's carved in stone. At the very
9  least, I have to understand it and then I have to
10 put it into my own economics framework. And then
11 I have to agree with it.
12     Q. I'm sorry, I cut you off. You were
13 heading towards vaporware, I believe?
14     A. Oh, vaporware. Vaporware is another area
15 which is, I don't want to say gray, but has
16 elements. There's a great deal of pre
17 announcement that goes on. There are reasons for
18 pre announcement. Some pre announcement is just
19 simply a mistake. People may preannounce
20 something because they're hopeful or optimistic.
21 So I don't think you're going to say that all pre
22 announcements of new products are
23 anti-competitive.
24     So you have to look at the particular
25 circumstance around Microsoft's statements with

Page 214

1  respect to 5.0. It eventually became available,
2  as I recall, in about July of 1991. That's a long
3  delay. I think that the facts are that that
4  harmed DR DOS significantly. The gray area, if
5  you like, is whether that harm was, was the only
6  reason why Microsoft did it, which certainly I
7  think is compatible with, consistent with
8  Microsoft's behavior. Or whether, in fact,
9  Microsoft was simply wildly optimistic.
10     That's an evidentiary question. But I
11 would say that if the intent was really clear
12 there, that that was an anti-competitive act.
13     Q. Have you seen any evidence that would
14 support the fact that Microsoft was simply wildly
15 optimistic?
16     A. None. It is a company with a great deal
17 of confidence in itself, but it has a history of
18 repeated acts that are similar to this. You know,
19 it's like, I guess, in The Importance of Being
20 Earnest, when a young lady says I'm an orphan,
21 I've lost both my parents, and she says, as you
22 probably recall, losing one, I can understand, but
23 losing two sounds like carelessness. Microsoft
24 has a tendency to preannounce. Particularly when
25 faced with a competing product. I haven't done

4 (Pages 211 to 214)

Combs & Greenley, Inc., A LegaLink Company (415) 359-2040